Bryan L. Clobes
Christopher P. Dolotosky*
**CAFFERTY CLOBES**
**MERIWETHER & SPRENGEL, LLP**
135 S. LaSalle Street, Suite 3210
Chicago, IL 60603
bclobes@caffertyclobes.com
cdolotosky@caffertyclobes.com
T: 312.782.4880
Attorneys for Plaintiffs

* *Pro Hac Vice Forthcoming*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| **In re: ALLSTATE & ARITY CONSUMER PRIVACY LITIGATION** | Case No. ________ |

**DECLARATION OF CHRISTOPHER P. DOLOTOSKY**

I, Christopher P. Dolotsky, declare as follows:

1. I am an attorney licensed in New Jersey and Pennsylvania and Of Counsel at the law firm of Cafferty Clobes Meriwether & Sprengel LLP. My firm represents approximately 34 plaintiffs (the "Plaintiffs") in a class action lawsuit captioned as *In re: Allstate & Arity Consumer Privacy Litigation* pending in the Northern District of Illinois under Master Docket No. 1:25-cv-00407 (the "Allstate Consumer Privacy Litigation").

2. I am submitting this Declaration in Support of Plaintiffs' Motion to Compel Non-Party Citizens United Reciprocal Exchange ("CURE") to Produce Documents and Information in Response to Plaintiffs' Subpoena Duces Tecum.

3. Attached as *Exhibit 1* is the First Amended Consolidated Class Action Complaint that was filed in the Allstate Consumer Privacy Litigation.

4. Attached as *Exhibit 2* is the subpoena that Plaintiffs served on CURE (the "Subpoena") pursuant to Federal Rule of Civil Procedure 45.

5. Attached as *Exhibit 3* is a signed Affidavit of Service showing that CURE accepted service of the Subpoena on September 18, 2026.

6. In addition to conducting party discovery, Plaintiffs also have served approximately 40 document subpoenas on developers that incorporated Defendants' Arity software development kit (the "Arity SDK") into their mobile apps, and insurance carriers who insured Plaintiffs' vehicles and/or purchased from Defendants data or services derived from information collected by the Arity SDK.

7. Although CURE accepted service of the Subpoena over 45 days ago on September 18, 2026, it has not responded or objected to it.

8. Neither CURE nor any counsel representing it has contacted Plaintiffs' counsel in response to the Subpoena.

9. CURE has not filed any motion to quash the Subpoena or otherwise sought relief from its obligation to comply with it.

10. At least one of the Plaintiffs, Robert Sanginito, has identified CURE as his auto insurer.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on November 5, 2026, at Philadelphia, PA.

Christopher P. Dolotosky

# EXHIBIT 1

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: ALLSTATE & ARITY CONSUMER PRIVACY LITIGATION** | Master Docket No. 1:25-cv-00407<br><br>**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR DAMAGES AND INJUNCTIVE RELIEF**<br><br>**<u>JURY TRIAL DEMANDED</u>** |

**TABLE OF CONTENTS**


I. NATURE OF THE ACTION .......... 1

II. PARTIES .......... 5

A. Plaintiffs .......... 5

B. Defendants .......... 94

III. JURISDICTION AND VENUE .......... 97

IV. FACTUAL BACKGROUND .......... 97

A. Telemetric Data About Driving .......... 98

B. Defendants Developed Software Tools to Covertly Collect Consumers' Data .......... 100

C. Defendants Paid App Developers to Integrate the Arity SDK Into Mobile Apps .......... 105

D. Defendants Offer Drivewise .......... 106

E. Defendants' Products and Services Monetized Class Members' Personal Information .......... 108

F. Defendants' Failure to Disclose the Collection, Sharing, and Use of Plaintiffs' Driving Data .......... 112

G. Defendants' Practices Cause Substantial Injury to Consumers .......... 117

H. Plaintiffs' Injuries .......... 118

V. TOLLING OF THE STATUTE OF LIMITATIONS .......... 120

VI. CLASS ACTION ALLEGATIONS .......... 121

VII. CAUSES OF ACTION .......... 126

COUNT ONE Violation of the Federal Wiretap Act, 18 U.S.C. §§ 2510, *et seq.* (On Behalf of Plaintiffs and the Class Against All Defendants) .......... 126

COUNT TWO Willful Violation of the Fair Credit Reporting Act, 15 U.S.C. §§ 1681, *et seq.* (On Behalf of Plaintiffs and the FCRA Subclass Against the Arity Defendants) .......... 129

COUNT THREE Violations of Common Law Right to Privacy (On Behalf of Each Plaintiff for the State They Reside In and the Members of the Respective State Subclass Against All Defendants) .......... 132

COUNT FOUR Intrusion Upon Seclusion (On Behalf of Plaintiffs and the Class

Against All Defendants)....................................................................................135

COUNT FIVE Unjust Enrichment (Quasi-Contract Claim for Restitution and Disgorgement) or, Alternatively, Breach of Contract (On Behalf of Plaintiffs and the Class Against All Defendants)..............................................................136

COUNT SIX Violation of the Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-1, *et seq.* (On Behalf of the Alabama Plaintiff and the Alabama Subclass Against All Defendants)....................................................................................138

COUNT SEVEN Violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq.* (On Behalf of the Arizona Plaintiff and the Arizona Subclass Against All Defendants)....................................................................................141

COUNT EIGHT California Constitutional Invasion of Privacy (On Behalf of the California Plaintiffs and the California Subclass Against All Defendants).........143

COUNT NINE Violation of the California Invasion of Privacy Act – Wiretapping Act, Cal. Penal Code §§ 630, *et seq.* (On Behalf of the California Plaintiffs and the California Subclass Against All Defendants)........................................145

COUNT TEN Use of a Pen Register or Trap and Trace Device, Cal. Penal Code § 638.51 (On Behalf of the California Plaintiffs and the California Subclass Against All Defendants)....................................................................................151

COUNT ELEVEN Violation of the California Unfair Competition Law (“UCL”), Cal. Bus. & Prof. Code §§ 17200, *et seq.* (On Behalf of the California Plaintiffs and the California Subclass Against All Defendants)..........................152

COUNT TWELVE Violation of the Florida Security of Communications Act (“FSCA”), Fla. Stat. §§ 934.01, *et seq.* (On Behalf of the Florida Plaintiff and the Florida Subclass Against All Defendants)...................................................154

COUNT THIRTEEN Violation of the Florida Unfair and Deceptive Trade Practices Act (“FDUTPA”), Fla. Stat. §§ 501.201, *et seq.* (On Behalf of the Florida Plaintiff and the Florida Subclass Against All Defendants)...............................158

COUNT FOURTEEN Violation of the Georgia Uniform Deceptive Trade Practices Act, Ga. Code Ann. §§ 10-1-370, *et seq.* (On Behalf of the Georgia Plaintiff and the Georgia Subclass Against All Defendants)............................................160

COUNT FIFTEEN Recovery of Expenses of Litigation, O.C.G.A. §§ 13-6-11, *et seq.* (On Behalf of the Georgia Plaintiff and the Georgia Subclass Against All Defendants)..........................................................................................163

COUNT SIXTEEN Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. §§ 505, *et seq.* (On Behalf of the Illinois Plaintiffs and the Illinois Subclass Against All Defendants)..............................164

COUNT SEVENTEEN Violation of the Illinois Wiretapping, Electronic Surveillance, and Interception of Communications Law, 720 ILCS 5/14-1, *et seq.* (On Behalf of the Illinois Plaintiffs and the Illinois Subclass Against All Defendants)..........................................................................................167

COUNT EIGHTEEN Violation of the Kentucky Consumer Protections Act, Ky. Rev. Stat. §§ 367.110, *et seq.* (On Behalf of the Kentucky Plaintiff and the Kentucky Subclass Against All Defendants)......170

COUNT NINETEEN Violation of the Mississippi Consumer Protection Act, Miss. Code. §§ 75-24-1, *et seq.* (On Behalf of the Mississippi Plaintiffs and the Mississippi Subclass Against All Defendants)......174

COUNT TWENTY Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws Ann. §§ 445.901, *et seq.* (On Behalf of the Michigan Plaintiff and the Michigan Subclass Against All Defendants)......177

COUNT TWENTY-ONE Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* (On Behalf of the New Jersey Plaintiff and the New Jersey Subclass Against All Defendants)......180

COUNT TWENTY-TWO Violation of the New York General Business Law, N.Y. Gen. Bus. Law § 349 (On Behalf of the New York Plaintiff and the New York Subclass Against All Defendants)......183

COUNT TWENTY-THREE Violation of the New York General Business Law, N.Y. Gen. Bus. Law § 350 (On Behalf of the New York Plaintiff and the New York Subclass Against All Defendants)......185

COUNT TWENTY-FOUR Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* (On Behalf of the North Carolina Plaintiff and the North Carolina Subclass Against All Defendants)......186

COUNT TWENTY-FIVE Violation of the Ohio Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.01, *et seq.* (On Behalf of the Ohio Plaintiff and the Ohio Subclass Against All Defendants)......189

COUNT TWENTY-SIX Violation of the Oregon Unlawful Trade Practices Act, ORS §§ 646.605, *et seq.* (On Behalf of the Oregon Plaintiff and the Oregon Subclass Against All Defendants)......191

COUNT TWENTY-SEVEN Pennsylvania Unlawful Use of Computer (On Behalf of the Pennsylvania Plaintiffs and the Pennsylvania Subclass Against All Defendants)......195

COUNT TWENTY-EIGHT Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (“UTP”), 73 Pa. Stat. §§ 201, *et seq.* (On Behalf of the Pennsylvania Plaintiffs and the Pennsylvania Subclass Against All Defendants)......197

COUNT TWENTY-NINE Violation of the Pennsylvania Wiretapping and Electronic Surveillance Act (“WECMA”), 18 Pa. Stat. §§ 5703, *et seq.* (On Behalf of the Pennsylvania Plaintiffs and the Pennsylvania Subclass Against All Defendants)......199

COUNT THIRTY Violation of the South Carolina Unfair Trade Practices Act (“South Carolina UTPA”), S.C. Code §§ 39-5-10, *et seq.* (On Behalf of the South Carolina Plaintiffs and the South Carolina Subclass Against All

Defendants) ........ 203

COUNT THIRTY-ONE Violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("Texas TPCPA"), Tex. Bus. & Com. Code §§ 17.41, *et seq.* (On Behalf of the Texas Plaintiff and the Texas Subclass Against All Defendants) ........ 205

COUNT THIRTY-TWO Violation of the Utah Truth in Advertising Act, Utah Code Ann. §§ 13.11a-1, *et seq.* (On Behalf of the Utah Plaintiff and the Utah Subclass Against All Defendants) ........ 208

COUNT THIRTY-THREE Violation of the Washington Consumer Protection Act ("Washington CPA"), Wash. Rev. Code §§ 19.86.010, *et seq.* (On Behalf of the Washington Plaintiff and the Washington Subclass Against All Defendants) ........ 211

VIII. REQUEST FOR RELIEF ........ 214

IX. JURY TRIAL DEMAND ........ 214

Plaintiffs Anna Anekwe, Kerry Appleton, Michelle Anderson, Delia Arellano, Michael Azar, Amanda Bare, Matthew Baumgartner, Beth DeValkeneer, Kimberleigh Duffield, James Eppley, Toyette Flowers, Jade Gable, Christy Hartline, Tyler Hill, Daniel Kilgo, Michael Mahoney, Sofia Malvar, James McNeill, Jennifer Monilaw, Amanda Quam, Laura Raftis, Nicole Rehfuss, Dorian Rochester, Robert Sanginito, Scott Schultz, Chrystie Seay, Ashika Singh, Robert Smith, Rita Streifel, Kimberly Summersill, Valencia Tucker, Tracy Tupper, Jacob Winkelvoss, and Eboni Wright, individually and on behalf of all others similarly situated (collectively, "Consolidated Plaintiffs" or "Plaintiffs"), bring this Amended Consolidated Class Action Complaint against The Allstate Corporation, Allstate Insurance Company, Allstate Vehicle and Property Insurance Company, Arity, LLC, Arity 875, LLC, and Arity Services, LLC (collectively, "Defendants"). Plaintiffs allege the following facts based upon personal knowledge, investigation by counsel, and on information and belief:

## I. NATURE OF THE ACTION

1. Plaintiffs bring this class action against Defendants seeking to redress the harms caused by Defendants' surreptitious, and unconsented, collection of Plaintiffs' personal information. The consumer driving data Defendants collected is highly invasive and personal, including information about what consumers did inside their cars each and every time they drove or rode in a vehicle sufficient to "fingerprint" (i.e., identify) each individual driver. The data Defendants harvested from each consumer was tied to individuals and included geolocation, route history, driving schedule, fuel or charging levels, phone usage, hard braking events, hard acceleration events, tailgating, time spent idle, speeds over 80 miles per hour, vehicle speed, average speed, late night driving, driver attention, and more (hereinafter, "Driving Data"). Defendants collected consumer Driving Data from consumers' own mobile devices, in-car devices

and apps, and the vehicles they drove—without consumers' knowledge or consent—and then used that personally identifying information for their own purposes (including to calculate insurance rates for Plaintiffs) or sold the data to third parties for profit.

2. Defendants Allstate Insurance Company and Allstate Vehicle and Property Insurance Company are all insurance companies and are subsidiaries of and owned by Defendant The Allstate Corporation (collectively, the "Allstate Defendants"). The Allstate Defendants sell vehicle insurance policies to individual consumers, pricing their insurance policies based on factors such as the driver's age, where they live, what type of vehicle they drive, and their driving record. Consumers provide this information to Allstate Defendants when they apply for an insurance policy.

3. Defendants Arity, LLC, Arity 875, LLC, and Arity Services, LLC (collectively, the "Arity Defendants") are all technology companies and are subsidiaries of and owned by Defendant The Allstate Corporation. Arity Defendants collect personal information from consumers via their mobile apps and websites, third-party mobile apps, Arity's software development kit ("SDK"), or via devices installed in consumers' vehicles.[1]

4. Together, Defendants conspired to collect and sell the driving behavior data of at least 40 million consumers, totaling "2 trillion miles," collecting more than one billion miles of driving data every single day.[2]

5. Defendants collect this data in part by developing and embedding their own software into third-party apps. Once a consumer downloaded one of those apps onto their phone, Defendants' software was downloaded as well, enabling Defendants to maintain a connection with

[1] Arity, "Privacy Statement," (effective date: November 1, 2024), https://arity.com/privacy/ (last accessed on May 22, 2025).

[2] Arity, "8 facts for 8 years of Arity!," https://arity.com/move/8-facts-for-8-years-of-arity/ (last accessed on May 22, 2025).

the consumer's phone, whether the consumer wanted it or not. Using the embedded software, Defendants monitor the consumer's location and behavior in real time and by pulling a trove of personal data directly from the consumer's phone.

6. In order to ensure their software was included in third-party apps, Defendants paid app developers millions of dollars to integrate Defendants' SDK into the third-party apps. Defendants also provided bonuses to these app developers as an additional incentive to participate in this integration. The success of Defendants' efforts to expand the reach of their software can be seen in their own claim that their software enables them to "capture data" in "real-time" from "40 [million] active mobile connections."[3]

7. The personal data collected by Defendants included information that together would be used to create a profile of a consumer's driving behavior, such as a phone's geolocation data, as well as phone usage, driver attention, accelerometer data, magnetometer data, and gyroscopic data, which monitors details such as the phone's altitude, longitude, latitude, bearing, GPS time, speed, and accuracy.

8. Defendants also harvested additional identifying information, including first and last name, phone number, address, zip code, mobile ad-ID ("MAID"), and device ID (together, "Identity Information").

9. Defendants used the Driving Data and Identity Information (together, "Personal Data") to build a driving behavior database consisting of the "largest driving behavior dataset tied to insurance claims," which they used to both support and expand their own insurance business and to sell to third parties for profit.[4]

---

[3] Arity, https://arity.com/solutions/real-time-insights/ (last accessed on May 22, 2025).

[4] Arity, *supra* n.2.

10. Defendants marketed and sold the Personal Data obtained through third-party apps as "driving" data purportedly reflecting consumers' driving habits. The Personal Data, however, was and is fundamentally flawed.

11. For example, the Personal Data was used and sold as "driving" data even though the data was collected from, and in reality, reflected the location, usage, and movement of consumers' phones—not the consumer's driving behavior. Thus, Defendants collected the consumer's data and attributed it to individuals regardless of whether that individual was in fact operating a vehicle at that time. For example, Defendants collected and reported data as reflecting an individual's driving behavior even when the individual was riding as a passenger in a motor vehicle, or even riding a roller coaster.[5]

12. The Driving Data was and is further decontextualized from the ways that vehicle owners can and must safely operate their vehicles. For example, a "hard braking event" may in fact be a safe and appropriate response to driving conditions—if, for example, a child or animal suddenly enters the roadway—but such an event could still have a negative impact on the individual's risk score, as assigned by Defendants.

13. Defendants have recently begun to expand the sources of their data by buying vehicle data directly from car manufacturers, such as Toyota, Lexus, Mazda, Chrysler, Dodge, Fiat, Jeep, Maserati, and Ram.

14. Defendants used this Personal Data to make insurance coverage decisions for consumers who sought vehicle insurance with them. They would also sell this data to other insurers, enabling those insurers to make their own coverage decisions about individual consumers. Defendants and other insurers used consumers' Personal Data to decide whether to

[5] Chad Murphy, "Sir, this is a roller coaster. Car insurance dings driving score for man riding The Beast." The Cincinnati Enquirer (October 8, 2024), https://www.cincinnati.com/story/entertainment/2024/10/08/insurance-cutsdriving-score-man-riding-the-beast-kings-island/75554987007/.

market insurance products to individual consumers, how much to increase a consumer's insurance premium or whether to provide them with insurance at all. These decisions were made without the consumer's knowledge that their Personal Data had been collected and used by Defendants to affect their insurance coverage.

15. Consumers were not informed of and did not consent to this collection and use of their Personal Data.

16. The putative Class is comprised of millions of Americans who were not informed of, did not consent to, and suffered harms as a result of Defendants' ongoing collection, use, and sale of their Personal Data. Plaintiffs and Class Members seek compensatory, consequential, statutory, punitive, general, and nominal damages, disgorgement and restitution, and injunctive relief on behalf of all consumers whose data was captured, collected, stored, and sold by Defendants without their knowledge and consent.

## II. PARTIES

### A. Plaintiffs

17. **Plaintiff Anna Anekwe** is an adult individual and a natural person, citizen of Georgia, where she resides and intends to stay.

18. From approximately November 5, 2021, Plaintiff Anekwe downloaded and used the Life360 app on her mobile phone. Plaintiff Anekwe downloaded the app for personal use. Plaintiff Anekwe reviewed the prominent information about the nature and function of the app presented to Plaintiff Anekwe prior to downloading and using the app. Plaintiff Anekwe was not provided meaningful notice that Defendants would use the app to collect and share her Personal Data.

19. Plaintiff Anekwe is informed and believes that the app integrates an SDK provided by Defendants, which harvests several types of data from Plaintiff Anekwe's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

20. Plaintiff Anekwe was unaware that Allstate and Arity's SDK had been integrated into the app at the time she installed, and later when she used the app. Through the app, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Anekwe's driving behavior, without Plaintiff Anekwe's knowledge or consent.

21. Upon information and belief, insurance premiums paid by Plaintiff Anekwe was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Anekwe rode as a passenger numerous times while carrying Plaintiff Anekwe's mobile phone, and any assumption that the movement of Plaintiff Anekwe's phone during those trips reflected Plaintiff Anekwe's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Anekwe paid more for insurance than she otherwise would have. For example, Plaintiff's recent automobile insurance policy covers only one vehicle and one driver. However, the premium was approximately the same as it was when covering three vehicles and two drivers, one of whom was under the age of twenty-five. Rather than decreasing significantly after two vehicles and the younger, higher-risk driver were removed from the policy, the premium remained substantially unchanged, meaning the cost of the remaining coverage became disproportionately more expensive over time.

22. Defendants' interception, collection, and monetization of Plaintiff Anekwe's highly sensitive Personal Data without consent caused Plaintiff Anekwe harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Anekwe's expense.

23. Because of Defendants' conduct, Plaintiff Anekwe has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

24. Defendants' secret collection of Plaintiff Anekwe's Personal Data deprived Plaintiff Anekwe of control over valuable personal information. Plaintiff Anekwe's Personal Data

has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Anekwe did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Anekwe's Personal Data for Defendants' financial benefit. Plaintiff Anekwe's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Anekwe's knowledge, compensation, or control. Plaintiff Anekwe would have expected compensation in exchange for providing Plaintiff Anekwe's Personal Data to third parties looking to use it for their own benefit.

25. Plaintiff Anekwe had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

26. **Plaintiff Kerry Appleton** is an adult individual and a natural person, citizen of Mississippi, where he resides and intends to stay.

27. In or around 2013, Plaintiff Appleton downloaded and used the Life360 app on his mobile phone. In addition, in or around 2013, Plaintiff Appleton downloaded and used the GasBuddy app. Plaintiff Appleton downloaded the apps for personal use. Plaintiff Appleton reviewed the prominent information about the nature and function of the apps presented to Plaintiff Appleton prior to downloading and using the apps. Plaintiff Appleton was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

28. Plaintiff Appleton is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Appleton's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

29. Plaintiff Appleton was unaware that Allstate and Arity's SDK had been integrated into the apps at the time he installed, and later when he used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Appleton's driving behavior, without Plaintiff Appleton's knowledge or consent.

30. Upon information and belief, insurance premiums paid by Plaintiff Appleton were, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data

would be unreliable and misleading. For example, Plaintiff Appleton rode as a passenger numerous times while carrying his mobile phone, and any assumption that the movement of Plaintiff Appleton's phone during those trips reflected Plaintiff Appleton's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendants' covert collection and use of his Personal Data, Plaintiff Appleton paid more for insurance than he otherwise would have.

31. Defendants' interception, collection, and monetization of Plaintiff Appleton's highly sensitive Personal Data without consent caused Plaintiff Appleton harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Appleton's expense.

32. Because of Defendants' conduct, Plaintiff Appleton has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

33. Defendants' secret collection of Plaintiff Appleton's Personal Data deprived Plaintiff Appleton of control over valuable personal information. Plaintiff Appleton's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Appleton did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Appleton's Personal Data for Defendants' financial benefit. Plaintiff Appleton's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Appleton's knowledge, compensation, or control. Plaintiff Appleton would have expected compensation in exchange for providing Plaintiff Appleton's Personal Data to third parties looking to use it for their own benefit.

34. Plaintiff Appleton had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

35. **Plaintiff Michelle Anderson** is an adult individual and a natural person, citizen of Michigan, where she resides and intends to stay.

36. In or around 2021, Plaintiff Anderson downloaded and used Life360 ("Apps") on her mobile phone. Plaintiff Anderson downloaded the Apps for personal use. Plaintiff Anderson reviewed the prominent information about the nature and function of the Apps presented to Plaintiff Anderson prior to downloading and using the Apps. Plaintiff Anderson was not provided meaningful notice that Defendants would use the Apps to collect and share her Personal Data.

37. Plaintiff Anderson is informed and believes that the Apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Anderson's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

38. Plaintiff Anderson was unaware that Allstate and Arity's SDK had been integrated into the Apps at the time she installed, and later when she used the Apps. Through the Apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Anderson's driving behavior, without Plaintiff Anderson's knowledge or consent.

39. Upon information and belief, insurance premiums paid by Plaintiff Anderson was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Anderson rode as a passenger numerous times while carrying Plaintiff Anderson's mobile phone, and any assumption that the movement of Plaintiff Anderson's phone during those trips reflected Plaintiff Anderson's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Anderson paid more for insurance than she otherwise would have.

40. Defendants' interception, collection, and monetization of Plaintiff Anderson's highly sensitive Personal Data without consent caused Plaintiff Anderson harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Anderson's expense.

41. Because of Defendants' conduct, Plaintiff Anderson has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

42. Defendants' secret collection of Plaintiff Anderson's Personal Data deprived Plaintiff of control over valuable personal information. Plaintiff Anderson's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Anderson did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Anderson's Personal Data for Defendants' financial benefit. Plaintiff Anderson's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Anderson's knowledge, compensation, or control. Plaintiff Anderson would have expected compensation in exchange for providing Plaintiff Anderson's Personal Data to third parties looking to use it for their own benefit.

43. Plaintiff Anderson had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

44. **Plaintiff Delia Arellano** is an adult individual and a natural person, citizen of Utah, where she resides and intends to stay.

45. In or around 2019, Plaintiff Arellano downloaded and used the Life360 app on her mobile phone. Plaintiff Arellano downloaded the app for personal use. Plaintiff Arellano reviewed the prominent information about the nature and function of the app presented to Plaintiff Arellano

prior to downloading and using the app. Plaintiff Arellano was not provided meaningful notice that Defendants would use the app to collect and share her Personal Data.

46. Plaintiff Arellano is informed and believes that the app integrates an SDK provided by Defendants, which harvests several types of data from Plaintiff Arellano's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

47. Plaintiff Arellano was unaware that Allstate and Arity's SDK had been integrated into the app at the time she installed, and later when she used the app. Through the app, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data

listed above, including but not limited to data related to Plaintiff Arellano's driving behavior, without Plaintiff Arellano's knowledge or consent.

48. Upon information and belief, insurance premiums paid by Plaintiff Arellano was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Arellano rode as a passenger numerous times while carrying Plaintiff Arellano's mobile phone, and any assumption that the movement of Plaintiff Arellano's phone during those trips reflected Plaintiff Arellano's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Arellano paid more for insurance than she otherwise would have.

49. Defendants' interception, collection, and monetization of Plaintiff Arellano's highly sensitive Personal Data without consent caused Plaintiff Arellano harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Arellano's expense.

50. Because of Defendants' conduct, Plaintiff Arellano has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

51. Defendants' secret collection of Plaintiff Arellano's Personal Data deprived Plaintiff Arellano of control over valuable personal information. Plaintiff Arellano's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Arellano did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Arellano's Personal Data for

Defendants' financial benefit. Plaintiff Arellano's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Arellano's knowledge, compensation, or control. Plaintiff Arellano would have expected compensation in exchange for providing Plaintiff Arellano's Personal Data to third parties looking to use it for their own benefit.

52. Plaintiff Arellano had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

53. **Plaintiff Michael Azar** is an adult individual and a natural person, citizen of California, where he resides and intends to stay.

54. In or around 2022, Plaintiff Azar downloaded and used the GasBuddy app on his mobile phone. Plaintiff Azar downloaded the app for personal use. Plaintiff Azar reviewed the prominent information about the nature and function of the app presented to Plaintiff Azar prior to downloading and using the app. Plaintiff Azar was not provided meaningful notice that Defendants would use the app to collect and share his Personal Data.

55. Plaintiff Azar is informed and believes that the app integrates an SDK provided by Defendants, which harvests several types of data from Plaintiff Azar's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) “Trip attributes,” which included information about a consumer’s movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) “GPS points,” such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer’s mobile phone;

e) “Derived events,” such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

56. Plaintiff Azar was unaware that Allstate and Arity’s SDK had been integrated into the app at the time he installed, and later when he used the app. Through the app, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Azar’s driving behavior, without Plaintiff Azar’s knowledge or consent.

57. Upon information and belief, insurance premiums paid by Plaintiff Azar was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Azar rode as a passenger numerous times while carrying Plaintiff Azar’s mobile phone, and any assumption that the movement of Plaintiff Azar’s phone during those trips reflected Plaintiff Azar’s driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated.

Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Azar paid more for insurance than he otherwise would have.

58. Defendants' interception, collection, and monetization of Plaintiff Azar's highly sensitive Personal Data without consent caused Plaintiff Azar harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Azar's expense.

59. Because of Defendants' conduct, Plaintiff Azar has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

60. Defendants' secret collection of Plaintiff Azar's Personal Data deprived Plaintiff Azar of control over valuable personal information. Plaintiff Azar's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Azar did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Azar's Personal Data for Defendants' financial benefit. Plaintiff Azar's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Azar's knowledge, compensation, or control. Plaintiff Azar would have expected compensation in exchange for providing Plaintiff Azar's Personal Data to third parties looking to use it for their own benefit.

61. Plaintiff Azar had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

62. **Plaintiff Amanda Bare** is an adult individual and a natural person, citizen of California, where she resides and intends to stay.

63. In or around 2023, Plaintiff Bare downloaded and used the Life360 app on her mobile phone. Plaintiff Bare downloaded the app for personal use. Plaintiff Bare reviewed the prominent information about the nature and function of the app presented to Plaintiff Bare prior to downloading and using the app. Plaintiff Bare was not provided meaningful notice that Defendants would use the app to collect and share her Personal Data.

64. Plaintiff Bare is informed and believes that the app integrates an SDK provided by Defendants, which harvests several types of data from Plaintiff Bare's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

Case 1:25-cv-09407-TDB Document 112 Filed 10/28/21 Page 25 of 220 PageID: 3689

65. Plaintiff Bare was unaware that Allstate and Arity's SDK had been integrated into the app at the time she installed, and later when she used the app. Through the app, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Bare's driving behavior, without Plaintiff Bare's knowledge or consent.

66. Upon information and belief, insurance premiums paid by Plaintiff Bare was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Bare rode as a passenger numerous times while carrying Plaintiff Bare's mobile phone, and any assumption that the movement of Plaintiff Bare's phone during those trips reflected Plaintiff Bare's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Bare paid more for insurance than she otherwise would have.

67. Defendants' interception, collection, and monetization of Plaintiff Bare's highly sensitive Personal Data without consent caused Plaintiff Bare harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Bare's expense.

68. Because of Defendants' conduct, Plaintiff Bare has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

69. Defendants' secret collection of Plaintiff Bare's Personal Data deprived Plaintiff Bare of control over valuable personal information. Plaintiff Bare's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data

to insurers, marketers, and other third parties. Plaintiff Bare did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Bare's Personal Data for Defendants' financial benefit. Plaintiff Bare's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Bare's knowledge, compensation, or control. Plaintiff Bare would have expected compensation in exchange for providing Plaintiff Bare's Personal Data to third parties looking to use it for their own benefit.

70. Plaintiff Bare had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

71. **Plaintiff Matthew Baumgartner** is an adult individual and a natural person, citizen of South Carolina, where he resides and intends to stay.

72. In or around 2015, Plaintiff Baumgartner downloaded and used the GasBuddy and Life360 apps on his mobile phone. Plaintiff Baumgartner downloaded the apps for personal use. Plaintiff Baumgartner reviewed the prominent information about the nature and function of the apps presented to Plaintiff Baumgartner prior to downloading and using the apps. Plaintiff Baumgartner was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

73. Plaintiff Baumgartner is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Baumgartner's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

74. Plaintiff Baumgartner was unaware that Allstate and Arity's SDK had been integrated into the apps at the time he installed, and later when he used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Baumgartner's driving behavior, without Plaintiff Baumgartner's knowledge or consent.

75. In early 2025, Plaintiff Baumgartner purchased insurance from Allstate, or one of its subsidiaries. Plaintiff Baumgartner is an Allstate insurance subscriber, and has been continuously from his initial purchase.

76. Upon information and belief, insurance premiums paid by Plaintiff Baumgartner was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data

was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Baumgartner rode as a passenger numerous times while carrying Plaintiff Baumgartner's mobile phone, and any assumption that the movement of Plaintiff Baumgartner's phone during those trips reflected Plaintiff Baumgartner's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Baumgartner paid more for insurance than he otherwise would have.

77. Defendants' interception, collection, and monetization of Plaintiff Baumgartner's highly sensitive Personal Data without consent caused Plaintiff Baumgartner harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Baumgartner's expense.

78. Because of Defendants' conduct, Plaintiff Baumgartner has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

79. Defendants' secret collection of Plaintiff Baumgartner's Personal Data deprived Plaintiff Baumgartner of control over valuable personal information. Plaintiff Baumgartner's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Baumgartner did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Baumgartner's Personal Data for Defendants' financial benefit. Plaintiff Baumgartner's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Baumgartner's knowledge, compensation, or

control. Plaintiff Baumgartner would have expected compensation in exchange for providing Plaintiff Baumgartner's Personal Data to third parties looking to use it for their own benefit.

80. Plaintiff Baumgartner had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

81. **Plaintiff Beth DeValkeneer** is an adult individual and a natural person, citizen of Pennsylvania, where she resides and intends to stay.

82. In or around 2019, Plaintiff DeValkeneer downloaded and used Life360 ("Apps") on her mobile phone. Plaintiff DeValkeneer downloaded the Apps for personal use and was not provided meaningful notice that Defendants would use the Apps to collect and share her Personal Data.

83. Plaintiff DeValkeneer is informed and believes that the Apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff DeValkeneer's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

84. Plaintiff DeValkeneer was unaware that Allstate and Arity's SDK had been integrated into the Apps at the time she installed, and later when she used the Apps. Through the Apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff DeValkeneer's driving behavior, without Plaintiff DeValkeneer's knowledge or consent.

85. Upon information and belief, insurance premiums paid by Plaintiff DeValkeneer was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff DeValkeneer paid more for insurance than she otherwise would have.

86. Defendants' interception, collection, and monetization of Plaintiff DeValkeneer's highly sensitive Personal Data without consent caused Plaintiff DeValkeneer harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff DeValkeneer's expense.

87. Because of Defendants' conduct, Plaintiff DeValkeneer has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

88. Defendants' secret collection of Plaintiff DeValkeneer's Personal Data deprived Plaintiff DeValkeneer of control over valuable personal information. Plaintiff DeValkeneer's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff DeValkeneer did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff DeValkeneer's Personal Data for Defendants' financial benefit. Plaintiff DeValkeneer's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff DeValkeneer's knowledge, compensation, or control.

89. Plaintiff DeValkeneer had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

90. **Plaintiff Kimberleigh Duffield** is an adult individual and a natural person, citizen of California, where she resides and intends to stay.

91. In or around 2017, Plaintiff Duffield downloaded and used the Life360 app on her mobile phone. Plaintiff Duffield downloaded the app for personal use. Plaintiff Duffield reviewed the prominent information about the nature and function of the app presented to Plaintiff Duffield prior to downloading and using the app. Plaintiff Duffield was not provided meaningful notice that Defendants would use the app to collect and share her Personal Data.

92. Plaintiff Duffield is informed and believes that the app integrates an SDK provided by Defendants, which harvests several types of data from Plaintiff Duffield's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

93. Plaintiff Duffield was unaware that Allstate and Arity's SDK had been integrated into the app at the time she installed, and later when she used the app. Through the app, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Duffield's driving behavior, without Plaintiff Duffield's knowledge or consent.

94. Upon information and belief, insurance premiums paid by Plaintiff Duffield was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Duffield rode as a passenger numerous times while carrying Plaintiff Duffield's mobile phone, and any assumption that the movement of Plaintiff Duffield's phone during those trips reflected Plaintiff Duffield's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendants' covert collection and use of her Personal Data, Plaintiff Duffield paid more for insurance than she otherwise would have.

95. Defendants' interception, collection, and monetization of Plaintiff Duffield's highly sensitive Personal Data without consent caused Plaintiff Duffield harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Duffield's expense.

96. Because of Defendants' conduct, Plaintiff Duffield has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

97. Defendants' secret collection of Plaintiff Duffield's Personal Data deprived Plaintiff Duffield of control over valuable personal information. Plaintiff Duffield's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Duffield did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Duffield's Personal Data for Defendants' financial benefit. Plaintiff Duffield's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data

without Plaintiff Duffield's knowledge, compensation, or control. Plaintiff Duffield would have expected compensation in exchange for providing Plaintiff Duffield's Personal Data to third parties looking to use it for their own benefit.

98. Plaintiff Duffield had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

99. **Plaintiff James Eppley** is an adult individual and a natural person, citizen of Pennsylvania, where he resides and intends to stay.

100. In or around 2021, Plaintiff Eppley downloaded and used the GasBuddy and Fuel Rewards apps on his mobile phone. Plaintiff Eppley downloaded the apps for personal use. Plaintiff Eppley reviewed the prominent information about the nature and function of the apps presented to Plaintiff Eppley prior to downloading and using the apps. Plaintiff Eppley was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

101. Plaintiff Eppley is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Eppley's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) “Trip attributes,” which included information about a consumer’s movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) “GPS points,” such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer’s mobile phone;

e) “Derived events,” such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

102. Plaintiff Eppley was unaware that Allstate and Arity’s SDK had been integrated into the apps at the time he installed, and later when he used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Eppley’s driving behavior, without Plaintiff Eppley’s knowledge or consent.

103. Upon information and belief, insurance premiums paid by Plaintiff Eppley was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Eppley rode as a passenger numerous times while carrying Plaintiff Eppley’s mobile phone, and any assumption that the movement of Plaintiff Eppley’s phone during those trips reflected Plaintiff Eppley’s driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated.

Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Eppley paid more for insurance than he otherwise would have.

104. Defendants' interception, collection, and monetization of Plaintiff Eppley's highly sensitive Personal Data without consent caused Plaintiff harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Eppley's expense.

105. Because of Defendants' conduct, Plaintiff Eppley has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

106. Defendants' secret collection of Plaintiff Eppley's Personal Data deprived Plaintiff Eppley of control over valuable personal information. Plaintiff Eppley's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Eppley did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Eppley's Personal Data for Defendants' financial benefit. Plaintiff Eppley's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Eppley's knowledge, compensation, or control. Plaintiff Eppley would have expected compensation in exchange for providing Plaintiff Eppley's Personal Data to third parties looking to use it for their own benefit.

107. Plaintiff Eppley had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

108. **Plaintiff Toyette Flowers** is an adult individual and a natural person, citizen of Wisconsin, where she resides and intends to stay.

109. In or around 2022, Plaintiff Flowers downloaded and used the SiriusXM and Routely apps on her mobile phone. Plaintiff Flowers downloaded the apps for personal use. Plaintiff Flowers reviewed the prominent information about the nature and function of the apps presented to Plaintiff Flowers prior to downloading and using the apps. Plaintiff Flowers was not provided meaningful notice that Defendants would use the apps to collect and share her Personal Data.

110. Plaintiff Flowers is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Flowers' phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

111. Plaintiff Flowers was unaware that Allstate and Arity's SDK had been integrated into the apps at the time she installed, and later when she used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Flowers' driving behavior, without Plaintiff Flowers' knowledge or consent.

112. Upon information and belief, insurance premiums paid by Plaintiff Flowers was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Flowers rode as a passenger numerous times while carrying Plaintiff Flowers' mobile phone, and any assumption that the movement of Plaintiff Flowers' phone during those trips reflected Plaintiff Flowers' driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Flowers paid more for insurance than she otherwise would have.

113. Defendants' interception, collection, and monetization of Plaintiff Flowers' highly sensitive Personal Data without consent caused Plaintiff Flowers harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Flowers' expense.

114. Because of Defendants' conduct, Plaintiff Flowers has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

115. Defendants' secret collection of Plaintiff Flowers' Personal Data deprived Plaintiff Flowers of control over valuable personal information. Plaintiff Flowers' Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Flowers did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Flowers' Personal Data for Defendants' financial benefit. Plaintiff Flowers' Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Flowers' knowledge, compensation, or control. Plaintiff Flowers would have expected compensation in exchange for providing Plaintiff Flowers' Personal Data to third parties looking to use it for their own benefit.

116. Plaintiff Flowers had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

117. **Plaintiff Jade Gable** is an adult individual and a natural person, citizen of Arizona, where she resides and intends to stay.

118. In or around 2024, Plaintiff Gable downloaded and used the Life360 app on her mobile phone. Plaintiff Gable downloaded the app for personal use. Plaintiff Gable reviewed the prominent information about the nature and function of the app presented to Plaintiff Gable prior to downloading and using the app. Plaintiff Gable was not provided meaningful notice that Defendants would use the app to collect and share her Personal Data.

119. Plaintiff Gable is informed and believes that the app integrates an SDK provided by Defendants, which harvests several types of data from Plaintiff Gable's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

120. Plaintiff Gable was unaware that Allstate and Arity's SDK had been integrated into the app at the time she installed, and later when she used the app. Through the app, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Gable's driving behavior, without Plaintiff Gable's knowledge or consent.

121. Upon information and belief, insurance premiums paid by Plaintiff Gable was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data

would be unreliable and misleading. For example, Plaintiff Gable rode as a passenger numerous times while carrying Plaintiff Gable's mobile phone, and any assumption that the movement of Plaintiff Gable's phone during those trips reflected Plaintiff Gable's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Gable paid more for insurance than she otherwise would have.

122. Defendants' interception, collection, and monetization of Plaintiff Gable's highly sensitive Personal Data without consent caused Plaintiff Gable harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Gable's expense.

123. Because of Defendants' conduct, Plaintiff Gable has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

124. Defendants' secret collection of Plaintiff Gable's Personal Data deprived Plaintiff Gable of control over valuable personal information. Plaintiff Gable's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Gable did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Gable's Personal Data for Defendants' financial benefit. Plaintiff Gable's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Gable's knowledge, compensation, or control. Plaintiff Gable would have expected compensation in exchange for providing Plaintiff Gable's Personal Data to third parties looking to use it for their own benefit.

125. Plaintiff Gable had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

126. **Plaintiff Christy Hartline** is an adult individual and a natural person, citizen of Oregon, where she resides and intends to stay.

127. In or around 2022, Plaintiff Hartline downloaded and used the Life360 and SiriusXM apps on her mobile phone. Plaintiff Hartline downloaded the apps for personal use. Plaintiff Hartline reviewed the prominent information about the nature and function of the apps presented to Plaintiff Hartline prior to downloading and using the apps. Plaintiff Hartline was not provided meaningful notice that Defendants would use the apps to collect and share her Personal Data.

128. Plaintiff Hartline is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Hartline's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) “Derived events,” such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

129. Plaintiff Hartline was unaware that Allstate and Arity’s SDK had been integrated into the apps at the time she installed, and later when she used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Hartline’s driving behavior, without Plaintiff Hartline’s knowledge or consent.

130. Upon information and belief, insurance premiums paid by Plaintiff Hartline was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Hartline rode as a passenger numerous times while carrying Plaintiff Hartline’s mobile phone, and any assumption that the movement of Plaintiff Hartline’s phone during those trips reflected Plaintiff Hartline’s driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant’s covert collection and use of her Personal Data, Plaintiff Hartline paid more for insurance than she otherwise would have.

131. Defendants’ interception, collection, and monetization of Plaintiff Hartline’s highly sensitive Personal Data without consent caused Plaintiff Hartline harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Hartline’s expense.

132. Because of Defendants' conduct, Plaintiff Hartline has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

133. Defendants' secret collection of Plaintiff Hartline's Personal Data deprived Plaintiff Hartline of control over valuable personal information. Plaintiff Hartline's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Hartline did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Hartline's Personal Data for Defendants' financial benefit. Plaintiff Hartline's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Hartline's knowledge, compensation, or control. Plaintiff Hartline would have expected compensation in exchange for providing Plaintiff Hartline's Personal Data to third parties looking to use it for their own benefit.

134. Plaintiff Hartline had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

135. **Plaintiff Tyler Hill** is an adult individual and a natural person, citizen of Mississippi, where he resides and intends to stay.

136. From approximately March 2023, Plaintiff Hill downloaded and used the Fuel Rewards app on his mobile phone. Plaintiff Hill downloaded the app for personal use. Plaintiff Hill reviewed the prominent information about the nature and function of the app presented to Plaintiff Hill prior to downloading and using the app. Plaintiff Hill was not provided meaningful notice that Defendants would use the app to collect and share his Personal Data.

137. Plaintiff Hill is informed and believes that the app integrates an SDK provided by Defendants, which harvests several types of data from Plaintiff Hill's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

138. Plaintiff Hill was unaware that Allstate and Arity's SDK had been integrated into the app at the time he installed, and later when he used the app. Through the app, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Hill's driving behavior, without Plaintiff Hill's knowledge or consent.

139. Upon information and belief, insurance premiums paid by Plaintiff Hill was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Hill rode as a passenger numerous times while carrying Plaintiff Hill's mobile phone, and any assumption that the movement of Plaintiff Hill's phone during those trips reflected Plaintiff Hill's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Hill paid more for insurance than he otherwise would have.

140. Defendants' interception, collection, and monetization of Plaintiff Hill's highly sensitive Personal Data without consent caused Plaintiff Hill harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Hill's expense.

141. Because of Defendants' conduct, Plaintiff Hill has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

142. Defendants' secret collection of Plaintiff Hill's Personal Data deprived Plaintiff Hill of control over valuable personal information. Plaintiff Hill's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Hill did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Hill's Personal Data for Defendants' financial benefit. Plaintiff Hill's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Hill's knowledge,

compensation, or control. Plaintiff Hill would have expected compensation in exchange for providing Plaintiff Hill's Personal Data to third parties looking to use it for their own benefit.

143. Plaintiff Hill had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

144. **Plaintiff Daniel Kilgo** is an adult individual and a natural person, citizen of Alabama, where he resides and intends to stay.

145. In or around 2021, Plaintiff Kilgo downloaded and used the Life360 app on his mobile phone. Plaintiff downloaded the app for personal use. Plaintiff Kilgo reviewed the prominent information about the nature and function of the app presented to Plaintiff Kilgo prior to downloading and using the app. Plaintiff Kilgo was not provided meaningful notice that Defendants would use the app to collect and share his Personal Data.

146. Plaintiff Kilgo is informed and believes that the app integrates an SDK provided by Defendants, which harvests several types of data from Plaintiff Kilgo's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

147. Plaintiff Kilgo was unaware that Allstate and Arity's SDK had been integrated into the app at the time he installed, and later when he used the app. Through the app, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Kilgo's driving behavior, without Plaintiff Kilgo's knowledge or consent.

148. Upon information and belief, insurance premiums paid by Plaintiff Kilgo was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Kilgo rode as a passenger numerous times while carrying Plaintiff Kilgo's mobile phone, and any assumption that the movement of Plaintiff Kilgo's phone during those trips reflected Plaintiff Kilgo's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Kilgo paid more for insurance than he otherwise would have.

149. Defendants' interception, collection, and monetization of Plaintiff Kilgo's highly sensitive Personal Data without consent caused Plaintiff Kilgo harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Kilgo's expense.

150. Because of Defendants' conduct, Plaintiff Kilgo has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

151. Defendants' secret collection of Plaintiff Kilgo's Personal Data deprived Plaintiff Kilgo of control over valuable personal information. Plaintiff Kilgo's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Kilgo did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Kilgo's Personal Data for Defendants' financial benefit. Plaintiff Kilgo's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Kilgo's knowledge, compensation, or control. Plaintiff Kilgo would have expected compensation in exchange for providing Plaintiff Kilgo's Personal Data to third parties looking to use it for their own benefit.

152. Plaintiff Kilgo had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

153. **Plaintiff Michael Mahoney** is an adult individual and a natural person, citizen of California, where he resides and intends to stay.

154. In or around 2011, Plaintiff Mahoney downloaded and used GasBuddy on his mobile phone. In addition, in or around 2015, Plaintiff Mahoney downloaded and used the SiriusXM app. Plaintiff Mahoney downloaded the apps for personal use. Plaintiff Mahoney

Case 1:25-cv-09407-DDD Document #: 112 Filed: 10/28/21 Page 50 of 220 PageID

reviewed the prominent information about the nature and function of the apps presented to Plaintiff Mahoney prior to downloading and using the apps. Plaintiff Mahoney was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

155. Plaintiff Mahoney is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Mahoney's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

156. Plaintiff Mahoney was unaware that Allstate and Arity's SDK had been integrated into the apps at the time he installed, and later when he used the apps. Through the apps, and the

integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Mahoney's driving behavior, without Plaintiff Mahoney's knowledge or consent.

157. Upon information and belief, insurance premiums paid by Plaintiff Mahoney was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Mahoney rode as a passenger numerous times while carrying Plaintiff Mahoney's mobile phone, and any assumption that the movement of Plaintiff Mahoney's phone during those trips reflected Plaintiff Mahoney's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Mahoney paid more for insurance than he otherwise would have.

158. Defendants' interception, collection, and monetization of Plaintiff Mahoney's highly sensitive Personal Data without consent caused Plaintiff Mahoney harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Mahoney's expense.

159. Because of Defendants' conduct, Plaintiff Mahoney has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

160. Defendants' secret collection of Plaintiff Mahoney's Personal Data deprived Plaintiff Mahoney of control over valuable personal information. Plaintiff Mahoney's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Mahoney did not authorize the sale, or use of his Personal Data, and did not receive any compensation.

Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Mahoney's Personal Data for Defendants' financial benefit. Plaintiff Mahoney's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Mahoney's knowledge, compensation, or control. Plaintiff Mahoney would have expected compensation in exchange for providing Plaintiff Mahoney's Personal Data to third parties looking to use it for their own benefit.

161. Plaintiff Mahoney had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

162. **Plaintiff Sofia Malvar** is an adult individual and a natural person, citizen of California, where she resides and intends to stay.

163. In or around 2010, Plaintiff Malvar downloaded and used the GasBuddy app on her mobile phone. In addition, in or around 2014, Plaintiff Malvar also downloaded and used the Fuel Rewards app, and in or around 2020, she downloaded and used the SiriusXM app. Plaintiff Malvar downloaded the apps for personal use. Plaintiff Malvar reviewed the prominent information about the nature and function of the apps presented to Plaintiff Malvar prior to downloading and using the apps. Plaintiff Malvar was not provided meaningful notice that Defendants would use the apps to collect and share her Personal Data.

164. Plaintiff Malvar is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Malvar's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

165. Plaintiff Malvar was unaware that Allstate and Arity's SDK had been integrated into the apps at the time she installed, and later when she used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Malvar's driving behavior, without Plaintiff Malvar's knowledge or consent.

166. Upon information and belief, insurance premiums paid by Plaintiff Malvar was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Malvar rode as a passenger numerous times while carrying Plaintiff Malvar's mobile phone, and any assumption that the movement of

Plaintiff Malvar's phone during those trips reflected Plaintiff Malvar's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Malvar paid more for insurance than she otherwise would have.

167. Defendants' interception, collection, and monetization of Plaintiff Malvar's highly sensitive Personal Data without consent caused Plaintiff Malvar harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Malvar's expense.

168. Because of Defendants' conduct, Plaintiff Malvar has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

169. Defendants' secret collection of Plaintiff Malvar's Personal Data deprived Plaintiff Malvar of control over valuable personal information. Plaintiff Malvar's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Malvar did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Malvar's Personal Data for Defendants' financial benefit. Plaintiff Malvar's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Malvar's knowledge, compensation, or control. Plaintiff Malvar would have expected compensation in exchange for providing Plaintiff Malvar's Personal Data to third parties looking to use it for their own benefit.

170. Plaintiff Malvar had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

171. **Plaintiff James McNeill** is an adult individual and a natural person, citizen of Louisiana, where he resides and intends to stay.

172. In or around 2022, Plaintiff McNeill downloaded and used the GasBuddy and Life360 apps on his mobile phone. Plaintiff McNeill downloaded the apps for personal use. Plaintiff McNeill reviewed the prominent information about the nature and function of the apps presented to Plaintiff McNeill prior to downloading and using the apps. Plaintiff McNeill was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

173. Plaintiff McNeill is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff McNeill's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

174. Plaintiff McNeill was unaware that Allstate and Arity's SDK had been integrated into the apps at the time he installed, and later when he used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff McNeill's driving behavior, without Plaintiff McNeill's knowledge or consent.

175. In or around 2022, Plaintiff McNeill purchased insurance from Allstate, or one of its subsidiaries. Plaintiff McNeill is an Allstate insurance subscriber, and has been continuously from his initial purchase.

176. Upon information and belief, insurance premiums paid by Plaintiff McNeill was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff McNeill rode as a passenger numerous times while carrying Plaintiff McNeill's mobile phone, and any assumption that the movement of Plaintiff McNeill's phone during those trips reflected Plaintiff McNeill's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff McNeill paid more for insurance than he otherwise would have.

177. Defendants' interception, collection, and monetization of Plaintiff McNeill's highly sensitive Personal Data without consent caused Plaintiff McNeill harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff McNeill's expense.

178. Because of Defendants' conduct, Plaintiff McNeill has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

179. Defendants' secret collection of Plaintiff McNeill's Personal Data deprived Plaintiff McNeill of control over valuable personal information. Plaintiff McNeill's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff McNeill did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff McNeill's Personal Data for Defendants' financial benefit. Plaintiff McNeill's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff McNeill's knowledge, compensation, or control. Plaintiff McNeill would have expected compensation in exchange for providing Plaintiff McNeill's Personal Data to third parties looking to use it for their own benefit.

180. Plaintiff McNeill had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

181. **Plaintiff Jennifer Monilaw** is an adult individual and a natural person, citizen of Illinois, where she resides and intends to stay.

182. In or around 2022, Plaintiff Monilaw downloaded and used the Fuel Rewards and Life360 apps on her mobile phone. In addition, in or around 2024, Plaintiff Monilaw downloaded

and used the GasBuddy app. Plaintiff Monilaw downloaded the apps for personal use. Plaintiff Monilaw reviewed the prominent information about the nature and function of the apps presented to Plaintiff Monilaw prior to downloading and using the apps. Plaintiff Monilaw was not provided meaningful notice that Defendants would use the apps to collect and share her Personal Data.

183. Plaintiff Monilaw is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Monilaw's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

184. Plaintiff Monilaw was unaware that Allstate and Arity's SDK had been integrated into the apps at the time she installed, and later when she used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Monilaw's driving behavior, without Plaintiff Monilaw's knowledge or consent.

185. Upon information and belief, insurance premiums paid by Plaintiff Monilaw was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Monilaw rode as a passenger numerous times while carrying Plaintiff Monilaw's mobile phone, and any assumption that the movement of Plaintiff Monilaw's phone during those trips reflected Plaintiff Monilaw's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Monilaw paid more for insurance than she otherwise would have.

186. Defendants' interception, collection, and monetization of Plaintiff Monilaw's highly sensitive Personal Data without consent caused Plaintiff Monilaw harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Monilaw's expense.

187. Because of Defendants' conduct, Plaintiff Monilaw has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

188. Defendants' secret collection of Plaintiff Monilaw's Personal Data deprived Plaintiff Monilaw of control over valuable personal information. Plaintiff Monilaw's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or

licensing access to such data to insurers, marketers, and other third parties. Plaintiff Monilaw did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Monilaw's Personal Data for Defendants' financial benefit. Plaintiff Monilaw's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Monilaw's knowledge, compensation, or control. Plaintiff Monilaw would have expected compensation in exchange for providing Plaintiff Monilaw's Personal Data to third parties looking to use it for their own benefit.

189. Plaintiff Monilaw had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

190. **Plaintiff Amanda Quam** is an adult individual and a natural person, citizen of Illinois, where she resides and intends to stay.

191. In or around 2023, Plaintiff Quam downloaded and used the GasBuddy, Fuel Rewards, Routely apps on her mobile phone. In addition, Plaintiff Quam downloaded the Life360 app. Plaintiff Quam downloaded the apps for personal use. Plaintiff Quam reviewed the prominent information about the nature and function of the apps presented to Plaintiff Quam prior to downloading and using GasBuddy, Fuel Rewards, and Routely. Plaintiff Quam was not provided meaningful notice that Defendants would use the apps to collect and share her Personal Data.

192. Plaintiff Quam is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Quam's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

193. Plaintiff Quam was unaware that Allstate and Arity's SDK had been integrated into the apps at the time she installed, and later when she used GasBuddy, Fuel Rewards, and Routely. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Quam's driving behavior, without Plaintiff Quam's knowledge or consent.

194. Upon information and belief, insurance premiums paid by Plaintiff Quam was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Quam rode as a passenger numerous times while carrying Plaintiff Quam's mobile phone, and any assumption that the movement of

Plaintiff Quam's phone during those trips reflected Plaintiff Quam's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Quam paid more for insurance than she otherwise would have.

195. Defendants' interception, collection, and monetization of Plaintiff Quam's highly sensitive Personal Data without consent caused Plaintiff Quam harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Quam's expense.

196. Because of Defendants' conduct, Plaintiff Quam has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

197. Defendants' secret collection of Plaintiff Quam's Personal Data deprived Plaintiff Quam of control over valuable personal information. Plaintiff Quam's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Quam did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Quam's Personal Data for Defendants' financial benefit. Plaintiff Quam's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Quam's knowledge, compensation, or control. Plaintiff Quam would have expected compensation in exchange for providing Plaintiff Quam's Personal Data to third parties looking to use it for their own benefit.

198. Plaintiff Quam had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

199. **Plaintiff Laura Raftis** is an adult individual and a natural person, citizen of Washington, where she resides and intends to stay.

200. In or around April 2017, Plaintiff Raftis downloaded and used the Credit Karma app on her mobile phone. In or around March 2022, she downloaded and used the Life360 app; in or around September 2025, she downloaded and used the MyRadar app. Plaintiff Raftis downloaded the apps for personal use, reviewed the prominent information about their nature and function before using them, and was not provided meaningful notice that Defendants would use them to collect and share her Personal Data.

201. Plaintiff Raftis is informed and believes that the apps integrate an SDK provided by Defendants, which harvests data from her phone without her knowledge or consent, including geolocation, accelerometer, magnetometer, and gyroscopic data; information about her interactions with the phone and apps; trip attributes such as locations, distance, duration, times, and termination codes; GPS points such as position, heading, speed, bearing, and altitude; derived events such as acceleration, speeding, distracted driving, and crash detection; and metadata such as ad ID, country code, device type, app version, and OS version.

202. Plaintiff Raftis was unaware that Allstate and Arity's SDK had been integrated into the apps when she installed or used them. Through the apps and integrated SDKs, Defendants covertly collected, intercepted, and transmitted the data described above, including data related to Plaintiff Raftis's driving behavior, without her knowledge or consent.

203. Upon information and belief, the premium for Plaintiff Raftis's automobile insurance was based in part on Personal Data covertly collected and used by Defendants. That data lacked context, and its accuracy was unverified. For example, Plaintiff Raftis rode as a passenger numerous times while carrying her phone; treating those trips as evidence of her driving would be

inaccurate. Any premium based on such an analysis would be inflated. Plaintiff Raftis's recent automobile insurance policy covers one vehicle and one driver, with a monthly premium of $260.30.

204. Defendants' interception, collection, and monetization of Plaintiff Raftis's highly sensitive Personal Data without consent caused her harm and invasion of privacy and unjustly enriched Defendants at her expense. Plaintiff Raftis lost control over her Personal Data, which is in the possession of third parties who have used or may use it for their financial advantage. Her Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Raftis did not authorize the sale or use of her Personal Data and received no compensation. She would have expected compensation for providing it to third parties for their benefit. Plaintiff Raftis reasonably expected her location, driving behavior, and movement patterns to remain private absent express authorization for their collection and use.

205. **Plaintiff Nicole Rehfuss** is an adult individual and a natural person, citizen of Kentucky, where she resides and intends to stay.

206. In or around 2020, Plaintiff Rehfuss downloaded and used the SiriusXM app on her mobile phone. Plaintiff Rehfuss downloaded the app for personal use. Plaintiff Rehfuss reviewed the prominent information about the nature and function of the app presented to Plaintiff Rehfuss prior to downloading and using the app. Plaintiff Rehfuss was not provided meaningful notice that Defendants would use the app to collect and share her Personal Data.

207. Plaintiff Rehfuss is informed and believes that the app integrates an SDK provided by Defendants, which harvests several types of data from Plaintiff Rehfuss's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

208. Plaintiff Rehfuss was unaware that Allstate and Arity's SDK had been integrated into the app at the time she installed, and later when she used the app. Through the app, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Rehfuss' driving behavior, without Plaintiff Rehfuss' knowledge or consent.

209. Upon information and belief, insurance premiums paid by Plaintiff Rehfuss was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data

would be unreliable and misleading. For example, Plaintiff Rehfuss rode as a passenger numerous times while carrying Plaintiff Rehfuss' mobile phone, and any assumption that the movement of Plaintiff Rehfuss' phone during those trips reflected Plaintiff Rehfuss' driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Rehfuss paid more for insurance than she otherwise would have.

210. Defendants' interception, collection, and monetization of Plaintiff Rehfuss' highly sensitive Personal Data without consent caused Plaintiff Rehfuss harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Rehfuss' expense.

211. Because of Defendants' conduct, Plaintiff Rehfuss has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

212. Defendants' secret collection of Plaintiff Rehfuss' Personal Data deprived Plaintiff Rehfuss of control over valuable personal information. Plaintiff Rehfuss' Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Rehfuss did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Rehfuss' Personal Data for Defendants' financial benefit. Plaintiff Rehfuss' Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Rehfuss' knowledge, compensation, or control. Plaintiff Rehfuss would have expected compensation in exchange for providing Plaintiff Rehfuss' Personal Data to third parties looking to use it for their own benefit.

213. Plaintiff Rehfuss had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

214. **Plaintiff Dorian Rochester** is an adult individual and a natural person, citizen of Pennsylvania, where he resides and intends to stay.

215. In or around 2023, Plaintiff Rochester downloaded and used the Life360 and Routely apps on his mobile phone. Plaintiff Rochester downloaded the apps for personal use. Plaintiff Rochester reviewed the prominent information about the nature and function of the apps presented to Plaintiff Rochester prior to downloading and using the apps. Plaintiff Rochester was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

216. Plaintiff Rochester is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Rochester's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

217. Plaintiff Rochester was unaware that Allstate and Arity's SDK had been integrated into the apps at the time he installed, and later when he used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Rochester's driving behavior, without Plaintiff Rochester's knowledge or consent.

218. Upon information and belief, insurance premiums paid by Plaintiff Rochester was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Rochester rode as a passenger numerous times while carrying Plaintiff Rochester's mobile phone, and any assumption that the movement of Plaintiff Rochester's phone during those trips reflected Plaintiff Rochester's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendants' covert collection and use of his Personal Data, Plaintiff Rochester paid more for insurance than he otherwise would have.

219. Defendants' interception, collection, and monetization of Plaintiff Rochester's highly sensitive Personal Data without consent caused Plaintiff Rochester harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Rochester's expense.

220. Because of Defendants' conduct, Plaintiff Rochester has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

221. Defendants' secret collection of Plaintiff Rochester's Personal Data deprived Plaintiff Rochester of control over valuable personal information. Plaintiff Rochester's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Rochester did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff's Personal Data for Defendants' financial benefit. Plaintiff Rochester's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Rochester's knowledge, compensation, or control. Plaintiff Rochester would have expected compensation in exchange for providing Plaintiff Rochester's Personal Data to third parties looking to use it for their own benefit.

222. Plaintiff Rochester had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

223. **Plaintiff Robert Sanginito** is an adult individual and a natural person, citizen of New Jersey, where he resides and intends to stay.

224. In or around 2016, Plaintiff Sanginito downloaded and used the SiriusXM app on his mobile phone. In addition, in or around 2020, Plaintiff Sanginito downloaded and used the Life360 app, and in or around 2021, he downloaded and used the GasBuddy app. Plaintiff Sanginito downloaded the apps for personal use. Plaintiff Sanginito reviewed the prominent

information about the nature and function of the apps presented to Plaintiff Sanginito prior to downloading and using the apps. Plaintiff Sanginito was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

225. Plaintiff Sanginito is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Sanginito's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

226. Plaintiff Sanginito was unaware that Allstate and Arity's SDK had been integrated into the apps at the time he installed, and later when he used the apps. Through the apps, and the

integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Sanginito's driving behavior, without Plaintiff Sanginito's knowledge or consent.

227. Upon information and belief, insurance premiums paid by Plaintiff Sanginito was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Sanginito rode as a passenger numerous times while carrying Plaintiff Sanginito's mobile phone, and any assumption that the movement of Plaintiff Sanginito's phone during those trips reflected Plaintiff Sanginito's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Sanginito paid more for insurance than he otherwise would have.

228. Defendants' interception, collection, and monetization of Plaintiff Sanginito's highly sensitive Personal Data without consent caused Plaintiff Sanginito harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Sanginito's expense.

229. Because of Defendants' conduct, Plaintiff Sanginito has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

230. Defendants' secret collection of Plaintiff Sanginito's Personal Data deprived Plaintiff Sanginito of control over valuable personal information. Plaintiff Sanginito's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Sanginito did not authorize the sale, or use of his Personal Data, and did not receive any compensation.

Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Sanginito's Personal Data for Defendants' financial benefit. Plaintiff Sanginito's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Sanginito's knowledge, compensation, or control. Plaintiff Sanginito would have expected compensation in exchange for providing Plaintiff Sanginito's Personal Data to third parties looking to use it for their own benefit.

231. Plaintiff Sanginito had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

232. **Plaintiff Scott Schultz** is an adult individual and a natural person, citizen of Illinois, where he resides and intends to stay.

233. In or around 2021, Plaintiff Schultz downloaded and used the GasBuddy and Life360 apps on his mobile phone. Plaintiff Schultz downloaded the apps for personal use. Plaintiff Schultz reviewed the prominent information about the nature and function of the apps presented to Plaintiff Schultz prior to downloading and using the apps. Plaintiff Schultz was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

234. Plaintiff Schultz is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Schultz's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

235. Plaintiff Schultz was unaware that Allstate and Arity's SDK had been integrated into the apps at the time he installed, and later when he used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Schultz's driving behavior, without Plaintiff Schultz's knowledge or consent.

236. In or around 2024, Plaintiff Schultz purchased insurance from National General, an Allstate subsidiary. Plaintiff Schultz is a National General insurance subscriber, and has been continuously from his initial purchase.

237. Upon information and belief, insurance premiums paid by Plaintiff Schultz was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Schultz rode as a passenger numerous times while carrying Plaintiff Schultz's mobile phone, and any assumption that the movement of

Plaintiff Schultz's phone during those trips reflected Plaintiff Schultz's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Schultz paid more for insurance than he otherwise would have.

238. Defendants' interception, collection, and monetization of Plaintiff Schultz's highly sensitive Personal Data without consent caused Plaintiff Schultz harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Schultz's expense.

239. Because of Defendants' conduct, Plaintiff Schultz has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

240. Defendants' secret collection of Plaintiff Schultz's Personal Data deprived Plaintiff Schultz of control over valuable personal information. Plaintiff Schultz's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Schultz did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Schultz's Personal Data for Defendants' financial benefit. Plaintiff Schultz's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Schultz's knowledge, compensation, or control. Plaintiff Schultz would have expected compensation in exchange for providing Plaintiff Schultz's Personal Data to third parties looking to use it for their own benefit.

241. Plaintiff Schultz had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

242. **Plaintiff Chrystie Seay** is an adult individual and a natural person, citizen of South Carolina, where she resides and intends to stay.

243. In or around 2020, Plaintiff Seay downloaded and used the GasBuddy and Life360 apps on her mobile phone. Plaintiff Seay downloaded the apps for personal use. Plaintiff Seay reviewed the prominent information about the nature and function of the apps presented to Plaintiff Seay prior to downloading and using the apps. Plaintiff Seay was not provided meaningful notice that Defendants would use the apps to collect and share her Personal Data.

244. Plaintiff Seay is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Seay's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

245. Plaintiff Seay was unaware that Allstate and Arity's SDK had been integrated into the apps at the time she installed, and later when she used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Seay's driving behavior, without Plaintiff Seay's knowledge or consent.

246. In or around 2020, Plaintiff Seay purchased insurance from Allstate, or one of its subsidiaries. Plaintiff Seay is an Allstate insurance subscriber, and has been continuously from her initial purchase.

247. Upon information and belief, insurance premiums paid by Plaintiff Seay was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Seay rode as a passenger numerous times while carrying Plaintiff Seay's mobile phone, and any assumption that the movement of Plaintiff Seay's phone during those trips reflected Plaintiff Seay's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Seay paid more for insurance than she otherwise would have.

248. Defendants' interception, collection, and monetization of Plaintiff Seay's highly sensitive Personal Data without consent caused Plaintiff Seay harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Seay's expense.

249. Because of Defendants' conduct, Plaintiff Seay has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

250. Defendants' secret collection of Plaintiff Seay's Personal Data deprived Plaintiff Seay of control over valuable personal information. Plaintiff Seay's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Seay did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Seay's Personal Data for Defendants' financial benefit. Plaintiff Seay's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Seay's knowledge, compensation, or control. Plaintiff Seay would have expected compensation in exchange for providing Plaintiff Seay's Personal Data to third parties looking to use it for their own benefit.

251. Plaintiff Seay had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

252. **Plaintiff Ashika Singh** is an adult individual and a natural person, citizen of North Carolina, where she resides and intends to stay.

253. In or around 2013, Plaintiff Singh downloaded and used the Life 360 app on her mobile phone. In addition, in or around 2020, Plaintiff Singh downloaded and used the Gas Buddy and Sirius XM apps. Plaintiff Singh downloaded the apps for personal use. Plaintiff Singh reviewed the prominent information about the nature and function of the apps presented to Plaintiff Singh prior to downloading and using the apps. Plaintiff Singh was not provided meaningful notice that Defendants would use the apps to collect and share her Personal Data.

254. Plaintiff Singh is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Singh's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

255. Plaintiff Singh was unaware that Allstate and Arity's SDK had been integrated into the apps at the time she installed, and later when she used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Singh's driving behavior, without Plaintiff Singh's knowledge or consent.

256. In or around 2010, Plaintiff Singh purchased insurance from Allstate and remained a customer until 2022. In or around 2022, Plaintiff Singh purchased insurance from National General, an Allstate subsidiary. Plaintiff Singh is a National General insurance subscriber, and has been continuously from her initial purchase.

257. Upon information and belief, insurance premiums paid by Plaintiff Singh was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Singh rode as a passenger numerous times while carrying Plaintiff Singh's mobile phone, and any assumption that the movement of Plaintiff Singh's phone during those trips reflected Plaintiff Singh's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Singh paid more for insurance than she otherwise would have.

258. Defendants' interception, collection, and monetization of Plaintiff Singh's highly sensitive Personal Data without consent caused Plaintiff Singh harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Singh's expense.

259. Because of Defendants' conduct, Plaintiff Singh has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

260. Defendants' secret collection of Plaintiff Singh's Personal Data deprived Plaintiff Singh of control over valuable personal information. Plaintiff Singh's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Singh did not authorize the sale, or use

of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Singh's Personal Data for Defendants' financial benefit. Plaintiff Singh's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Singh's knowledge, compensation, or control. Plaintiff Singh would have expected compensation in exchange for providing Plaintiff Singh's Personal Data to third parties looking to use it for their own benefit.

261. Plaintiff Singh had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

262. **Plaintiff Robert Smith** is an adult individual and a natural person, citizen of Ohio, where he resides and intends to stay.

263. In or around 2021, Plaintiff Smith downloaded and used the GasBuddy and Fuel Rewards apps on his mobile phone. Plaintiff Smith downloaded the apps for personal use. Plaintiff Smith reviewed the prominent information about the nature and function of the apps presented to Plaintiff Smith prior to downloading and using the apps. Plaintiff Smith was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

264. Plaintiff Smith is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Smith's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

265. Plaintiff Smith was unaware that Allstate and Arity's SDK had been integrated into the apps at the time he installed, and later when he used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Smith's driving behavior, without Plaintiff's knowledge or consent.

266. Upon information and belief, insurance premiums paid by Plaintiff Smith was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Smith rode as a passenger numerous times while carrying Plaintiff Smith's mobile phone, and any assumption that the movement of Plaintiff Smith's phone during those trips reflected Plaintiff Smith's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated.

Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Smith paid more for insurance than he otherwise would have.

267. Defendants' interception, collection, and monetization of Plaintiff Smith's highly sensitive Personal Data without consent caused Plaintiff Smith harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Smith's expense.

268. Because of Defendants' conduct, Plaintiff Smith has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

269. Defendants' secret collection of Plaintiff Smith's Personal Data deprived Plaintiff Smith of control over valuable personal information. Plaintiff Smith's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Smith did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Smith's Personal Data for Defendants' financial benefit. Plaintiff Smith's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Smith's knowledge, compensation, or control. Plaintiff Smith would have expected compensation in exchange for providing Plaintiff Smith's Personal Data to third parties looking to use it for their own benefit.

270. Plaintiff Smith had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

271. **Plaintiff Rita Streifel** is an adult individual and a natural person, citizen of California, where she resides and intends to stay.

272. In or around 2020, Plaintiff Streifel downloaded and used the GasBuddy and Fuel Rewards apps on her mobile phone. Plaintiff Streifel downloaded the apps for personal use. Plaintiff Streifel reviewed the prominent information about the nature and function of the apps presented to Plaintiff Streifel prior to downloading and using the apps. Plaintiff Streifel was not provided meaningful notice that Defendants would use the apps to collect and share her Personal Data.

273. Plaintiff Streifel is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Streifel's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

274. Plaintiff Streifel was unaware that Allstate and Arity's SDK had been integrated into the apps at the time she installed, and later when she used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Streifel's driving behavior, without Plaintiff Streifel's knowledge or consent.

275. Upon information and belief, insurance premiums paid by Plaintiff Streifel was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Streifel rode as a passenger numerous times while carrying Plaintiff Streifel's mobile phone, and any assumption that the movement of Plaintiff's phone during those trips reflected Plaintiff Streifel's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Streifel paid more for insurance than she otherwise would have.

276. Defendants' interception, collection, and monetization of Plaintiff Streifel's highly sensitive Personal Data without consent caused Plaintiff Streifel harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Streifel's expense.

277. Because of Defendants' conduct, Plaintiff Streifel has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

278. Defendants' secret collection of Plaintiff Streifel's Personal Data deprived Plaintiff Streifel of control over valuable personal information. Plaintiff Streifel's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Streifel did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff's Personal Data for Defendants' financial benefit. Plaintiff Streifel's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Streifel's knowledge, compensation, or control. Plaintiff Streifel would have expected compensation in exchange for providing Plaintiff Streifel's Personal Data to third parties looking to use it for their own benefit.

279. Plaintiff Streifel had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

280. **Plaintiff Kimberly Summersill** is an adult individual and a natural person, citizen of Texas, where she resides and intends to stay.

281. In or around 2017, Plaintiff Summersill downloaded and used Life360 ("Apps") on her mobile phone. Plaintiff Summersill downloaded the Apps for personal use. Plaintiff Summersill reviewed the prominent information about the nature and function of the Apps presented to Plaintiff Summersill prior to downloading and using the Apps. Plaintiff Summersill was not provided meaningful notice that Defendants would use the Apps to collect and share her Personal Data.

282. Plaintiff Summersill is informed and believes that the Apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Summersill's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

283. Plaintiff Summersill was unaware that Allstate and Arity's SDK had been integrated into the Apps at the time she installed, and later when she used the Apps. Through the Apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Summersill's driving behavior, without Plaintiff Summersill's knowledge or consent.

284. Upon information and belief, insurance premiums paid by Plaintiff Summersill was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Summersill rode as a passenger numerous times while carrying Plaintiff Summersill's mobile phone, and any assumption that the movement of Plaintiff Summersill's phone during those trips reflected Plaintiff Summersill's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Summersill paid more for insurance than she otherwise would have.

285. Defendants' interception, collection, and monetization of Plaintiff Summersill's highly sensitive Personal Data without consent caused Plaintiff Summersill harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Summersill's expense.

286. Because of Defendants' conduct, Plaintiff Summersill has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

287. Defendants' secret collection of Plaintiff Summersill's Personal Data deprived Plaintiff Summersill of control over valuable personal information. Plaintiff Summersill's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Summersill did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Summersill's Personal Data for Defendants' financial benefit. Plaintiff Summersill's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using

that data without Plaintiff Summersill's knowledge, compensation, or control. Plaintiff Summersill would have expected compensation in exchange for providing Plaintiff Summersill's Personal Data to third parties looking to use it for their own benefit.

288. Plaintiff Summersill had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

289. **Plaintiff Valencia Tucker** is an adult individual and a natural person, citizen of Illinois, where he resides and intends to stay.

290. In or around 2019, Plaintiff Tucker downloaded and used the Fuel Rewards app on his mobile phone. In addition, prior to 2019, Plaintiff Tucker downloaded and used the SiriusXM app. Plaintiff Tucker downloaded the apps for personal use. Plaintiff Tucker reviewed the prominent information about the nature and function of the apps presented to Plaintiff Tucker prior to downloading and using the apps. Plaintiff Tucker was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

291. Plaintiff Tucker is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Tucker's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

292. Plaintiff Tucker was unaware that Allstate and Arity's SDK had been integrated into the apps at the time he installed, and later when he used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Tucker's driving behavior, without Plaintiff Tucker's knowledge or consent.

293. Upon information and belief, insurance premiums paid by Plaintiff Tucker was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Tucker rode as a passenger numerous times while carrying Plaintiff Tucker's mobile phone, and any assumption that the movement of Plaintiff Tucker's phone during those trips reflected Plaintiff Tucker's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated.

Case 1:25-cv-09407 Document 112 Filed 11/05/26 Page 220 of 263 PageID: 3754

Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Tucker paid more for insurance than he otherwise would have.

294. Defendants' interception, collection, and monetization of Plaintiff Tucker's highly sensitive Personal Data without consent caused Plaintiff Tucker harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Tucker's expense.

295. Because of Defendants' conduct, Plaintiff Tucker has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

296. Defendants' secret collection of Plaintiff Tucker's Personal Data deprived Plaintiff Tucker of control over valuable personal information. Plaintiff Tucker's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Tucker did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Tucker's Personal Data for Defendants' financial benefit. Plaintiff Tucker's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Tucker's knowledge, compensation, or control. Plaintiff Tucker would have expected compensation in exchange for providing Plaintiff Tucker's Personal Data to third parties looking to use it for their own benefit.

297. Plaintiff Tucker had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

298. **Plaintiff Tracy Tupper** is an adult individual and a natural person, citizen of New York, where she resides and intends to stay.

299. In or around 2019, Plaintiff Tupper downloaded and used the Drivewise app on his mobile phone. Plaintiff Tupper downloaded the app for personal use. Plaintiff Tupper reviewed the prominent information about the nature and function of the app presented to Plaintiff Tupper prior to downloading and using the app. Plaintiff Tupper was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

300. Plaintiff Tupper is informed and believes that the app integrates an SDK provided by Defendants, which harvests several types of data from Plaintiff Tupper's phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

301. Plaintiff Tupper was unaware that Allstate and Arity's SDK had been integrated into the app at the time he installed, and later when he used the app. Through the app, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Tupper's driving behavior, without Plaintiff Tupper's knowledge or consent.

302. In or around 2019, Plaintiff Tupper purchased insurance from Allstate, or one of its subsidiaries. Plaintiff Tupper is an Allstate insurance subscriber, and has been continuously from his initial purchase.

303. Upon information and belief, insurance premiums paid by Plaintiff Tupper was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Tupper rode as a passenger numerous times while carrying Plaintiff Tupper's mobile phone, and any assumption that the movement of Plaintiff Tupper's phone during those trips reflected Plaintiff Tupper's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Tupper paid more for insurance than he otherwise would have.

304. Defendants' interception, collection, and monetization of Plaintiff Tupper's highly sensitive Personal Data without consent caused Plaintiff Tupper harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Tupper's expense.

305. Because of Defendants' conduct, Plaintiff Tupper has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

306. Defendants' secret collection of Plaintiff Tupper's Personal Data deprived Plaintiff Tupper of control over valuable personal information. Plaintiff Tupper's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Tupper did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Tupper's Personal Data for Defendants' financial benefit. Plaintiff Tupper's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Tupper's knowledge, compensation, or control. Plaintiff Tupper would have expected compensation in exchange for providing Plaintiff Tupper's Personal Data to third parties looking to use it for their own benefit.

307. Plaintiff Tupper had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

308. **Plaintiff Jacob Winkelvoss** is an adult individual and a natural person, citizen of Pennsylvania, where he resides and intends to stay.

309. In or around 2019, Plaintiff Winkelvoss downloaded and used the Life360 on his mobile phone. In addition, in or around 2021, Plaintiff Winkelvoss downloaded and used the GasBuddy and Fuel Rewards apps, and in or around 2022, he downloaded and used the Sirius XM app. Plaintiff Winkelvoss downloaded the apps for personal use. Plaintiff Winkelvoss reviewed the prominent information about the nature and function of the apps presented to Plaintiff Winkelvoss prior to downloading and using the apps. Plaintiff Winkelvoss was not provided meaningful notice that Defendants would use the apps to collect and share his Personal Data.

310. Plaintiff Winkelvoss is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Winkelvoss' phone without his knowledge or consent, including but not limited to his:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

e) "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

311. Plaintiff Winkelvoss was unaware that Allstate and Arity's SDK had been integrated into the apps at the time he installed, and later when he used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Winkelvoss' driving behavior, without Plaintiff Winkelvoss's knowledge or consent.

312. Upon information and belief, insurance premiums paid by Plaintiff Winkelvoss was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Winkelvoss rode as a passenger numerous times while carrying Plaintiff Winkelvoss's mobile phone, and any assumption that the movement of Plaintiff Winkelvoss' phone during those trips reflected Plaintiff Winkelvoss's driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated. Accordingly, as a result of Defendant's covert collection and use of his Personal Data, Plaintiff Winkelvoss paid more for insurance than he otherwise would have.

313. Defendants' interception, collection, and monetization of Plaintiff Winkelvoss's highly sensitive Personal Data without consent caused Plaintiff Winkelvoss harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Winkelvoss's expense.

314. Because of Defendants' conduct, Plaintiff Winkelvoss has lost control over the use of his Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

315. Defendants' secret collection of Plaintiff Winkelvoss's Personal Data deprived Plaintiff Winkelvoss of control over valuable personal information. Plaintiff Winkelvoss' Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff Winkelvoss did not authorize the sale, or use of his Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Winkelvoss' Personal Data for Defendants' financial benefit. Plaintiff Winkelvoss' Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using

that data without Plaintiff Winkelvoss' knowledge, compensation, or control. Plaintiff Winkelvoss would have expected compensation in exchange for providing Plaintiff Winkelvoss' Personal Data to third parties looking to use it for their own benefit.

316. Plaintiff Winkelvoss had a reasonable expectation that his location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

317. **Plaintiff Eboni Wright** is an adult individual and a natural person, citizen of Florida, where she resides and intends to stay.

318. In or around 2017, Plaintiff Wright downloaded and used the Life360 app on her mobile phone. In addition, in or around 2022, Plaintiff Wright downloaded and used the Allstate app. Plaintiff Wright downloaded the apps for personal use. Plaintiff Wright reviewed the prominent information about the nature and function of the apps presented to Plaintiff Wright prior to downloading and using the apps. Plaintiff Wright was not provided meaningful notice that Defendants would use the apps to collect and share her Personal Data.

319. Plaintiff Wright is informed and believes that the apps integrate an SDK provided by Defendants, which harvests several types of data from Plaintiff Wright's phone without her knowledge or consent, including but not limited to her:

a) mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b) how Plaintiff interacted with the phone including when and whether the device was in Plaintiff's hand, how long Plaintiff used the app in which the SDK was integrated, and when and whether the device was locked or unlocked;

c) “Trip attributes,” which included information about a consumer’s movements, such as start and end location, distance, duration, start and end time, and termination reason code;

d) “GPS points,” such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer’s mobile phone;

e) “Derived events,” such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

f) Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, device type, app version, and OS version.

320. Plaintiff Wright was unaware that Allstate and Arity’s SDK had been integrated into the apps at the time she installed, and later when she used the apps. Through the apps, and the integrated SDKs, Defendants covertly collected, intercepted, and transmitted the types of data listed above, including but not limited to data related to Plaintiff Wright’s driving behavior, without Plaintiff Wright’s knowledge or consent.

321. Upon information and belief, insurance premiums paid by Plaintiff Wright was, in part, based on Personal Data covertly collected and used by Defendants. The Personal Data was uncontextualized and its accuracy was unverified. Any analysis derived from such Personal Data would be unreliable and misleading. For example, Plaintiff Wright rode as a passenger numerous times while carrying Plaintiff Wright’s mobile phone, and any assumption that the movement of Plaintiff Wright’s phone during those trips reflected Plaintiff Wright’s driving was inaccurate. Furthermore, any insurance premiums based on this analysis would necessarily be inflated.

Accordingly, as a result of Defendant's covert collection and use of her Personal Data, Plaintiff Wright paid more for insurance than she otherwise would have.

322. Defendants' interception, collection, and monetization of Plaintiff Wright's highly sensitive Personal Data without consent caused Plaintiff Wright harm, invasion of privacy, and unjust enrichment of Defendants at Plaintiff Wright's expense.

323. Because of Defendants' conduct, Plaintiff Wright has lost control over the use of her Personal Data, which is in the possession of third parties who have used it and will use it for their own financial advantage.

324. Defendants' secret collection of Plaintiff Wright's Personal Data deprived Plaintiff of control over valuable personal information. Plaintiff's Personal Data has intrinsic and economic value, as demonstrated by Defendants' practice of selling or licensing access to such data to insurers, marketers, and other third parties. Plaintiff did not authorize the sale, or use of her Personal Data, and did not receive any compensation. Defendants' conduct resulted in the unauthorized exploitation of Plaintiff Wright's Personal Data for Defendants' financial benefit. Plaintiff Wright's Personal Data is economically and intrinsically valuable, and Defendants profited by commodifying and selling or otherwise using that data without Plaintiff Wright's knowledge, compensation, or control. Plaintiff Wright would have expected compensation in exchange for providing Plaintiff Wright's Personal Data to third parties looking to use it for their own benefit.

325. Plaintiff Wright had a reasonable expectation that her location, driving behaviors, and movement patterns would remain private unless expressly authorized for collection and use.

**B. Defendants**

326. **Defendant The Allstate Corporation** is a United States public corporation headquartered in Glenview, Illinois, and incorporated under the laws of Illinois. Together with its subsidiaries, Defendant The Allstate Corporation provides insurance products, including car insurance, throughout the United States.

327. **Defendant Allstate Insurance Company** is a wholly owned subsidiary of The Allstate Corporation and is headquartered in Northbrook, Illinois, and incorporated under the laws of Illinois. Defendant Allstate Insurance Company provides insurance products, including car insurance, throughout the United States.

328. **Defendant Allstate Vehicle and Property Insurance Company** is a subsidiary of The Allstate Corporation and is headquartered in Northbrook, Illinois, and incorporated under the laws of Illinois. Defendant Allstate Vehicle and Property Insurance Company provides insurance products, including car insurance, throughout the United States.

329. **Defendant Arity, LLC** was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Chicago, Illinois, and it is incorporated under the laws of Delaware. Defendant Arity, LLC is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate Corporation, collects and analyzes data obtained throughout the United States, and uses predictive analytics to build solutions to sell to third parties.

330. **Defendant Arity 875, LLC** was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Northbrook, Illinois, and it is incorporated under the laws of Delaware. Upon information and belief, Arity 875, LLC's members, including Allstate, Alexandra Band, Christopher Belden, Jennifer Brown, Julie

Cho, Eric Ferren, Amit Goswami, Suren Gupta, Gary Hallgren, Christina Hwang, and Lisa Jillson, are all citizens of Illinois. Defendant Arity 875, LLC, is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate Corporation, collects and analyzes data obtained throughout the United States, and uses predictive analytics to build solutions to sell to third parties.

331. **Defendant Arity Services, LLC** was founded by The Allstate Corporation in 2016 and is a wholly owned subsidiary of The Allstate Corporation. Its headquarters is in Northbrook, Illinois, and it is incorporated under the laws of Delaware. Upon information and belief, Arity Services, LLC's members, including Allstate, Alexandra Band, Christopher Belden, Jennifer Brown, Julie Cho, Eric Ferren, Amit Goswami, Suren Gupta, Gary Hallgren, Christina Hwang, and Lisa Jillson, are all citizens of Illinois. Defendant Arity Services, LLC is a mobility data and analytics company that, together with the other subsidiaries of Defendant The Allstate Corporation, collects and analyzes data obtained throughout the United States, and uses predictive analytics to build solutions to sell to third parties.

332. Upon information and belief, the Allstate and Arity Defendants collaborated among themselves to create a common enterprise for the purpose of collecting Driving Data and Identity Information. Defendants used this Data to support and expand their own insurance business and to sell to third parties for profit. Defendants achieved this common enterprise by relying on coordination between themselves.

333. While Defendant Allstate had developed methods of collecting this data, it formed the Arity subsidiaries in 2016 to further develop and advance its data collection and monetization efforts. Gary Hallgren, the self-purported President of both Arity and Allstate Connected Car,[6] has

[6] Gary Hallgren, Linkedin, https://www.linkedin.com/in/garyhallgren/ (last accessed May 22, 2025)

described the decision by Allstate to form Arity as follows: "[Allstate] faced two choices: they could either keep the technology for themselves or look to the industry. Allstate did the latter and realized we had a strategic asset that could be valuable to the rest of the industry, so Arity formed in 2016."[7]

334. Hallgren has further described the relationship between Allstate Defendants and Arity Defendants, stating:[8]

335. **We think of the Allstate Insurance Company as our customer, and they are in a regulated industry**. Our corporation is not in the regulated part of the Allstate corporate structure, so we must interface with them in the same way that a vendor and a customer would interface for a whole variety of legal and regulatory reasons. **We have a different relationship with the Allstate Corporation. From there, we can leverage a variety of resources, especially around security and cyber.** Having the backing of a [major] financial services company that takes security and cyber so seriously gives us great benefits relative to our competitors of similar size. We try to take the best from the Allstate Corporation, and we are fortunate to have customers that are siblings to us inside of the corporate hierarchy.

336. From 2017 to present, Arity Defendants have marketed and sold Driving Data and Identity Information to Allstate Insurance Defendants as well as to non-Allstate affiliates.[9]

---

[7] Peter High, *How Allstate Built An Analytics Company Anticipating Major Changes In Transportation*, Forbes (Nov. 11, 2019), https://www.forbes.com/sites/peterhigh/2019/11/11/how-allstate-built-an-analytics-company-anticipating-major-changes-in-transportation/

[8] *Id.*

[9] The Allstate Corporation, Inc, Form 10-K (Feb. 26, 2018) https://www.allstateinvestors.com/node/14596/html.

## III. JURISDICTION AND VENUE

337. This Court has jurisdiction over this action under the Class Action Fairness Act, 28 U.S.C. § 1332(d). There are at least 100 members in the proposed class, the aggregated claims of the individual class members exceed the sum or value of $5,000,000, exclusive of interests and costs, and this is a class action in which one or more members of the proposed class, including thirty (30) Plaintiffs, are citizens of a state different from Defendants. The Court has supplemental jurisdiction over the alleged state law claims under 28 U.S.C. § 1367 because they form part of the same case or controversy.

338. This Court has personal jurisdiction over the Defendants as Defendants maintain their principal headquarters in this District, do business in this District, directly or through agents, and have sufficient minimum contacts with this District such that they have intentionally availed themselves of the laws of the United States and Illinois.

339. Venue is proper under 28 U.S.C. § 1391(a) through (d) because Defendants' headquarters and principal place of business are located in this District, Defendant resides in this District, and substantial parts of the events or omissions giving rise to the claims occurred in or emanated from this District, including, without limitation, decisions made by Defendants' governance and management personnel.

## IV. FACTUAL BACKGROUND

340. The car insurance industry collects information about consumers in order to assess an individual's eligibility for insurance, and to set an individual's insurance premium. To calculate premiums, car insurance carriers ("Insurers") collect personal data about drivers, including their driving records, their vehicle, garage, location, and personal characteristics like age and gender.[10]

[10] National Association of Insurance Commissioners, "Want Your Auto Insurer to Track Your Driving? Understanding Usage-Based Insurance," NAIC (Sept. 8, 2021) https://content.naic.org/article/consumer-insight-want-your-auto-insurer-track-your-driving-understanding-usage-based-insurance#:~:text=UBI%

Defendants, however, have taken those efforts further than even the most privacy-conscious consumer could possibly imagine.

341. Using surveillance technology embedded in third-party mobile device applications and in-car sensors to amass vast amounts of highly-sensitive, individual-specific consumer data, Defendants have built highly detailed data profiles of at least 45 million Americans, including Plaintiffs,[11] and all without consumers' knowledge or consent.

342. Defendants have monetized this data in a variety of ways, including when underwriting their own automotive insurance policies (in contravention of their own stated privacy policies and insurance agreements), and by selling access to the "world's largest driving behavior database" to third parties, including other Insurers, that likewise use this ill-gotten data to the detriment of consumers.[12]

**A. Telemetric Data About Driving**

343. In recent years, a new method of collecting individual-specific information has proliferated: telemetry. At a high level, telemetric data provides detailed and time-stamped data about an individual's location, movements, and device usage and is transmitted remotely. Combining telemetric data yields "telematics": data on a driver's speed, phone usage, attention, miles driven, idling time, acceleration and braking, and airbag deployment. This data can be collected through, among other methods, systems installed in vehicles, mobile applications, or SIM cards installed on mobile phones.[13]

---

20or%20usage%2Dbased%20insurance,type%2C%20and%20insurance%20credit%20score.

[11] Arity, "Vehicle Miles Traveled," https://arity.com/solutions/vehicle-miles-traveled/, (last accessed May 22, 2025).

[12] Arity, https://arity.com/ (last accessed May 22, 2025).

[13] Carter Cordes, "Driving value from fleet telematics," McKinsey & Company (Dec. 18, 2018), https://www.mckinsey.com/capabilities/operations/our-insights/driving-value-from-fleet-telematics#/; Verizon Connect, "What is Telematics?" Verizon (June 26, 2023) https://www.verizonconnect.com/resources/article/what-is-telematics/.

344. With the advent of driving telemetric data, the insurance industry touted collection of telematic data in order to provide Usage Based Insurance.[14] Insurers have proposed that analyzing this data allows Insurers to compose a picture of driver behavior, and provide personalized premiums for car insurance.

345. A key feature of Usage Based Insurance is consumer consent.[15] In some states, consent for Usage Based Insurance is a statutory requirement, along with the right to dispute the veracity of the information collected, regulatory reviews of the algorithm collecting and analyzing telemetric data, and a requirement to anonymize any individual consumer data that is transferred or sold.

346. To implement User Based Insurance and collect telematics data, insurance companies have developed smart phone applications ("apps") that allow consumers to access information about their policies, make claims, request roadside assistance, and significantly, enable telemetric data collection.[16]

347. In 2024, 15% of auto-insurance shoppers were offered Usage Based Insurance, and of that 15%, only 17% signed up.[17]

---

[14] National Association of Insurance Commissioners, "Want Your Auto Insurer to Track Your Driving? Understanding Usage-Based Insurance," NAIC (Sept. 8, 2021) https://content.naic.org/article/consumer-insight-want-your-auto-insurer-track-your-driving-understanding-usage-based-insurance#:~:text=UBI%20or%20usage%2Dbased%20insurance,type%2C%20and%20insurance%20credit%20score.

[15] Omri Ben-Shahar, "Privacy Protection, At What Cost? Exploring the Regulatory Resistance to Data Technology in Auto Insurance," Coase-Sandor Working Paper Series in Law and Economics, No. 985 (2023) at 10 f.14, https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1114&context=law_and_economics_wp.

[16] Daniel Robinson, "Guide to the Best Car Insurance Apps," MarketWatch (Aug. 9, 2024), https://www.marketwatch.com/insurance-services/auto-insurance/guide-to-the-best-car-insurance-apps/.

[17] J.D. Power, "Get Ready for an Insurance 'Shop-a-Palooza' in 2025" (Dec. 20, 2025) https://www.jdpower.com/business/resources/2025-insurance-outlook

348. Despite the small percentage of auto-insurance shoppers that select Usage Based Insurance products, the market for Usage Based Insurance is estimated to grow from $57 billion in 2023 to $66 billion by 2032.[18]

349. Not satisfied with the amount of data obtained from consumers that opt-in to Usage Based Insurance, Defendants devised a scheme to use other apps to track individuals and obtain significantly more data regarding the millions of consumers that have not opted in to UBI. Most concerning, this tracking was done through third-party apps rather than those developed, published and associated with Defendants, and thus without the knowledge and informed consent of Plaintiffs and class members.

350. Defendants use the voluminous data they intercepted and collected without consumers' consent to enrich themselves at the expense of consumers, including by setting automotive insurance rates for their own customers, and selling the data to third parties.

**B. Defendants Developed Software Tools to Covertly Collect Consumers' Data**

351. To siphon and amass data concerning consumers, Defendants developed software to embed in third-party apps that require consumers to communicate location data for the app to function as intended.

352. A software development kit ("SDK") is a software-building tool that includes a library of pre-built tools and frameworks, including Application Programming Interfaces ("API"), and code specific to an operating system (such as Android or Apple). SDKs can be downloaded in order to build or integrate into apps in order to reduce the costs, resources, and time required to build apps.[19] Preprogrammed functions in SDKs operate in the background of mobile devices.

---

[18] Fortune Business Insights, "Automatic Usage Based Insurance Market Size," (Apr. 14, 2025) https://www.fortunebusinessinsights.com/automotive-usage-based-insurance-market-104103.

[19] Arity, "Powering safer driving with DriveDown," (Sept. 2023) https://arity.com/wp-content/uploads/2023/09/Arity_Case-Study_insol_southern-farm-bureau.pdf.

353. Developers using SDKs may not know the full extent and functions of the code embedded in their apps. SDKs can be (and, as alleged here, often are) designed to intercept users' location or behavioral data and their personally identifiable information.[20]

354. Defendants' SDK (also referred to herein as the "Arity SDK" and "Defendants' SDK") does all of the above. Defendants made the Arity SDK available to third-party developers to insert as a plug-in for their respective apps. Defendants developed and integrated their SDK not only into their own applications (such as Drivewise), but also into third-party apps unrelated to the provision of automotive insurance, including, but upon information and belief not limited to, Life360 (an app for individuals to share their locations with one another), SiriusXM (a radio and broadcasting app), GasBuddy (an app that identifies gas prices by locations), and the weather apps MyRadar and Weather Bug, the functionality of which relies on location data.[21] Defendants did so to ensure that when an individual downloaded any of these apps they also, unwittingly, downloaded Defendants' software.

355. The Arity SDK siphons, collects, and diverts in real time substantial amounts of data concerning users, including the user's geolocation and movements, as well as the individual's use of the smartphone.

356. "Smartphones come equipped with an array of microelectromechanical sensors (MEMS) capable of gathering information about the world around them, such as location-based and motion sensors, environmental sensors, biometric sensors and activity and health sensors."[22]

[20] IBM, "SDK v. API: What's the difference?" https://www.ibm.com/think/topics/api-vs-sdk (last accessed May 3, 2025).

[21] Kathleen Sampey, "Arity's Driver Data Reaches 200 Million Connections," Street Fight Magazine (Mar. 24, 2023) https://streetfightmag.com/2023/03/24/aritys-driver-data-reaches-200-million-connections/.

[22] George Grouios et al., "Accelerometers in Our Pocket: Does Smartphone Accelerometer Technology Provide Accurate Data?" (Dec. 24, 2022) https://pmc.ncbi.nlm.nih.gov/articles/PMC9824767/.

Specifically, "Smartphone sensors are specific technologies able to sense a physical quantity and translate it into electric signals, so that the particular quantity can be interpreted by the smartphone computing system."

357. A smartphone's accelerometer, magnetometer, and gyroscope are such sensors that collect and send signals that, when processed through the internal computing system, enable the device to perform useful functions for the user's benefit including measuring steps taken and determining the device's position for screen orientation and game functions. They "permit capturing data directly from hardware sensors, embedded into the device, and derived sensors which provide processed and fused data from a few raw sensors all at once, providing users of the system with different information." A user can grant access to this data to software developers "to create novel sensing applications of increasing functionality and complexity."[23]

358. Unbeknownst to consumers, Defendants' apps and the SDK embedded in third-party apps siphon consumers' phone and location data, including precise geolocation data. The Arity SDK can even track users' locations through public Bluetooth beacons, which enable fine-grained tracking indoors.[24]

359. Once downloaded onto a consumer's device, the Arity SDK can intercept and read massive amounts of consumer data.[25] The Arity SDK collects telemetric information about trip distance, trip duration, phone usage, driver attention, acceleration, hard braking, and GPS coordinates, including longitude and latitude, that is collected in "real-time."[26] The movement-

---

[23] *Id.*

[24] Devin McLaughlin, "OEM and mobile telematics data: Unlock a more complete driver profile," Arity (Sept. 9, 2024), https://arity.com/move/oem-and-mobile-telematics-data-unlock-a-more-complete-driver-profile/.

[25] Arity, "How can insurers drive profitable growth using telematics?" https://arity.com/auto-insurance-drive-profitability-growth-telematics/ (last accessed May 4, 2025).

[26] Arity, "Arity Platform," https://apidocs.arity.com/ (last accessed May 4, 2025).

tracking portion of this collection is accomplished through GPS, accelerometer, and gyroscope sensors on mobile phones that can track a vehicle's speed, direction, and lane changes.[27]

360. The Arity SDK also collects additional data that includes but is not limited to:

a. a mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b. how a user interacts with their device including whether the user locks and unlocks their phone;

c. whether the phone is in the user's hand;

d. the amount of time the user spends using the app in which it is embedded;

e. "Trip attributes," which includes information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

f. "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone;

g. "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end location, start and end time, speed attribute, rate of change attribute, and signal strength attribute; and

h. Metadata, such as ad ID, country code, iOS vs. Android indicator, User ID, Mobile Advertising ID ("MAID"), device type, app version, and OS version.[28]

361. In addition to the foregoing data, the Arity SDK also collects information about the mobile device on which the app is installed, like IP addresses, browser and device information, user IDs, geolocation data, and other data. Defendants use this data (as well as personally identifiable

[27] Satoru Inoue, "Analytics in action: What driving data can we collect from accelerometers?," Arity (Oct. 28, 2024), https://arity.com/move/analytics-in-action-what-driving-data-can-we-collect-from-accelerometers/.

[28] Allstate, "Allstate online Privacy Statement," (Sept. 6, 2024), https://delivery.contenthub.allstate.com/api/public/content/3140e554e53b44dfa00a40f15fddca39?v=a9270b36.

information such as names and email addresses licensed from their partner apps) to "fingerprint" individuals, which allows them to generate revenue from the use of this data and the later sale thereof to third parties.[29]

362. Additionally, the Arity SDK collects and transmits encrypted data to Defendants concerning the devices, user, and user's actions. Due to the nature of the encryptions, Plaintiffs cannot determine the full extent of the data that the Arity SDK intercepts and transmits to Defendants.

363. The Arity SDK runs in the background of the device, even if the user is not currently using an app that includes the Arity SDK.

364. The Driving Data collected by Defendants, even without Identity Information, can be personally identifying. For example, the data collected just from the accelerometer of a mobile device can create an "accelerometer fingerprint" that can be used by the receiver of that data to "track [a user] over space and time."[30] One study found that, once created, such a "fingerprint" is "hard to erase, unless the accelerometer wears out to the degree that its fingerprint becomes inconsistent"—which was not observed even once during 9 months of testing 107 different accelerometers.[31]

365. In addition to the telemetric information, the Arity SDK collects usage data from mobile phones, including "scrolling, tapping, locking and unlocking, and hands-free phone calls."[32] This data goes far beyond where a consumer is at any given moment and directly

---

[29] Allstate, "Allstate online Privacy Statement," (Sept. 6, 2024), https://delivery.contenthub.allstate.com/api/public/content/3140e554e53b44dfa00a40f15fddca39?v=a9270b36.

[30] Dey et al., "AccelPrint: Imperfections of Accelerometers Make Smartphones Trackable" at 2, *available at* https://www.ndss-symposium.org/wp-content/uploads/2017/09/03_2_1.pdf.

[31] *Id.*

[32] Arity, "Device data is good. Mobility data is better," (Mar. 12, 2020), https://arity.com/move/shift-location-device-data-mobility-data/.

communicates the user's decisions, actions, choices, and activities, and can and is used to understand consumers' behaviors and actions.

366. The Arity SDK is little more than a method for Defendants to scrape user data from unrelated third-party apps under the pretext of providing a necessary function, and all alongside various identifiers unique to the consumers from whose data has been misappropriated, allowing Defendants to build incredibly detailed profiles concerning the movements, actions, behaviors and choices of specific individuals and others close to them.

367. Meanwhile, consumers who had chosen to download and use a third-party app with the Arity SDK embedded had no knowledge that the app they were using contained the Arity SDK, which was harvesting their data for these purposes. Defendants never notified nor otherwise informed consumers that they were collecting consumer data via the Arity SDK and third-party apps.

**C. Defendants Paid App Developers to Integrate the Arity SDK Into Mobile Apps**

368. Since at least 2017, Defendants have paid third-party app developers millions of dollars to integrate the Arity SDK into their respective mobile apps. Defendants successfully integrated Arity SDK into several popular apps, such as Routely, Life360, GasBuddy, Sirius XM, Fuel Rewards, Streetwise, GPS Driving Route, Fuelzee, and Ago. These apps had a key feature that made them appealing to Defendants as a vehicle for their data collection efforts: all these apps required location information to function properly. Location information is central to the development of the Personal Data Defendants sought to capture, since it factors into many components of driver data, including geolocation, "trip attributes," "GPS points," and "derived events."

369. Once an app integrated the Arity SDK, a consumer who downloaded and used that app unknowingly enabled Defendants to collect their location data without their consent.

370. In addition, Personal Data collected from users by the third-party apps was licensed to and shared with Defendants. The personal data that mobile apps licensed to Defendants generally included first and last name, phone number, address, zip code, mobile ad-ID ("MAID"), and device ID. Together with the Driving Data, the Personal Data could be used by Defendants to more reliably identify the specific person being monitored by the Arity SDK.

371. Defendants would similarly share some of the driving data they collected with the third-party apps with which they contracted to support those apps' features. Thus even the third-party apps that consumers chose to download and use for a specific purpose profited from Defendants' surreptitious and nonconsensual collection of consumers' personal information.

**D. Defendants Offer Drivewise**

372. As well, in 2010, Defendants began offering Drivewise to Allstate customers, which monitored driving behavior through a small telematics device provided by the company to customers at their request. Defendants offered that if customers installed Drivewise devices in their cars they could be rewarded for low mileage and safe driving by, for example, receiving lower rates or other discounts[33] In 2014, Defendants introduced Drivewise Mobile for Allstate customers, the industry's first mobile telematics app.

373. The current iteration of the Drivewise program uses a mobile app that includes a "dashboard" providing driving feedback in real time, "driving insights" that provide personalized feedback on how users can make driving improvements, and a "trip summary" that includes trip histories, parking locations, and family driving insights.[34]

---

[33] *Our History*, Allstate, https://www.allstatecorporation.com/about/our-history.aspx (last accessed May 22, 2025).

[34] *Drivewise from Allstate*, Allstate, https://www.allstate.com/drivewise (last accessed May 22, 2025).

374. Drivewise identifies safe driving by automatically detecting when trips occur and collecting driving information such as speed, braking behaviors, and the time of day you're on the road.[35]

375. Nevertheless, Defendants acknowledge that "Drivewise follows the person, not the vehicle," so the app will detect trips when you are a passenger in a vehicle.[36] Trips are assigned a predicted vehicle, i.e., automobile, train, bus, plane or boat, but can be wrong. The Drivewise user could also be identified as the driver when he or she is in fact the passenger. For this reason, and in clear recognition of the imperfect method that collecting driver trip data through a mobile phone represents, the Drivewise program allows users to edit recorded trips to correct mistakes before they are considered for any rate or discount decision.

376. Defendants include in the Drivewise app the Arity SDK, and through it share all data they collect through the app. Defendants clearly understand that no consumer would permit submission of driving data to their auto insurer without the opportunity to review and correct it. Defendants offer this opportunity with their own Drivewise app. Nevertheless, there is no such ability for any consumers to correct the data collected by the Defendants through the Arity SDK, or control how that information is further relayed to insurers.

---

[35] *Id.*

[36] *Drivewise FAQs*, Allstate, https://www.allstate.com/drivewise/drivewise-faq-asc (last accessed May 22, 2025).

### E. Defendants' Products and Services Monetized Class Members' Personal Information

377. Defendants further profited off of the Personal Data they collected by using it to create and sell additional products and services. These products and services included:

a. **Drivesight**. Drivesight is a product created and sold by the Arity Defendants to third parties to generate a driving score for potential insureds by analyzing data and using that information to score that individual's driving risk.[37]

b. **ArityIQ**. This product is directed at insurers, enabling them to access the driving data collected by Defendants and to use that data to assign more accurate (and therefore "to price more profitably") insurance rate quotes to individual consumers."[38]

c. **Arity Marketing Platform**. Defendants' marketing platform enables third-party advertisers to target drivers "based on driving behavior data" and publishers to "monetize their inventory by displaying relevant ads to high-intent US drivers at scale."[39]

d. **Arity Audiences**. Defendants let companies, including third-party insurers, target drivers with marketing "based on their actual driving history." As part of this product, Defendants displayed ads to the users of apps that agreed to integrate the Arity SDK.[40]

e. **Real Time Insights**. This product collects and distributes transportation-related data derived from the personal and driving data collected by Defendants.

f. **Routely**. This product is offered to consumers as a "free" application providing "helpful insights" into the consumers' driving habits to encourage safer driving. By contrast,

---

[37] Arity, "Drivesight®," https://arity.com/solutions/drivesight/ (last accessed on May 22, 2025).

[38] Arity, "ArityIQ SM," https://arity.com/solutions/arity-iq/ (last accessed on May 22, 2025).

[39] Arity, "Arity Marketing Platform," https://arity.com/solutions/arity-marketing-platform/ (last accessed on May 22, 2025).

[40] Arity, "Arity Audiences," https://arity.com/solutions/arity-audiences/ (last accessed on May 22, 2025).

Defendants sell this product to insurers as "a better way to effectively measure and quantify risky driving behaviors" and "provide personalized pricing while lowering loss ratios."[41]

378. Defendants also partnered with Google, starting in October 2023. Defendants provided their data to "Google Cloud's insurance customers," including unnamed third parties.[42]

379. Defendants track and associate the data collected with specific individuals using various smartphone device identifiers. One of the above-referenced unique smartphone identifiers collected by the Arity SDK, in addition to consumers' names and email addresses, is a Mobile Advertising ID ("MAID"). A MAID is a unique identifier assigned to a consumer's mobile device to assist marketers in advertising to the consumer. MAIDs thus can be used to fingerprint consumers across the internet, and associate and aggregate data collected about them in one place with data generated elsewhere. For example, on iPhones, the MAID is referred to as an identifier for advertisers ("IDFA"), is used for tracking and identifying a user and is assigned at the device level.[43]

380. Although a MAID may be changed by a consumer, doing so requires the consumer to proactively reset the MAID on the consumer's mobile device. Some consumers attempt to block developers from accessing their device's MAID in order to prevent the association of a phone's location data and other unique identifiers with a specific individual.

381. In addition to the IDFA, app developers also create unique identifiers for users of their apps, referred to as the "Identifier for Vendors," or IDFV.[44] An IDFV is a code created by an

---

[41] Arity, "Routely®," https://arity.com/solutions/routely/ (last accessed on May 22, 2025).

[42] Arity, "Arity launches Arity IQ℠ on Google Cloud's Analytics Hub," (Oct. 19, 2023), https://arity.com/move/arity-launches-arity-iq-on-google-clouds-analytics-hub.

[43] The Android equivalent of the IDFA is called GAID, for Google Advertising ID. Play Console Help, "Advertising ID," GOOGLE, https://support.google.com/googleplay/android-developer/answer/6048248?hl=en (last accessed May 4, 2025).

[44] Apple Developer, "IdentifierforVendor," Apple, https://developer.apple.com/documentation/uikit/uidevice/identifierforvendor (last accessed May

app developer and assigned to all of their apps. This code is also shared between all of the apps created by the same developer. The IDFV value is the same for apps from the same developer running on the same device. IDFVs thus provide a way to run cross-promotional iOS campaigns, compatible with iPhones. So long as an IDFV is passed in the tracker URLs and apps, the IDFV can provide app developers with more accurate attribution data for iOS campaigns.[45]

382. In other words, even when consumers try to protect their privacy by disabling device tracking for advertising purposes, app developers can overcome those efforts by doing an end-run around those consumer protections by gathering IDFV and other unique identifying information in order to continue to track consumers without their knowledge or consent, thus further invading their privacy.

383. Privacy experts note that mobile advertising IDs like MAIDs can be more valuable as a tracker and a "better identifier than a name because "[t]his code can be used to track and follow you across many life situations."[46]

384. Notably, Defendants primarily marketed the Driving Data to third parties as "driving behavior" data as opposed to what the Driving Data really was: data about the movements of a person's mobile phone. On information and belief, Defendants had no way to reliably determine whether a person was driving at the time Defendants collected the Driving Data, or which particular person was driving.

---

4, 2025).

[45] Apple Developer, "IdentifierforVendor," Apple, https://developer.apple.com/documentation/uikit/uidevice/identifierforvendor (last accessed May 4, 2025).

[46] Jon Keegan and Alfred Ng, "The Popular Family Safety App Life360 Is Selling Precise Location Data on Its Tens of Millions of Users," The Markup (Dec. 6, 2021), https://themarkup.org/privacy/2021/12/06/the-popular-family-safety-app-life360-is-selling-precise-location-data-on-its-tens-of-millions-of-user.

385. For example, if a person was a passenger in a bus, a taxi, or a friend's car, and that vehicle's driver sped, braked hard, or made a sharp turn, Defendants would conclude that the passenger, not the actual driver, engaged in "bad" driving behavior based on the Driving Data. Defendants would then subsequently sell and share the data so it could be used to inform decisions about that passenger's insurability based on their "bad" driving behavior.

386. In a further example of the obvious flaws in Defendants' abusive practices using Driving Data, a person's driving score was lowered because the "driving" behavior data collected from his phone by that insurance company assumed he was driving, when he was actually riding a roller coaster.[47]

387. The Driving Data further would not reflect contextual information necessary to determine whether certain driving events recorded reflected risky driving. A "hard braking event," for example, could be the result of a sudden hazard such as a child or animal running into the roadway. But the Driving Data would record only a "hard braking event," negatively impacting the risk score assigned by Defendants.

388. These flaws are and should have been obvious to all of the Defendants, yet they continued to collect, disclose, and profit from flawed Driving Data without regard to inaccuracy of the information.

389. Nevertheless, the data Defendants collect through the Arity SDK is incredibly valuable. Geolocation data alone is part of an estimated $12 billion market.[48]

[47] Chad Murphy, "Sir, this is a roller coaster. Car insurance dings driving score for man riding The Beast." The Cincinnati Enquirer (October 8, 2024), https://www.cincinnati.com/story/entertainment/2024/10/08/insurance-cutsdriving-score-man-riding-the-beast-kings-island/75554987007/.

[48] Jon Keegan and Alfred Ng, "There's a Multibillion-Dollar Market for Your Phone's Location Data," The Markup (Sept. 30, 2021), https://themarkup.org/privacy/2021/09/30/theres-a-multibillion-dollar-market-for-your-phones-location-data.

390. An investigation by the Public Interest Research Group found that the data Defendants collect just on consumer geolocation is sold to advertisers so that they can target consumers based on location and driving habits, allowing advertisers to target consumers "on when and where they drive."[49]

391. Defendants' monetization efforts have proven successful and profitable, stating "[t]elematics data available at time of quote through the Arity IQ℠ network was exactly what many of our partners needed to return to a stable, profitable state."

392. Defendants further attribute the industry's swing to a $9.3 billion underwriting gain in Q1 of 2024, compared to the $8.5 billion loss in Q1 of 2023, because of Insurers' more widespread use of their telematics information.[50] And between 2024 and 2025, Allstate's "revenue increased 50.6% or $43 million" which Allstate credited, "primarily due to higher lead generation revenue at Arity."[51]

**F. Defendants' Failure to Disclose the Collection, Sharing, and Use of Plaintiffs' Driving Data**

393. Pursuant to their agreements with app developers, Defendants had varying levels of control over the privacy disclosures and consent language that app developers presented to consumers. Defendants do not verify whether the third-party apps that incorporate Arity SDK obtain informed consumer consent prior to collecting, recording, using, and disseminating consumers' data.

---

[49] R.J. Cross and Nico Vacca, "How Allstate's data broker Arity sells driver Data," Public Interest Research Group (Jan. 22, 2025), https://pirg.org/resources/allstate-arity-selling-data/.

[50] Jen Gold, *How Telematics is Revolutionizing Auto Insurance Marketing Strategies*, ARITY (Oct. 21, 2024) https://arity.com/move/how-telematics-is-revolutionizing-auto-insurance-marketing-strategies.

[51] The Allstate Corporation, Inc, "Form 10-K for Fiscal Quarter Ended May 31, 2025," https://www.allstateinvestors.com/static-files/cd69f838-5d9b-4b01-b4c4-237b935afd1c.

394. In fact, Defendants and the apps running Defendants' SDK either failed to inform Plaintiffs and Class Members that Defendants were collecting Personal Data and Driving Data, or purported to do so in a manner so misleading, confusing, deceptive, and opaque that no reasonable consumer would have understood the extent of the Personal Data and Driving Data collection. Vague disclosures offered by third party apps stating that they are "powered by Arity" or that "certain information" is shared with Defendants did not hint at the scope, sensitive nature, detail, and volume of data sharing, nor that Defendants were using them to build profiles to be used and sold for profit.

395. Thus, neither Defendants nor the apps on Defendants' behalf, informed Plaintiffs and Class Members of the various ways that Defendants would collect, use, and ultimately monetize the Personal Data collected by Defendants.

396. For example, Life360 told app users that it needed location sharing turned on "to enable data use for the in-app map, Place Alerts, and location sharing with [a user's] Circle." Nowhere on that screen – even in the fine print – did Life360 mention Defendants' existence, let alone the breadth of Defendants' data collection and use and sale of that data.

Figure 1




397. Similarly, Fuel Rewards requests permission to track location to "Allow Fuel Rewards to use your location to help find the best gas prices near you and to send you personalized offers and location based alerts." Nowhere is it disclosed that users' mobile phone location and other data is being used to infer driving behavior for purposes of auto insurance underwriting, nor would any reasonable consumer infer that. The reference to additional disclosure of "location" to "third parties" and "business partners" is not just vague but affirmatively misleading given the breadth of data actually shared and because the data is being used for much more than "provid[ing] you with personalized offers."

Figure 2




398. Because Defendants did not disclose their unlawful practices, Plaintiffs and Class Members were wholly unaware that Defendants were collecting the Personal Data and Driving Data from their phones. Plaintiffs and Class Members were likewise wholly unaware (and had no way of knowing) that Defendants would use the Personal Data and Driving Data to create and sell several different products and services to third parties, including other insurers.

399. Defendants did not provide Plaintiffs and Class Members with any sort of notice of their data and privacy practices, nor did the mobile apps notify consumers about Defendants' practices on Defendants' behalf. Similarly, neither Defendants nor the mobile apps notified consumers of the ways in which their Driving Data would be used, nor did consumers agree to have their data used for Defendants' own products or services.

400. Even if a Class Member took the extra step to investigate Defendants outside of the app by navigating to Defendants' website and locating their privacy disclosures, Class Members would still not understand the breadth of the data collected or what Defendants did with their data. Consumers reading Defendants' privacy disclosures are met with a series of untrue and contradictory statements that do not reflect Defendants' practices.

401. For example, Arity's Privacy Policy states that it "do[es] not sell personal information for monetary value,"[52] which is false – and Defendants know it is false. Defendants sold a number of data-based products and services for monetary value that linked a specific app user to their alleged driving behavior, which is personal information. Further, Defendants do not provide Class Members with the ability to request that Defendants stop selling their data.

402. Defendants likewise obscured how they used Plaintiffs' and Class Members' data. In Defendants' privacy disclosures, Defendants state that they "[u]se [consumers'] personal data for analytics and profiling." But in describing how Defendants "profile" consumers, Defendants fail to explain that they combine the Driving Data and Personal Data to create a database of driving profiles for more than 45 million Americans and sell access to that database as a for-profit product. Rather, Defendants describe their profiling activities as follows:

> We use your personal data to assist in our development of predictive driving models. We may profile [consumers'] personal data only for the purposes of creating a driving score ('Driving Score'), which is used for our analytics purposes to develop and validate our predictive driving models.[53]

403. In the event a Class Member took the extraordinary steps of tracking down Defendants' privacy statement, finding the subparagraph describing profiling, parsing through Defendants' convoluted description of their profiling activities, and concluding that they did not want Defendants to use their data to create a "Driving Score" about them, the Class Member still

---

[52] Arity, "Privacy Statement," *supra* n.1.

[53] *Id.*

could do nothing to stop Defendants from collecting their data and creating a Driving Score. The privacy statement did not provide a method for a consumer to request that such data not be used to profile them.

**G. Defendants' Practices Cause Substantial Injury to Consumers**

404. Since Defendants' SDK records location and other data regardless of whether the device is active or idle, and this information is transmitted to Defendants in real time, Defendants are able to collect highly sensitive information about consumers. Even with just location data, Defendants could determine where someone lived, where they worked, where their children go to school, where they go for medical treatment, where they worship, whether and which rallies, demonstrations or protests they attend, and any and all information that can be determined by tracking a person's location and movement. Defendants collected this highly sensitive information, and integrated it with unique PII and demographic data, and additional data regarding their device usage.

405. Such data is valuable for marketing and advertising purposes, and is therefore regularly bought and sold in the "data broker" market. The data broker market is a booming industry market analysts estimate generates nothing less than hundreds of billions of dollars annually. The general market for location data alone is estimated to be over $12 billion.[54] Thus, Plaintiffs were economically harmed because the information taken from them without consent has an economic value that can be measured by the very markets for that data the Defendants participate in.

406. In addition, Defendants' actions caused economic harm to Plaintiffs who faced adverse insurance outcomes, such as denied coverage, increased rates, dropped coverage, and

[54] There's a Multibillion-Dollar Market for Your Phone's Location Data, The Markup (Sept. 30, 2021), https://themarkup.org/privacy/2021/09/30/theres-a-multibillion-dollar-market-for-your-phones-location-data

excessively high quotes, as a result of the information Defendants collected about them and packaged for use and sale in the insurance market.

407. Defendants' actions also caused significant privacy harms. Defendants' extensive surveillance of Plaintiffs' activities while using their phones and within their vehicles—a private space where individuals spend a considerable amount of time speaking with others and engaging in intimate actions beyond simply driving—is an unlawful intrusion in and of itself. Collection and sale of such data is an intrusion into the most private areas of a consumer's life. The scope, quality, and character of the data collected must also be considered as part of that harm. Consumers do not expect that their every movement and details of their device usage, including both in their own vehicles in additional to any other vehicle in which they travel will be tracked in excruciating detail, recorded, and disseminated to unknown third parties.

**H. Plaintiffs' Injuries**

408. As described more fully above, the data that Defendants extracted, manipulated, and monetized may be used to identify consumers' sensitive locations and to infer "driving behavior" including driver attention and details regarding their device usage. The collection and sale of this data is an unwarranted and unauthorized intrusion into the most private areas of a consumer's life and has caused, or is likely to cause, substantial injury to the consumers and their privacy interests.

409. Each Plaintiff's cell phone contains one or more mobile applications that have embedded Defendants' SDK.

410. On information and belief, the SDK harvested several types of data from each Plaintiff's phone without their knowledge or consent, and exfiltrated this data to Defendants, including but not limited to:

a. the mobile phone's geolocation data, accelerometer data, magnetometer data, and gyroscopic data;

b. how a user interacts with their device including whether the user locks and unlocks their phone;

c. whether the phone is in the user's hand;

d. the amount of time the user spends using the app in which it is embedded;

e. "Derived events," such as acceleration, speeding, distracted driving, crash detection, and attributes such as start and end locations, start and end time, speed, rate of change, and signal strength;

f. "Trip attributes," which included information about a consumer's movements, such as start and end location, distance, duration, start and end time, and termination reason code;

g. "GPS points," such as the accuracy, position, longitude, latitude, heading, speed, GPS time, time received, bearing, and altitude of a consumer's mobile phone; and

h. Metadata, such as ad ID, country code, IOS vs Android, User ID, device type, app version, and OS version.

411. Each Plaintiff was unaware that Defendants' SDK was covertly installed on his or her phone. Each Plaintiff was similarly unaware that this SDK was secretly collecting her or his highly granular location, driving, and other data -- and exfiltrating it to Defendants.

412. None of the Plaintiffs consented to Defendants' conduct. None of the Plaintiffs have any agreement with the Defendants concerning the collection of private information from their mobile devices.

413. Plaintiffs have had insurers drop them from coverage, have been denied coverage, have experienced a substantial increase in insurance premiums compared to the steady and regular increases they would otherwise expect, and have been quoted excessively high premiums. These

Plaintiffs have not had any accidents, speeding tickets, or other moving violations that could reasonably be attributed to their loss of coverage or these otherwise unreasonable rate increases.

414. The "driving behavior" and other data described above that was extracted from Plaintiffs without knowledge or consent has substantial integrity issues causing it to be misleading and unreliable as a way of profiling driving behavior. Defendants were aware of these obvious flaws, but marketed and sold the data to insurers to be used to infer driving habits anyway.

415. Plaintiffs' data has tangible value. Defendants' conduct has caused Plaintiffs and Class Members to lose control over the data that Defendants have secretly taken from them and sold for profit. This data is now in the possession of third parties, including insurers, that have used it for their own financial benefit, and will continue to use it to their advantage.

416. Plaintiffs and Class Members have a reasonable expectation of privacy in their vehicles, in taxis, on public transit, while going about their daily lives, and at their doctors' offices. Plaintiffs and Class Members reasonably expect that their location, driving behavior, routes, and schedule would not be collected, transmitted to third parties, or sold without express consent or authorization. This unceasing, detailed, comprehensive, and silent collection of data – including data not perceptible to the naked eye – for profile-building purposes far exceeds what any Plaintiff or Class Member reasonably understood another motorist or passerby might notice about Class Members' driving behavior by virtue of driving on the road with other people. By covertly harvesting, exfiltrating, manipulating, and selling their personal information, Defendants have invaded Plaintiffs and Class Members' privacy rights.

## V. TOLLING OF THE STATUTE OF LIMITATIONS

417. All applicable statute(s) of limitations have been tolled by Defendants' knowing and active concealment and denial of the facts alleged herein. Plaintiffs and Class Members could

not have reasonably discovered Defendants' practice of surreptitiously acquiring and compiling their Driving Data and Personal Data, including sensitive location data, without their consent, selling it to third parties, and/or compiling it in a manner that impacts their insurance premiums—including when the data gathered does not accurately reflect Plaintiffs or Class Members' driving habits.

418. Defendants were and remain under a continuing duty to disclose to Plaintiffs and Class Members their practice of acquiring Driving Data and Personal Data, including sensitive location data, for use in determining insurance premiums. As a result of the active concealment by Defendants, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VI. CLASS ACTION ALLEGATIONS

419. Plaintiffs seek certification of the class set forth herein under Federal Rule of Civil Procedure 23. Specifically, Plaintiffs seek class certification of all claims for relief herein of a class and subclass defined as follows:

> **Class:** All persons residing in the United States and its territories whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Class").
>
> **FCRA Subclass:** All persons residing in the United States and its territories whose vehicle Driving Data and/or Identity Information was collected, stored, distributed, and/or sold by Defendants, and for which a report was created, which was then disclosed to a third party.
>
> **Alabama Subclass:** All person residing in Alabama whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Alabama Subclass").
>
> **Arizona Subclass:** All person residing in Arizona whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Arizona Subclass").
>
> **California Subclass:** All person residing in California whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "California Subclass").
>
> **Florida Subclass:** All person residing in Florida whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Florida Subclass").

**Georgia Subclass:** All person residing in Georgia whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Georgia Subclass").

**Illinois Subclass:** All person residing in Illinois whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Illinois Subclass").

**Kentucky Subclass:** All person residing in Kentucky whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Kentucky Subclass").

**Michigan Subclass:** All person residing in Michigan whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Michigan Subclass").

**Mississippi Subclass:** All person residing in Mississippi whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Mississippi Subclass").

**New Jersey Subclass:** All person residing in New Jersey whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "New Jersey Subclass").

**New York Subclass:** All person residing in New York whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "New York Subclass").

**North Carolina Subclass:** All person residing in North Carolina whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "North Carolina Subclass").

**Ohio Subclass:** All person residing in Ohio whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Ohio Subclass").

**Oregon Subclass:** All person residing in Oregon whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Oregon Subclass").

**Pennsylvania Subclass:** All person residing in Pennsylvania whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Pennsylvania Subclass").

**South Carolina Subclass:** All person residing in South Carolina whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "South Carolina Subclass").

**Texas Subclass:** All person residing in Texas whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Texas Subclass").

**Utah Subclass:** All person residing in Utah whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Utah Subclass").

**Washington Subclass:** All person residing in Washington whose Personal Data was collected, distributed, stored, and/or sold by Defendants (the "Washington Subclass").

420. Excluded from the proposed Class are: Defendants, any entity in which Defendants have a controlling interest, is a parent or subsidiary, or which is controlled by Defendants, as well as the officers, directors, affiliates, legal representatives, heirs, predecessors, successors, and assigns of Defendants; and judicial officers to whom this case is assigned and their immediate family members.

421. Plaintiffs reserve the right to re-define the Class definition after conducting discovery.

422. **Numerosity (Fed. R. Civ. P. 23(a)(1)).** The Class Members are so numerous that joinder of all members is impracticable. Based on information and belief, the Class includes millions of people who were harmed as a result of Defendants' unlawful conduct. The parties will be able to identify the exact size of the Class through discovery and Defendants' records.

423. **Commonality and Predominance (Fed. R. Civ. P. 23(a)(2); 23(b)(3)).** Common questions of law and fact exist for each of the claims and predominate over questions affecting only individual members of the Class. Questions common to the Class include, but are not limited to the following:

a. Whether Defendants engaged in the activities and practices referenced above, including whether Defendants collected and shared Plaintiffs' and Class Members' Driving Data;

b. Whether Defendants used this information to determine insurance premiums and/or insurance coverage;

c. Whether Plaintiffs and Class Members consented to such collection and sharing;

d. Whether Defendants were unjustly enriched;

e. Whether Defendants' conduct constitutes an invasion of privacy and/or an intrusion upon seclusion;

f. Whether Defendants' conduct violated federal and state wiretap laws;

g. Whether Defendants acted knowingly and/or willfully;

h. Whether Plaintiffs and Class Members sustained damages as a result of Defendants' activities and practices referenced above, and, if so, in what amount;

i. Whether Defendants should be enjoined from such conduct in the future; and

j. Whether Defendants profited from their activities and practices referenced above, and, if so, in what amount.

424. All members of the proposed Class are readily ascertainable. In the Driving Data and Personal Data they surreptitiously collected, Defendants have access to the addresses and other contact information for members of the Class, which can be used for providing notice to many Class Members.

425. **Typicality (Fed. R. Civ. P. 23(a)(3)).** Pursuant to Rule 23(a)(3), Plaintiffs' claims are typical of the claims of the Class Members. Plaintiffs' claims are typical of the claims of the members of the Class because all Class Members' highly personal data was captured by Defendants in the same or substantially similar way, and thus Class Members were similarly harmed as a result.

426. **Adequacy of Representation (Fed. R. Civ. P. 23(a)(4)).** Pursuant to Rule 23(a)(4), Plaintiffs and their counsel will fairly and adequately protect the interests of the Class. Plaintiffs have no interest antagonistic to, or in conflict with, the interests of the Class Members. Plaintiffs have retained counsel experienced in prosecuting class actions and data privacy cases.

427. **Superiority (Fed. R. Civ. P. 23(b)(3)).** Pursuant to Rule 23(b)(3), a class action is superior to individual adjudications of this controversy. Litigation is not economically feasible for individual Class Members because the amount of monetary relief available to individual plaintiffs

is insufficient in the absence of the class action procedure. Separate litigation could yield inconsistent or contradictory judgments and increase the delay and expense to all parties and the court system. A class action presents fewer management difficulties and provides the benefits of a single adjudication, economy of scale, and comprehensive supervision by a single court.

428. **Risk of Inconsistent or Dispositive Adjudications and the Appropriateness of Final Injunctive or Declaratory Relief (Fed. R. Civ. P. 23(b)(1) and (2)).** In the alternative, this action may properly be maintained as a class action, because:

a. the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual Class Members which would establish incompatible standards of conduct for Defendants;

b. the prosecution of separate actions by individual Class Members would create a risk of adjudications with respect to individual Class Members which would, as a practical matter, be dispositive of the interests of other Class Members not parties to the adjudications, or substantially impair or impede their ability to protect their interests; or

c. Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole.

429. **Issue Certification (Fed. R. Civ. P. 23(c)(4)).** In the alternative, the common questions of fact and law, set forth in Paragraph 423, are appropriate for issue certification on behalf of the proposed Class.

## VII. CAUSES OF ACTION

**<u>COUNT ONE</u>**
**Violation of the Federal Wiretap Act,**
**18 U.S.C. §§ 2510, *et seq.***
**(On Behalf of Plaintiffs and the Class Against All Defendants)**

430. Plaintiffs repeat and fully incorporate all preceding paragraphs as if fully set forth herein.

431. The Federal Wiretap Act ("FWA"), as amended by the Electronic Communications Privacy Act of 1986 ("ECPA"), prohibits the intentional interception, use, or disclosure of any wire, oral, or electronic communication.

432. In relevant part, the FWA prohibits any person from intentionally intercepting, endeavoring to intercept, or procuring "any other person to intercept or endeavor to intercept, any wire, oral, or electronic communication." 18 U.S.C. § 2511(1)(a).

433. The FWA also makes it unlawful for any person to intentionally disclose, or endeavor to disclose, to any other person or to intentionally use, or endeavor to use, the "contents of any wire, oral, or electronic communication, knowing or having reason to know that" the communication was obtained in violation of the FWA. 18 U.S.C. § 2511(1)(c) & (d).

434. The FWA provides a private right of action to any person whose wire, oral, or electronic communication is intercepted, used, or disclosed. 18 U.S.C. § 2520(a).

435. The FWA defines "intercept" as "the aural or other acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device." 18 U.S.C. § 2510(4).

436. The FWA defines "electronic communication" as "any transfer of signs, signals, […] data, or intelligence of any nature transmitted in whole or in part by a wire, radio,

electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce.” 18 U.S.C. § 2510(12).

437. The FWA defines “electronic, mechanical, or other device” as “any device or apparatus which can be used to intercept a wire, oral, or electronic communication.” 18 U.S.C. § 2510(5).

438. The FWA defines “contents,” with respect to any covered communication, to include “any information concerning the substance, purport, or meaning of that communication[.]” 18 U.S.C. § 2510(8).

439. The FWA defines “person” to include “any individual, partnership, association, joint stock company, trust, or corporation[.]” 18 U.S.C. § 2510(6).

440. Defendants are each a person as defined in 18 U.S.C. §2510(6).

441. The data and transmissions within and from Plaintiffs’ and Class Members’ mobile devices constitute “electronic communications,” as defined by 18 U.S.C. § 2510(12), as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photooptical systems that affect interstate commerce. As the sensors in Plaintiffs’ devices generated data to be analyzed by and stored within their devices (for Plaintiffs’ benefit) or to be sent to the servers of the application developer, the Arity SDK intercepted and siphoned that data and diverted it to Defendants.

442. As alleged herein, Defendants intercepted, in real time, contemporaneously, and as it was transmitted, the contents of electronic communications transmitted within and from Plaintiffs’ mobile devices, and diverted those communications to themselves without consent.

443. As detailed herein, the electronic communications detailed above that Defendants have intercepted are tied to individual drivers and vehicles, and not anonymized.

444. Plaintiffs and Class Members have a reasonable expectation of privacy within their vehicles and while using their mobile devices, and Plaintiffs and Class Members reasonably expected privacy while driving their vehicles and using their mobile devices.

445. Common understanding and experience of how mobile apps work create a reasonable expectation that an insurer and its affiliates, such as Defendants, would not surreptitiously intercept and divert the detailed and personal electronic communications described above.

446. In further violation of the FWA, Defendants have intentionally used or endeavored to use the contents of the electronic communications described above knowing or having reason to know that the information was obtained through interception in violation of 18 U.S.C. § 2511(1)(a). 18 U.S.C. § 2511(1)(d).

447. Specifically, Defendants used the illicitly obtained information to price insurance products sold to Plaintiffs and Class Members and sold this information to other insurers and other entities.

448. As a result, Plaintiffs and Class Members have suffered harm and injury due to the interception, disclosure, and/or use of electronic communications containing their private and personal information.

449. Pursuant to 18 U.S.C. § 2520, Plaintiffs and Class Members have been damaged by Defendants' interception, disclosure, and/or use of their communications in violation of the Wiretap Act and are entitled to: (1) appropriate equitable or declaratory relief; (2) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Plaintiffs and the Class and any profits made by Defendants as a result of the violation or (b) statutory damages for each Class Member of whichever is the greater of $100 per day per

violation or $10,000; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

**<u>COUNT TWO</u>**
**Willful Violation of the Fair Credit Reporting Act,**
**15 U.S.C. §§ 1681, *et seq.***
**(On Behalf of Plaintiffs and the FCRA Subclass Against the Arity Defendants)**

450. Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

451. Plaintiffs bring this claim on their own behalf and on behalf of each member of the FCRA Subclass described above against the Arity Defendants.

452. Plaintiffs and FCRA Subclass Members are consumers entitled to the protections of the FCRA. 15 U.S.C. § 1681a(c).

453. Under the FCRA, a "consumer reporting agency" includes any person which, for monetary fees or on a cooperative nonprofit basis, regularly engages, in whole or in part, in the practice of assembling or evaluating consumer credit information or other consumer information for the purpose of furnishing "consumer reports" to third parties, and which uses any means or facility of interstate commerce for the purpose of preparing or furnishing consumer reports. At all relevant times, the Arity Defendants were consumer reporting agencies. 15 U.S.C. § 1681a(f).

454. Under the FCRA, a "consumer report" is any written, oral, or other communication of any information by a consumer reporting agency bearing on a consumer's credit worthiness, credit standing, credit capacity, character, general reputation, personal characteristics, or mode of living, which is used, expected to be used, or collected, in whole or in part, for the purpose of serving as a factor in establishing the consumer's eligibility for (i) credit or insurance to be used primarily for personal, family, or household purposes, (ii) employment purposes, or (iii) any other

purpose authorized by 15 U.S.C. § 1681b. At all relevant times, the Arity Defendants had compiled and maintained "consumer reports" on Plaintiffs and FCRA Subclass Members. 15 U.S.C. § 1681a(d)(1).

455. As consumer reporting agencies, the Arity Defendants are and were required to identify, implement, maintain, and monitor systems to ensure the accuracy of consumer information in its possession, custody, and control, including Plaintiffs' and FCRA Subclass Members' Driving Data.

456. The Arity Defendants obtain driver behavior data from Defendants and furnish it to third parties, including automobile insurers, for many purposes outside of insurance such as marketing and analytics, without Plaintiffs' and other FCRA Subclass Members' full knowledge and consent. For example, the Arity Defendants describe their own "Arity Audiences" and "Arity Marketing Platform" products and services as tailored to providing data useful for targeted advertising – not for insurance underwriting. The Arity Defendants at all times knew that Plaintiffs and the FCRA Subclass Members did not provide consent for collection, use, and sale of their Driving Data, including for marketing and analytics purposes.

457. The Arity Defendants' provision of credit information that includes driver behavior data to third parties, including automobile insurance companies, constitutes the furnishing of consumer reports under the FCRA and an impermissible purpose and use of data under the FCRA.

458. The FCRA requires credit reporting agencies to adopt reasonable procedures to ensure the "maximum possible accuracy" of the consumer credit information it furnishes. 15 U.S.C. § 1681e(b).

459. The Arity Defendants act as consumer reporting agencies, as defined by 15 U.S.C. § 1681(c)(1), but have failed to implement procedures to maintain "maximum possible accuracy" regarding Plaintiffs' and FCRA Subclass Members' Driving Data.

460. The Arity Defendants have knowingly and willfully engaged in the collection and production of inaccurate data metrics regarding Plaintiffs' and FCRA Subclass Members' driving abilities. Those actions have included, among other things as alleged herein:

a. Adopting and implementing systems which misreport Driver Data and as being associated with one individual, when that information should be associated with other individuals;

b. Continuing to misreport Driver Data and Identity Information even when the Arity Defendants know that the systems they developed to collect and report such information is prone to errors, does not correctly report Driver Data, provides no context for certain Driver Data, and is not subject to review to ensure that the Driver Data is correct;

c. Preparing reports which the Arity Defendants knew, or were reckless in not knowing, that the Driver Data included therein was inaccurate.

461. As a result of the Arity Defendants' conduct, insurance carriers and other third parties who view these consumer reports receive and in turn rely on an inaccurate representation of Plaintiffs' and FCRA Subclass Members' driving abilities.

462. The foregoing deceptive acts and practices constitute reckless and/or negligent violations of the FCRA, including, but not limited to, 15 U.S.C. § 1681e(b).

463. As a result of each and every willful violation of the FCRA, Plaintiffs are entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681n(a)(1); statutory damages pursuant to 15 U.S.C. § 1681n(a)(1); punitive damages as the Court may allow pursuant to 15

U.S.C. § 1681n(a)(2); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681n(a)(3) from the Arity Defendants.

464. As a result of each and every negligent noncompliance of the FCRA, Plaintiffs and FCRA Subclass Members are entitled to actual damages as the Court may allow pursuant to 15 U.S.C. § 1681o(a)(1); and reasonable attorneys' fees and costs pursuant to 15 U.S.C. § 1681o(a)(2) from the Arity Defendants.

**COUNT THREE**
**Violations of Common Law Right to Privacy**
**(On Behalf of Each Plaintiff for the State They Reside In and the Members of the Respective State Subclass Against All Defendants)**

465. Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

466. Common law prohibits Defendants from intentional intrusion into the personal matters of Plaintiffs and Class Members, including their PII, driver behavior information, and location.

467. Plaintiffs and Class Members hold, and at all relevant times held, a legally protected privacy interest in their PII and other personal data and are entitled to the protection of private property, matters, and information therein from intentional intrusions and unauthorized access.

468. As Plaintiffs and Class Members used and carried their phones, visiting family and going about their days, they have unknowingly created troves of highly sensitive data mapping of their respective personal lives which is then collected, captured, transmitted, accessed, compiled, stored, analyzed, and sold—all without their knowledge or informed consent.

469. The private Information of Plaintiffs and Class Members consists of PII and other personal data that were never intended to be shared to third parties.

470. Plaintiffs and Class Members had a legitimate and reasonable expectation of privacy regarding their PII and other personal data and were accordingly entitled to the protection of this information against disclosure to unauthorized third parties.

471. Defendants intentionally invaded Plaintiffs' and Class Members' privacy interests by deliberately designing devices and programs that surreptitiously obtain, improperly gain knowledge of, review, retain, package, and sell their PII and other data.

472. Defendants' unauthorized acquisition and collection of Plaintiffs' and Class Members' PII and other personal data, is highly offensive to a reasonable person. The continued nonconsensual surveillance of an individual in their private capacity, as Defendants have done and continue to do, represents a fundamental violation of personal privacy, freedom, and autonomy. It is not simply an intentional intrusion but a profound and egregious infringement upon the most personal and sacred aspects of one's life. Plaintiffs have unknowingly been subjected to constant observation while they go about their days, which destabilizes the very essence of personal liberty. This unceasing, detailed, comprehensive, and silent collection of data – including data not perceptible to the naked eye – for profile-building purposes far exceeds what any Plaintiff or Class Member reasonably understood another motorist or passerby might notice about Class Members' behavior by virtue of being on the road or out in public.

473. Defendants' conduct exploited Plaintiffs' phone in order to record and transmit Plaintiffs' highly sensitive and personally identifiable data and behavior.

474. Defendants' willful and intentional use of Plaintiffs' and Class Members' PII and other personal data constitutes an intentional interference with Plaintiffs' and the Class Members' interest in solitude or seclusion, either as to their person or as to their private affairs or concerns of a kind that would be highly offensive to a reasonable person.

475. Defendants intentionally and willfully acquired Plaintiffs' data, Defendants had notice and knew that its practices would cause injury to Plaintiffs and Class Members.

476. Defendants' conduct constitutes and, at all relevant times, constituted serious and highly offensive invasions of privacy, as Defendants either did not disclose at all, or failed to make an effective disclosure, that they would record, collect, capture, sell, take and make use of—and allow third-party companies to take and make use of Plaintiffs' and Class Members' PII and other personal data.

477. Defendants profited from Plaintiffs' and Class Members' data without compensating them, and often inaccurately reporting on Plaintiffs' and Class Members' driving abilities and history to third parties. Plaintiffs and Class Members did not receive any compensation in return for the improper use of their personal data. Defendants deprived Plaintiffs and Class Members of the right to control how their personal information is collected, used, or disseminated and by whom.

478. Plaintiffs, on behalf of themselves and Class members, seek compensatory damages for Defendants' invasion of privacy, which includes the value of the privacy interest invaded by Defendants, loss of time, money, and opportunity costs, plus prejudgment interest, and costs.

479. Defendants' wrongful conduct will continue to cause great and irreparable injury to Plaintiffs and the Class since their Private Information is still maintained by Defendants.

480. Plaintiffs and Class Members have no adequate remedy at law for the injuries relating to Defendants' continued possession of their PII and other personal data. A judgment for monetary damages will not undo Defendants' disclosure of the information to third parties, who on information and belief, continue to possess and utilize that information.

481. Plaintiffs, on behalf of themselves and Class Members, further seek injunctive relief to enjoin Defendants from further intruding into the privacy and confidentiality of Plaintiffs' and Class members' PII and other data and to adhere to its common law, contractual, statutory, and regulatory duties.

**COUNT FOUR**
**Intrusion Upon Seclusion**
**(On Behalf of Plaintiffs and the Class Against All Defendants)**

482. Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

483. Plaintiffs and Class Members have reasonable expectations of privacy in their mobile phones, vehicles, and with their movements, generally. Plaintiffs' and Class Members' private affairs include their locations.

484. The reasonableness of such expectations of privacy is supported by Defendants' unique position to monitor Plaintiffs' and Class Members' behavior through their access to Plaintiffs' and Class Members' mobile phone location data through the inclusion of their SDK in certain apps unbeknownst to Plaintiffs. It is further supported by the surreptitious and non-intuitive nature of Defendants' tracking practices. The unceasing, detailed, comprehensive, and silent collection of data – including data not perceptible to the naked eye – for profile-building purposes far exceeds what any Plaintiff or Class Member reasonably understood another motorist or passerby might notice about Class Members' driving behavior by virtue of driving on the road with other people.

485. Defendants intentionally intruded on and into Plaintiffs' and Class Members' solitude, seclusion, or private affairs by intentionally collecting and transmitting information via the SDK installed in their mobile phones.

486. These intrusions are highly offensive to a reasonable person.

487. Plaintiffs and Class Members were harmed by the intrusion into their private affairs as detailed throughout this Complaint.

488. Defendants' actions and conduct complained of herein were a substantial factor in causing the harm suffered by Plaintiffs and Class Members.

489. As a result of Defendants' actions, Plaintiffs and Class Members seek damages and punitive damages in an amount to be determined at trial. Plaintiffs and Class Members seek punitive damages because Defendants' actions—which were malicious, oppressive, and willful—were calculated to injure Plaintiffs and Class Members and were made in conscious disregard of Plaintiffs' and Class Members' rights. Punitive damages are warranted to deter Defendants from engaging in future misconduct.

**COUNT FIVE**
**Unjust Enrichment (Quasi-Contract Claim for Restitution and Disgorgement) or, Alternatively, Breach of Contract**
**(On Behalf of Plaintiffs and the Class Against All Defendants)**

490. Plaintiffs hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

491. Plaintiffs bring this claim on their own behalf and on behalf of Class Members.

492. Plaintiffs and Class Members unwittingly conferred a benefit upon Defendants.

493. Defendants collected and sold Plaintiffs' and Class Members' Personal Data, without Plaintiffs' and Class Members' consent to insurance companies and to other third parties and also used it to build products and services to further sell. Defendants also used this data to evaluate insurance premiums and coverage.

494. Defendants were enriched when they utilized Plaintiffs' and Class Members' location information, gathered without consent, for their own financial advantage to sell in raw

form, or use to create reports or other analyses for sale, including, but not limited to, reports of Plaintiffs' and Class Members' driving behaviors for automobile insurers.

495. In exchange for Plaintiffs' and Class Members' loss of privacy and the financial benefits Defendants enjoyed as a result thereof, including, but not limited to, profits from the sale of the location data, and reports based on that location data, Plaintiffs and Class Members received nothing.

496. Plaintiffs and Class Members received no benefit from this use and sale of their Personal Data. Plaintiffs and Class Members would have expected to receive compensation for providing this data to a data broker who uses such data for profit. But, because Plaintiffs and Class Members did not consent to Defendants' collection and sale of Plaintiffs' and Class Members' Personal Data, they could not and do not benefit from such practices. It is therefore inequitable for Defendants to retain any profit from such collection and sale without payment to Plaintiffs and Class Members for the value of their Personal Data.

497. Alternatively, to the extent Defendants successfully assert that any terms of service from a binding contract that sufficiently defines the parties' rights regarding Defendants' use of Plaintiffs' and Class Members' location information, thereby rendering a claim for unjust enrichment unavailable (which Plaintiffs deny in the first instance), then Plaintiffs allege that Defendants' conduct constitutes a breach of any such binding contract, including, but not limited to, the covenant of good faith and fair dealing implied into every contract. Defendants did not adequately disclose prior to collecting or selling Plaintiffs' and Class Members' mobile phone location and driving behavior data that it would or could be sold to automobile insurance companies with whom Plaintiffs and Class Members had an ongoing, or prospective relationship. By virtue of Defendants' conduct as alleged herein, including the sale of Plaintiffs' and Class

Members' location information without adequate disclosure beforehand, Defendants breached the covenant of good faith and fair dealing implied into every contract, including any applicable terms of service.

498. Defendants are therefore liable to Plaintiffs and Class Members for restitution in the amount of the benefit conferred on Defendants as a result of its wrongful conduct, including specifically the value to Defendants of the Personal Data that they wrongfully intercepted, collected, used, and sold to third parties, and the profits Defendants received or is currently receiving from the use and sale of that Personal Data.

**<u>COUNT SIX</u>**
**Violation of the Alabama Deceptive Trade Practices Act,**
**Ala. Code §§ 8-19-1, *et seq.***
**(On Behalf of the Alabama Plaintiff and the Alabama Subclass Against All Defendants)**

499. Plaintiff Kilgo (for the purposes of this count, the "Alabama Plaintiff"), individually and on behalf of the Alabama Subclass, hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

500. Alabama Plaintiff brings this claim on his own behalf and on behalf of each member of the Alabama Subclass described above.

501. Alabama Plaintiff and the Alabama Subclass Members are each a "consumer" as defined in Ala. Code § 8-19-3.

502. Defendants are each a "person" as defined by Ala. Code § 8-19-3.

503. Alabama Plaintiff sent pre-suit notice pursuant to Ala. Code § 8-19-10(e).

504. Defendants are each engaged in "trade or commerce" affecting the people of Alabama by advertising, offering for sale, selling, or distributing goods and services in the State of Alabama. *See* Ala. Code § 8-19-3.

505. Defendants engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of Ala. Code § 8-19-3.

506. Defendants engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of Ala. Code § 8-19-5, including:

a. Intercepting, collecting, using, and selling Alabama Plaintiff's and Alabama Subclass Members' data, including driving data, without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Alabama Plaintiff's and Alabama Subclass Members' data, including driving data, to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that other third parties collected, manipulated, used, and sold Alabama Plaintiff's and Alabama Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and the associated mobile applications with respect to the privacy of consumers;

e. Misrepresenting the purpose of the SDK and that it would protect the privacy of Alabama Plaintiff's and the Alabama Subclass Members' data, including that it would not intercept, collect, use or sell such data; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Alabama Plaintiff's and Alabama Subclass Members' data, including driving data.

507. These statements, misrepresentations, omissions, and concealments constitute violations of Ala. Code § 8-19-5 (5), (7), (9) and (27).

508. Defendants acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Alabama Plaintiff's and Alabama Subclass Members' rights, because Defendants intentionally intercepted, collected, used, and sold Alabama Plaintiff's and Subclass Members' data without obtaining their consent.

509. The fact that Defendants intercepted, collected, used, and sold Alabama Plaintiff's and Alabama Subclass Members' data was material to Alabama Plaintiff and Alabama Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase, use or download an application.

510. Alabama Plaintiff and Alabama Subclass Members were deceived, and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the functionality of the SDK and associated applications, the security and privacy of their data, and their privacy, to their detriment.

511. Defendants engaged in unfair and unconscionable conduct in violation of the Act by engaging the conduct alleged herein, including by harvesting, selling, and disseminating Alabama Plaintiff and Alabama Subclass Members' data without Plaintiff's and Subclass Members' consent.

512. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Alabama Plaintiff and Alabama Subclass Members have suffered and will continue to suffer injury, including, but not limited to, the loss of privacy, the unauthorized dissemination of their valuable data, and economic harm stemming from Defendants' exploitation of their data.

513. Defendants' unconscionable and unfair acts and practices caused substantial injury to Alabama Plaintiff and Alabama Subclass Members, which they could not reasonably avoid, and which outweighed any benefits to consumers or to competition.

514. Alabama Plaintiff and the Alabama Subclass seek all monetary and non-monetary relief allowed by law, including the greater of (a) actual damages or (b) statutory damages of $100; treble damages; injunctive relief; attorneys' fees, costs, and any other relief that is just and proper.

**COUNT SEVEN**
**Violation of the Arizona Consumer Fraud Act,**
**Ariz. Rev. Stat. §§ 44-1521, *et seq.***
**(On Behalf of the Arizona Plaintiff and the Arizona Subclass Against All Defendants)**

515. Plaintiff Gable (for the purposes of this count, the "Arizona Plaintiff"), individually and on behalf of the Arizona Subclass, hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

516. Arizona Plaintiff brings this claim on her own behalf and on behalf of each member of the Arizona Subclass described above.

517. Arizona Plaintiff and members of the Arizona Subclass are each a "person" as defined by Ariz. Rev. Stat. § 44-1521.

518. Defendants are each a "person" as defined by Ariz. Rev. Stat. § 44-1521.

519. Defendants are each engaged in trade directly or indirectly affecting the people of Arizona by advertising, offering for sale, selling or distributing goods and services in the State of Arizona. *See* Ariz. Rev. Stat. § 44-1521.

520. Defendants are engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of Arizona Revised Statute § 44-1522(A), including:

a. Intercepting, collecting, using, and selling Arizona Plaintiff's and Arizona Subclass Members' data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Arizona Plaintiff's and Arizona Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that Defendants collected, manipulated, used, and sold Arizona Plaintiff's and Arizona Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of the SDK and associate applications with respect to the privacy of consumers;

e. Misrepresenting the purpose of their SDK and associated applications, and that it would protect the privacy of Arizona Plaintiff's and the Arizona Subclass Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Arizona Plaintiff's and Subclass Members' data.

521. Defendants acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Arizona Plaintiff's and Arizona Subclass Members' rights, because Defendants intentionally intercepted, collected, used, and sold Arizona Plaintiff's and Arizona Subclass Members' Driving data without obtaining their consent.

522. The fact the Defendants intercepted, collected, used and sold Arizona Plaintiff's and Arizona Subclass Members' data was material to Arizona Plaintiff and Arizona Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase, download, or use an application.

523. Arizona Plaintiff and Arizona Subclass Members were deceived, and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the functionality of their SDK and associated mobile applications, the security and privacy of their data, and their privacy while going about their day, to their detriment.

524. Arizona Plaintiff's and the Arizona Subclass' data has tangible value. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Arizona Plaintiff's and Arizona Subclass Members' data is in the possession of third parties who have used and will use such data for their commercial benefit.

525. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Arizona Plaintiff and Arizona Subclass Members have suffered and will continue to suffer injury, including, but not limited to, the loss of privacy, the unauthorized dissemination of their valuable data, and economic harm stemming from Defendants' exploitation of their data.

526. Arizona Plaintiff and Arizona Subclass Members seek all monetary and non-monetary relief allowed by law, including compensatory damages; disgorgement; punitive damages; injunctive relief; and reasonable attorneys' fees and costs.

**COUNT EIGHT**
**California Constitutional Invasion of Privacy**
**(On Behalf of the California Plaintiffs and the California Subclass Against All Defendants)**

527. Plaintiffs Azar, Bare, Duffield, Mahoney, Malvar, and Streifel (for the purposes of this count, the "California Plaintiffs"), individually and on behalf of the California Subclass, hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

528. California Plaintiffs bring this claim on their own behalf and on behalf of each member of the California Subclass described above.

529. Article I, section I of the California Constitution states:

> All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy.

Cal. Const. art I § 1.

530. California Plaintiffs and California Subclass Members have an interest in precluding the dissemination and misuse of their driving data by Defendants, and using their personal property without observation, intrusion, or interference by Defendants.

531. California Plaintiffs and California Subclass Members had no knowledge and did not consent or authorize Defendants to obtain their driving data or to share it with third parties and with each other, let alone to use that data in determining insurance coverage and pricing.

532. California Plaintiffs and California Subclass Members enjoyed objectively reasonable expectations of privacy surrounding their driving telematics data. The unceasing, detailed, comprehensive, and silent collection of such data – including data not perceptible to the naked eye – for profile-building purposes far exceeds what any California Plaintiff and California Subclass Member reasonably understood another motorist or passerby might notice about Class Members' driving behavior by virtue of being on a public highway.

533. Defendants' intrusion upon seclusion occurred the moment Defendants began tracking California Plaintiffs and California Subclass Members' driving data.

534. Defendants' conduct was intentional and intruded on California Plaintiffs' and California Subclass Members' use of their personal property.

535. Defendants' conduct was highly offensive to a reasonable person because they shared and/or sold the data to auto insurance companies to influence California Plaintiffs' and California Subclass Members' insurance rates without their prior knowledge or consent.

536. As a direct and proximate result of Defendants' invasions of privacy, California Plaintiffs and California Subclass Members have suffered and will continue to suffer injury and

damages, as alleged herein, including but not limited to overpayment for auto insurance services and decreased value of their driving telematics data.

537. California Plaintiff and California Subclass Members seek all relief available for invasion of privacy claims under the California Constitution, including nominal damages and general privacy damages.

**<u>COUNT NINE</u>**
**Violation of the California Invasion of Privacy Act – Wiretapping Act,**
**Cal. Penal Code §§ 630, *et seq.***
**(On Behalf of the California Plaintiffs and the California Subclass Against All Defendants)**

538. Plaintiffs Azar, Bare, Duffield, Mahoney, Malvar, and Streifel (for the purposes of this count, the "California Plaintiffs"), individually and on behalf of the California Subclass, hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

539. California Plaintiffs bring this claim on their own behalf and on behalf of each member of the California Subclass described.

540. At all relevant times, there was in full force and effect the California Wiretapping Act, Cal. Penal Code § 631.

541. The California legislature enacted the California Invasion of Privacy Act ("CIPA"), Cal. Penal Code § 630, *et seq.*, including the Wiretapping Act, "to protect the right of privacy" of residents of California. Cal. Penal Code § 630.

542. The California legislature was motivated to enact CIPA by a concern that the "advances in science and technology have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications and that the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." *Id.*

543. Cal. Penal Code § 632 prohibits eavesdropping upon or recording of any confidential communication, including those occurring among the parties in the presence of one another or by means of a telephone, telegraph, or other device, through the use of an electronic amplifying or recording device without the consent of all parties to the communication.

544. Cal. Penal Code § 631(a) prohibits:

> any person [from using] any machine, instrument, [] contrivance, or in any other manner . . . [from making] any unauthorized connection, whether physically, electronically, acoustically, inductively, or otherwise, with any telegraph or telephone wire, line, cable, or instrument, including the wire, line, cable, or instrument of any internal telephonic communication system, or who willfully and without the consent of all parties to the communication, or in any unauthorized manner, reads, or attempts to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state; or who uses, or attempts to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained, or who aids, agrees with, employs, or conspires with any person or persons to unlawfully do, or permit, or cause to be done any of the acts or things mentioned above in this section.

545. Defendants are each a "person" within the scope of the California Wiretapping Act.

546. California Plaintiffs' and California Subclass Members' specific user input events and choices on their mobile devices that are tracked by Defendants' SDK communicates the user's affirmative actions, such as clicking a link, installing an app, selecting an option, or relaying a response, and constitute communications within the scope of the California Wiretapping Act.

547. The transmissions of information from California Plaintiffs' and California Subclass Members' mobile device sensors within California Plaintiffs' and California Subclass Members' mobile devices, and to the servers of third-party app developers, constitute communications within the meaning of the California Wiretapping Act.

548. California Plaintiffs' and California Subclass Members are residents of California and used their smartphones within California. As such, Defendants intercept, read, or attempt to

read California Plaintiffs' and California Subclass Members' data, communications, and personal information in California.

549. On information and belief, Defendants use servers in California to intercept, track, process, or otherwise use California Plaintiffs' and California Subclass Members' data, communications, and personal information within California.

550. Defendants intercept California Plaintiffs' and California Subclass Members' communications while they are in transit within and from California Plaintiffs' and California Subclass Members' smartphones and the apps, app developers, and cellphone towers; Defendants transmit a copy of California Plaintiffs' and California Subclass Members' communications to themselves. As the sensors in California Plaintiffs' and California Subclass Members' devices generated data to be analyzed by and stored within their devices (for plaintiffs' benefit) or to be sent to the servers of the application developer, the Arity SDK intercepted and siphoned that data and diverted it to Defendants. Defendants use the contents of the communications to sell to third parties and in other methods for their own pecuniary gain.

551. Neither Defendants nor any other person informed California Plaintiffs and California Subclass Members that Defendants were intercepting and transmitting California Plaintiff's and California Subclass Members' private communications. California Plaintiffs and California Subclass Members did not know Defendants were intercepting and recording their communications, as such they could not and did not consent for their communications to be intercepted by Defendants and thereafter transmitted to others.

552. Defendants' SDK constitutes a machine, instrument, contrivance, or other manner to track and intercept California Plaintiffs' and California Subclass Members' communications while they are using their smartphones.

553. Defendants use and attempt to use or communicate the meaning of California Plaintiffs' and California Subclass Members' communications by ascertaining their personal information, including their Personal Driving Data and places that they have visited, in order to sell California Plaintiffs' and California Subclass Members' personal information to third parties.

554. Specifically, Defendants have used the information derived from the communications described above to create products they market, license, and sell, including driving scores, risk ratings, and access to databases containing Plaintiffs' and California Subclass Members' data.

555. Further, Defendants have used the information derived from the communications described above for their own financial and commercial benefit, obtaining substantial profit.

556. Specifically, Defendants knew or should have known that the detailed information they used and sold was captured in secret in violation of the Act for the following reasons, among others that will become known through discovery:

a. The opaque disclosures in Defendants' various terms and polices, which did not operate as a reasonable basis for inferring consumer consent to share the information with third parties;

b. The lack of public knowledge about Defendants' collection and sharing practices until at least January 2025;

c. The fact that Defendants continue to collect after it was publicized that collection was secret/happening without consent or knowledge; and

d. The nature of the data as such that it had to be obtained via a wiretap.

557. At all relevant times to this complaint, Defendants intercepted and recorded components of California Plaintiffs' and California Subclass Members' private telephone communications and transmissions when California Plaintiffs and California Subclass Members

accessed Defendants' software via their cellular mobile access devices within the State of California.

558. At all relevant times to this complaint, California Plaintiffs and the California Subclass Members did not know Defendants were engaging in such interception and recording and therefore could not provide consent to have their Personal Data intercepted and recorded by Defendants and thereafter transmitted to others.

559. At the inception of Defendants' illegally intercepting and storing the Personal Driving Data, Defendants never advised California Plaintiffs or the other California Subclass Members that any part of this sensitive Personal Data would be intercepted, recorded, and transmitted to third parties.

560. Section 631(a) is not limited to phone lines, but also applies to "new technologies" such as computers, the Internet, and email. *See Matera v. Google Inc.*, 2016 WL 8200619, at *21 (N.D. Cal. Aug. 12, 2016) (CIPA applies to "new technologies" and must be construed broadly to effectuate its remedial purpose of protecting privacy); *Bradley v. Google, Inc.*, 2006 WL 3798134, at *5–6 (N.D. Cal. Dec. 22, 2006) (CIPA governs "electronic communications"); *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589 (9th Cir. 2020) (reversing dismissal of CIPA and common law privacy claims based on Facebook's collection of consumers' Internet browsing history).

561. Defendants' use of MAIDs and its SDK are both a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

562. At all relevant times, by using Defendants' MAID software and SDK as well as tracking California Plaintiffs' and California Subclass Members' geolocation and Personal Driving Data, Defendants intentionally tapped, electrically or otherwise, the lines of internet

communication between California Plaintiffs and California Subclass Members on the one hand, and the specific sites and locations California Plaintiffs and California Subclass Members visited on the other.

563. At all relevant times, by using Defendants' geolocation tracking software technology, Defendants willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of California Plaintiffs and putative California Subclass Members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within California.

564. California Plaintiffs and California Subclass Members did not consent to any of Defendants' actions in implementing these wiretaps. Nor have California Plaintiffs or California Subclass Members consented to Defendants' intentional access, interception, reading, learning, recording, and collection of California Plaintiffs' and California Subclass Members' electronic communications.

565. Defendants violated Cal. Penal Code §§ 631 and 632 by knowingly accessing and without permission accessing California Plaintiffs' and California Subclass Members' devices in order to obtain their personal information, including their Personal Driving Data and location data, and in order for Defendants to share that data with third parties, in violation of California Plaintiffs' and California Subclass Members' reasonable expectations of privacy in their devices and data.

566. Defendants violated Cal. Penal Code §§ 631 and 632 by knowingly and without permission intercepting, wiretapping, accessing, taking, and using California Plaintiffs' and California Subclass Members' personally identifiable information and personal communications with others.

567. As a direct and proximate result of Defendants' violation of the Wiretapping Act, California Plaintiffs and California Subclass Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

568. Defendants were unjustly enriched by their violation of the Wiretapping Act. Pursuant to California Penal Code § 637.2, California Plaintiffs and California Subclass Members have been injured by Defendants' violation of the Wiretapping Act, and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief.

**COUNT TEN**
**Use of a Pen Register or Trap and Trace Device,**
**Cal. Penal Code § 638.51**
**(On Behalf of the California Plaintiffs and the California Subclass Against All Defendants)**

569. Plaintiffs Azar, Bare, Duffield, Mahoney, Malvar, and Streifel (for the purposes of this count, the "California Plaintiffs"), individually and on behalf of the California Subclass, hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

570. California Plaintiffs bring this claim on their own behalf and on behalf of each member of the California Subclass described above.

571. California Penal Code § 638.50(b) defines a "pen register" as "a device or process that records or decodes dialing, routing, addressing, or signaling information transmitted by an instrument or facility from which a wire or electronic communication is transmitted, but not the contents of a communication."

572. California Penal Code § 638.51 prohibits any person from using a pen register without a court order.

573. Defendants' SDK constitutes a "pen register" because it is a device or process that records addressing or signaling information—California Plaintiffs' and Class Members' location

data and personal information—from the electronic communications transmitted by their smartphones.

574. Defendants were not authorized by any court order to use a pen register to track California Plaintiffs' and Class Members' location data and personal information.

575. As a direct and proximate result of Defendants' conduct, California Plaintiffs and Class Members suffered losses and were damaged in an amount to be determined at trial.

**COUNT ELEVEN**
**Violation of the California Unfair Competition Law ("UCL"),**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***
**(On Behalf of the California Plaintiffs and the California Subclass Against All Defendants)**

576. Plaintiffs Azar, Bare, Duffield, Mahoney, Malvar, and Streifel (for the purposes of this count, the "California Plaintiffs"), individually and on behalf of the California Subclass, hereby repeat and incorporate by reference each preceding paragraph as if fully stated herein.

577. California Plaintiffs bring this claim on their own behalf and on behalf of each member of the California Subclass described above.

578. Defendants are "persons" as defined by Cal. Bus. & Prof. Code § 17201.

579. Defendants violated Cal. Bus. & Prof. Code §§ 17200, *et seq.* ("UCL") by engaging in unlawful, unfair, and deceptive business acts and practices.

580. Defendants have engaged in "unlawful" business practices by violating California common law and California constitutional right to privacy.

581. Defendants violated, and continue to violate, the "unfair" prong of the UCL because they took California Plaintiffs' and the California Subclass Members' Personal Data and used this data for undisclosed purposes, including sharing this information with undisclosed third parties. Defendants' statements to consumers were so hidden, misleading, confusing, deceptive, and opaque that no reasonable consumer would have understood the extent of the Personal Data

collection if the consumer understood Defendants were collecting it at all. Plaintiffs' Personal Data is property under the laws of California and common law. The Defendants' use of this Data also caused Plaintiffs to overpay for auto insurance services. Defendants' unlawful taking and use of this property was immoral, unethical, oppressive, unscrupulous and substantially injurious to California Plaintiffs and the California Subclass. Defendants' unauthorized collection and disclosure of Plaintiffs' Personal Data was made for their own gain and at the expense of California Plaintiffs and the California Subclass.

582. Defendants violated, and continue to violate, the "fraudulent" prong of the UCL because they failed to inform California Plaintiffs and the California Subclass that Defendants were collecting their Personal Data, or purported to do so in a manner so misleading, confusing, deceptive, and opaque that no reasonable consumer would have understood the extent of the Personal Data collection. Defendants failed to disclose or did not meaningfully disclose that its SDK and associated applications, intercepted, collected, used, and disseminated Plaintiffs' and California Subclass Members' data, or that Defendants profited from the dissemination, sale, and use of such data. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers about the true function and purposes of Defendants' products and services. Reasonable consumers lack the means to verify Defendants' representations and omissions concerning the SDK's, and associated mobile applications, data collection practices, or to understand the fact or significance of Defendants' practices concerning the collection, dissemination and use of Plaintiffs' and California Subclass Members' data.

583. As a direct and proximate result of Defendants' unfair, unlawful, and fraudulent acts and practices, California Plaintiffs and California Subclass Members were injured and

suffered damages, as alleged herein, including but not limited to invasion of privacy; overpayment for auto insurance services; and decreased value of their driving telematics data.

584. Defendants acted intentionally, knowingly, and maliciously to violate California's Unfair Competition Law, and recklessly disregarded California Plaintiffs' and California Subclass Members' rights.

585. California Plaintiffs and California Subclass Members seek all monetary relief allowed by law, including restitution of all profits stemming from Defendants' unfair, unlawful, and fraudulent business practices and reasonable attorneys' fees and costs under California Code of Civil Procedure § 1021.5. California Plaintiffs and the California Subclass are entitled to restitution as the available damages remedies are inadequate to return to California Plaintiffs and the California Subclass the value of the information taken by Defendants. California Plaintiffs and the California Subclass are entitled to restitution for Defendants' unjust enrichment in a quanta that is not identical to the legal damages suffered.

586. Further, California Plaintiffs and the California Subclass lack an adequate remedy at law and are thus entitled to seek equitable relief. Unless restrained and enjoined, Defendants will continue to misrepresent their data practices and will not recall and destroy all wrongfully collected data. Due to the ongoing nature of the harm, damages will be insufficient to address it. Thus, injunctive relief is appropriate.

## COUNT TWELVE
**Violation of the Florida Security of Communications Act ("FSCA"),**
**Fla. Stat. §§ 934.01, *et seq.***
**(On Behalf of the Florida Plaintiff and the Florida Subclass Against All Defendants)**

587. Plaintiff Wright (for the purposes of this count, the "Florida Plaintiff"), individually and on behalf of the Florida Subclass, repeats and realleges the preceding paragraphs as if fully alleged herein.

588. Florida Plaintiff brings this claim on her own behalf and on behalf of each member of the Florida Subclass described above.

589. The Florida Security of Communications Act ("FSCA"), Fla. Stat. §§ 934.01, *et seq.*, states that any person who"[i]ntentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, oral, or electronic communication" is subject to liability. Fla. Stat. § 934.03(1)(a).

590. Florida Plaintiff, members of the Florida Subclass, and Defendants each constitute a "person" as defined in Fla. Stat. § 934.02.

591. The data and transmissions within, to, and from Florida Plaintiff's and Class Members' vehicles constitute "electronic communications," as defined by Fla. Stat. § 934.02, as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic or photooptical systems that affect intrastate, interstate or foreign commerce.

592. The FSCA prohibits any person from intentionally disclosing, or endeavoring to disclose, to any other person "the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of [the FSCA]." Fla. Stat. Ann. § 934.03(c).

593. The FSCA prohibits any person from intentionally using, or endeavoring to use, "the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of [the FSCA.]" Fla. Stat. Ann. § 934.03(d).

594. As alleged herein, Defendants intercepted, in real time and as they were transmitted, the contents of electronic communications, and diverted those communications to itself without consent.

595. As detailed herein, the electronic communications detailed above that Defendants intercepted are tied to individual drivers and vehicles, and are not anonymized. Plaintiff and Florida Subclass Members have a reasonable expectation of privacy within their vehicles, and Florida Plaintiff and Florida Subclass Members reasonably expected privacy while driving their vehicles, in their homes, and in their doctor's office. Further, there is a reasonable expectation that the interactions between a driver and their phone, including their personal data, are private.

596. Defendants intercepted these electronic communications in real time separately from and in addition to accessing data stored in Florida Plaintiff's and Florida Subclass Members' MAIDs.

597. Defendants intercepted these data transmissions by diverting them, during flight, to their own servers, unbeknownst to Florida Plaintiff and Florida Subclass Members.

598. As detailed herein, the electronic communications detailed above that Defendants intercepted are tied to individuals and vehicles, and are not anonymized.

599. In further violation of the FSCA, Defendants have disclosed or attempted to disclose to third parties the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the FSCA.

600. In further violation of the FSCA, Defendants have used or attempted to use the contents of the communications described above while knowing or having reason to know that the information was obtained through interception in violation of the FSCA.

601. In further violation of the FSCA, Defendants have used the information derived from the communications described above to create products they market, license, and sell,

including so-called driving scores, risk ratings, and access to databases containing Florida Plaintiff's and the Florida Subclass Members' data.

602. Upon information and belief, Defendants continue to disclose and use unlawfully obtained data, including driving data, for their own financial gain.

603. Florida Plaintiff and Florida Subclass Members did not consent or otherwise authorize Defendants to intercept, disclose, or use their communications.

604. As a result, Florida Plaintiff and Florida Subclass Members have suffered harm and injury due to the interception, disclosure, and/or use of communications containing their private and personal information.

605. Defendants' violations of the FSCA have directly and proximately caused Florida Plaintiff and the Florida Subclass to suffer harm and injury due to the interception, disclosure, and/or use of their private and personal information in an amount to be ascertained at trial.

606. Pursuant to Fla. Stat. § 934.10(1), Florida Plaintiff and Florida Subclass Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the FSCA and are entitled to: (1) damages, in an amount to be determined at trial, assessed as the greater of (a) the sum of the actual damages suffered by Florida Plaintiff and the Florida Subclass or (b) statutory damages of whichever is the greater of $100 per day per violation or $10,000; and (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs reasonably incurred.

**COUNT THIRTEEN**
**Violation of the Florida Unfair and Deceptive Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.***
**(On Behalf of the Florida Plaintiff and the Florida Subclass Against All Defendants)**

607. Plaintiff Wright (for the purposes of this count, the "Florida Plaintiff"), individually and on behalf of the Florida Subclass, repeats and realleges the preceding paragraphs as if fully alleged herein.

608. Florida Plaintiff brings this claim on her own behalf and on behalf of each member of the Florida Subclass described above.

609. The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. §§ 501.201, *et seq.*, prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla. Stat. § 501.204.

610. Florida Plaintiff and the members of the Florida Subclass are each a "consumer" as defined in Fla. Stat. Ann. § 501.203.

611. Defendants are each a "person" as defined in Fla. Stat. Ann. § 504.203.

612. Defendants each engaged in "trade or commerce" affecting the people of Florida by advertising, offering for sale, selling or distributing goods and services in the State of Florida. Fla. Stat. Ann. § 501.203.

613. Defendants engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of the FDUTPA by:

a. Representing that goods or services have characteristics that they do not have;

b. Representing that goods or services are of a particular standard, quality, or grade if they are of another;

c. Advertising goods or services with intent not to sell them as advertised;

d. Engaging in other conduct that creates a likelihood of confusion or misunderstanding;

e. Failing to comply with common law and/or statutory duties pertaining to the privacy of Florida Plaintiff's and Florida Subclass Members' data.

614. These deceptive statements, misrepresentations, omissions, concealments and acts constitute violations of Fla. Stat. 7 501.204(1).

615. Defendants acted intentionally, knowingly, and maliciously to violate FDUTPA, and recklessly disregarded Florida Plaintiff's and Florida Subclass Members' rights, because Defendants intentionally intercepted, collected, used, and sold Florida Plaintiff's and Florida Subclass Members' data without obtaining their consent.

616. The fact that Defendants intercepted, collected, used, and sold Florida Plaintiff's and Florida Subclass Members' data was material to Florida Plaintiff and Florida Subclass Members. This is a fact that reasonable consumers would consider important when choosing download, use, or purchase an application.

617. Florida Plaintiff and Florida Subclass Members were deceived and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the functionality of their SDK, the security and privacy of their data, and their privacy in their own vehicles to their detriment.

618. Florida Plaintiff's and the Florida Subclass' data has tangible value. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Florida Plaintiff's and Florida Subclass Members' data is in the possession of third parties who have used and will use such data for their commercial benefit.

619. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Florida Plaintiff and Florida Subclass Members have suffered and

will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

620. Florida Plaintiff and Florida Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

**COUNT FOURTEEN**
**Violation of the Georgia Uniform Deceptive Trade Practices Act,**
**Ga. Code Ann. §§ 10-1-370, *et seq.***
**(On Behalf of the Georgia Plaintiff and the Georgia Subclass Against All Defendants)**

621. Plaintiff Anekwe (for the purposes of this count, the "Georgia Plaintiff"), individually and on behalf of the Georgia Subclass, hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

622. Georgia Plaintiff brings this claim on her own behalf and on behalf of each member of the Georgia Subclass described above.

623. Defendants, Georgia Plaintiff, and Georgia Subclass Members are "persons" within the meaning of § 10-1-371(5) of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA").

624. Defendants engaged in deceptive trade practices in the conduct of its business in violation of Ga. Code § 10-1-372(a), including:

a. Representing that goods or services have characteristics that they do not have;

b. Representing that goods or services are of a particular standard, quality, or grade if they are of another;

c. Advertising goods or services with intent not to sell them as advertised;

d. Engaging in other conduct that creates a likelihood of confusion or misunderstanding.

625. Defendants engaged in unfair, unconscionable, unlawful, and/or deceptive acts and practices in conducting trade and commerce in violation of the Georgia UDTPA by:

a. Intercepting, collecting, using, and selling Georgia Plaintiff's and Georgia Subclass Members' data, including driving data, without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Georgia Plaintiff's and Georgia Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that Defendants and third parties collected, manipulated, used, and sold Georgia Plaintiff's and Georgia Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and associated applications, particularly Routely, with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of Defendants' SDK and associated applications, particularly Routely, and that it would protect the privacy of Georgia Plaintiff's and the Georgia Subclass Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Georgia Plaintiff's and Georgia Subclass Members' data.

626. Defendants acted intentionally, knowingly, and maliciously to violate the Georgia UDTPA, and recklessly disregarded Georgia Plaintiff's and Georgia Subclass Members' rights,

because Defendants intentionally intercepted, collected, used, and sold Georgia Plaintiff's and Georgia Subclass Members' data without obtaining their consent.

627. The fact that Defendants intercepted, collected, used, and sold Georgia Plaintiff's and Georgia Subclass Members' data was material to Georgia Plaintiff and Georgia Subclass Members. This is a fact that reasonable consumers would consider important when choosing which applications to download.

628. Georgia Plaintiff and Georgia Subclass Members were deceived and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the functionality of Defendants' SDK and associated applications, including Routely, and the security and privacy of their and data.

629. In the course of its business, Defendants engaged in activities with a tendency or capacity to deceive. Defendants' spent millions of dollars to influence application developers to integrate their SDK that covertly harvested user data demonstrates that Defendants were aware that consumers would not consent to the collection and disclosure of their Data, thus necessitating Defendants' omissions and misrepresentations regarding their actions.

630. Georgia Plaintiff's and the Georgia Subclass' Data has tangible value. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Georgia Plaintiff's and Georgia Subclass Members' data is in the possession of third parties who have used and will use such data for their commercial benefit.

631. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Georgia Plaintiff and Georgia Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal

information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

632. Georgia Plaintiff and Georgia Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs under O.C.G.A. § 10-1-373.

**COUNT FIFTEEN**
**Recovery of Expenses of Litigation,**
**O.C.G.A. §§ 13-6-11, *et seq.***
**(On Behalf of the Georgia Plaintiff and the Georgia Subclass Against All Defendants)**

633. Plaintiff Anekwe (for the purposes of this count, the "Georgia Plaintiff"), individually and on behalf of the Georgia Subclass, hereby repeats and incorporates by reference each preceding paragraph as if fully stated herein.

634. Georgia Plaintiff brings this claim on her own behalf and on behalf of each member of the Georgia Subclass described above.

635. Pursuant to O.C.G.A. § 13-6-11, the jury may allow the expenses of litigation and attorneys' fees as part of the damages where a defendant "has acted in bad faith, has been stubbornly litigious, or has caused the plaintiff unnecessary trouble and expense."

636. Defendants, through its actions alleged and described herein, acted in bad faith, was stubbornly litigious, or caused the Georgia Subclass unnecessary trouble and expense with respect to the transaction or events underlying this litigation.

637. The Georgia Subclass therefore requests that their claim for recovery of expenses of litigation and attorneys' fees be submitted to the jury, and that the Court enter a Judgment awarding their expenses of litigation and attorneys' fees pursuant to O.C.G.A. § 13-6-11.

**<u>COUNT SIXTEEN</u>**

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 Ill. Comp. Stat. §§ 505, *et seq.***

**(On Behalf of the Illinois Plaintiffs and the Illinois Subclass Against All Defendants)**

638. Plaintiffs Monilaw, Quam, Schultz, and Tucker (for the purposes of this count, the "Illinois Plaintiffs"), individually and on behalf of the Illinois Subclass, repeat and reallege the preceding paragraphs as if fully alleged herein.

639. Illinois Plaintiffs bring this claim on their own behalf and on behalf of each member of the Illinois Subclass described above.

640. Defendants are each a "person" as defined by 815 Ill. Comp. Stat. § 505/1(c).

641. Illinois Plaintiffs and Illinois Subclass Members are "consumers" as defined by 815 Ill. Comp. Stat. § 505/1(e).

642. Defendants' conduct as described herein was in the conduct of "trade" or "commerce" as defined by 815 Ill. Comp. Stat. § 505/1(f).

643. Defendants' deceptive, unfair, and unlawful trade acts or practices, in violation of 815 Ill. Comp. Stat. § 505/2, include:

a. Intercepting, collecting, using, and selling Illinois Plaintiffs' and Illinois Subclass Members' Driving Data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Illinois Plaintiffs' and Illinois Subclass Members' Driving Data to other third parties for their own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that Defendants and other parties collected, manipulated, used, and sold Illinois Plaintiffs' and Illinois Subclass Members' Driving Data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of the Arity SDK with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of the Arity SDK and that it would protect the privacy of Illinois Plaintiffs' and the Illinois Subclass Members' Driving Data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Illinois Plaintiffs' and Illinois Subclass Members' Driving Data.

644. Defendants acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Illinois Plaintiffs' and Illinois Subclass Members' rights, because Defendants intentionally intercepted, collected, used, and sold Illinois Plaintiffs' and Illinois Subclass Members' Driving Data without obtaining their consent. The fact that Defendants intercepted, collected, used, and sold Illinois Plaintiffs' and Illinois Subclass Members' Driving Data was material to Illinois Plaintiffs and Illinois Subclass Members. This is a fact that reasonable consumers would consider important when choosing to use a mobile app or in-vehicle app.

645. Illinois Plaintiffs and Illinois Subclass Members were deceived and/or could reasonably be expected to be deceived by Defendants misrepresentations and omissions regarding the functionality of the Arity SDK, the security and privacy of their Driving Data, and their privacy in their own vehicles to their detriment.

646. Defendants intended to mislead Illinois Plaintiffs and Illinois Subclass Members and induce them to rely on their misrepresentations and omissions.

647. In the course of its business, Defendants engaged in activities with a tendency or capacity to deceive.

648. Illinois Plaintiffs and the Illinois Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

649. Defendants engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by inducing Illinois Plaintiffs and Illinois Subclass Members to provide their Driving Data with knowledge that such data was obtained without Illinois Plaintiffs' and Illinois Subclass Members' consent, and further using, selling, and disseminating Illinois Plaintiffs' and Illinois Subclass Members' Driving Data without their consent.

650. Defendants also violated the Act by knowingly taking advantage of Illinois Plaintiffs' and Illinois Subclass Members' inability to reasonably protect their interests, due to their lack of knowledge regarding Defendants' practices, of which Defendants were aware.

651. Illinois Plaintiffs' and the Illinois Subclass Members' Driving Data has tangible value. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Illinois Plaintiffs' and Illinois Subclass Members' Driving Data is in the possession of third parties —who have used and will use such data for their commercial benefit.

652. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Illinois Plaintiffs and Illinois Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Driving Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their Driving Data; and economic harm stemming from the exploitation of their Driving Data.

653. Illinois Plaintiffs and Illinois Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs.

**<u>COUNT SEVENTEEN</u>**
**Violation of the Illinois Wiretapping, Electronic Surveillance, and Interception of Communications Law, 720 ILCS 5/14-1, *et seq.***
**(On Behalf of the Illinois Plaintiffs and the Illinois Subclass Against All Defendants)**

654. Plaintiffs Monilaw, Quam, Schultz, and Tucker (for the purposes of this count, the "Illinois Plaintiffs"), individually and on behalf of the Illinois Subclass, repeat and reallege all preceding paragraphs, as if fully alleged herein.

655. Illinois Plaintiffs bring this claim on their own behalf and on behalf of each member of the Illinois Subclass described above.

656. The Illinois Eavesdropping Law, 720 ILCS 5/14-1, *et seq.*, prohibits, *inter alia*, any person from knowingly or intentionally "intercept[ing], record[ing], or transcrib[ing], in a surreptitious manner, any private electronic communication" without the consent of all parties. 720 ILCS 5/14-2(a)(3).

657. The Illinois Eavesdropping Law also prohibits any person from using or disclosing "any information which he or she knows or reasonably should know was obtained" in violation of the Act, unless such use or disclosure is done "with the consent of all of the parties." 720 ILCS 5/14-2(a)(5).

658. Defendants are each a "person" within the scope of the Illinois Eavesdropping Law.

659. The data and transmissions within, to, and from Illinois Plaintiffs' and Illinois Subclass Members' vehicles constitute "private electronic communications" as defined by 720 ILCS 5/14-1(e), as they are transfers of signals, data, and intelligence transmitted by electromagnetic, photoelectronic, or photooptical systems.

660. Illinois Plaintiffs and Illinois Subclass Members have a reasonable expectation of privacy within their vehicles, and Illinois Plaintiffs and Illinois Subclass Members reasonably expected privacy while driving their vehicles. Further, there is a reasonable expectation that the interactions between a driver and their vehicle, *i.e.*, their personal Driving Data, are private.

661. As alleged herein, Defendants have intercepted, in real time, contemporaneously, and as they were transmitted, the contents of private electronic communications, and diverted those communications to itself without consent.

662. Defendants intercepted these data transmissions by diverting them to their own servers, unbeknownst to Illinois Plaintiffs and Illinois Subclass Members.

663. As detailed herein, the electronic communications detailed above that Defendants intercepted are tied to individual drivers and vehicles, and not anonymized.

664. In further violation of the Illinois Eavesdropping law, Defendants intentionally disclosed or endeavored to disclose to third parties the contents of the private electronic communications described above while knowing or having reason to know that the information was obtained through the interception of the private electronic communications.

665. In further violation of the Illinois Eavesdropping law, Defendants intentionally used or endeavored to use the contents of the communications described above knowing or having reason to know that the information was obtained through interception in violation of the Act.

666. Defendants have disclosed and used the contents of the communications described above by selling consumers' personal Driving Data to the third parties, for its own financial and commercial benefit, obtaining substantial profit.

667. In violation of the Illinois Eavesdropping Law, Defendants intentionally disclosed, used, or endeavored to use disclose to third parties the contents of Illinois Plaintiffs and Illinois

Subclass Members' private electronic communications intercepted by Defendants while knowing or having reason to know that the information was obtained through the interception of the communications in violation of the Illinois Eavesdropping law.

668. Specifically, Defendants intentionally disclosed or endeavored to disclose Illinois Plaintiffs and Illinois Subclass Members' detailed Driving Data to various auto insurance companies.

669. Defendants further used the information derived from Illinois Plaintiffs' and Illinois Subclass Members' private electronic communications to create products they market, license, and sell, including so-called driving scores, risk ratings, and access to databases containing Illinois Plaintiffs' and Illinois Subclass Members' Driving Data. Defendants also used the information derived from the communications described above in aggregate fashion to create their telematics exchange, develop risk models, and other products they market and sell.

670. Defendants knew or should have known that the detailed driving information they used and sold was captured in violation of the Illinois Eavesdropping Law for the following reasons, among others that will become known through discovery:

a. the numerous, obvious consent and privacy challenges to the collection of Driving Data that Defendants acknowledged in writing and in presentations;

b. the opaque disclosures in Defendants various terms and policies, which did not operate as a reasonable basis for inferring consumer consent to share the information with Defendants;

c. the sheer volume of data Defendants were receiving versus from other manufacturers;

d. the lack of public knowledge about Defendants' collection and sharing practices until at least 2024;

e. that fact that Defendants continued to collect after it was publicized that collection was

secret/happening without consent or knowledge; and

f. the nature of the data as such that it had to be obtained via a wiretap.

671. Illinois Plaintiffs and Illinois Subclass Members did not consent or otherwise authorize Defendants to intercept, disclose, or use their communications.

672. As a result, Illinois Plaintiffs and Illinois Subclass Members have suffered harm and injury due to the interception, disclosure, and/or use of communications containing their private and personal information.

673. Pursuant to 720 ILCS 14-6, Illinois Plaintiffs and Illinois Subclass Members have been damaged by the interception, disclosure, and/or use of their communications in violation of the Eavesdropping law and are entitled to: (1) damages, in an amount to be determined at trial; (2) punitive damages; (3) injunctive relief prohibiting Defendants from further eavesdropping; and (4) reasonable attorneys' fees and other litigation costs reasonably incurred.

**COUNT EIGHTEEN**
**Violation of the Kentucky Consumer Protections Act,**
**Ky. Rev. Stat. §§ 367.110, *et seq.***
**(On Behalf of the Kentucky Plaintiff and the Kentucky Subclass Against All Defendants)**

674. Plaintiff Rehfuss (for the purposes of this count, the "Kentucky Plaintiff"), individually and on behalf of the Kentucky Subclass, repeats and realleges all preceding paragraphs, as if fully alleged herein.

675. Kentucky Plaintiff brings this claim on her own behalf and on behalf of each member of the Kentucky Subclass described above.

676. Defendants are each a "person" as defined by Ky. Rev. Stat. § 367.110(1).

677. Defendants advertised, offered, or sold goods or services in Kentucky and engaged in trade or commerce directly or indirectly affecting the people of Kentucky, as defined by Ky. Rev. Stat. 367.110(2).

678. Defendants engaged in unfair, false, misleading, deceptive, and unconscionable acts or practices, in violation of Ky. Rev. Stat. § 367.170, including:

a. Intercepting, collecting, using, and selling Kentucky Plaintiff's and Kentucky Subclass Members' data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Kentucky Plaintiff's and Kentucky Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that third parties collected, manipulated, used, and sold Kentucky Plaintiff's and Kentucky Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and associated applications, including Routely, with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of Defendants' SDK and associated applications, including Routely, and that it would protect the privacy of Kentucky Plaintiff's and the Kentucky Subclass Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Kentucky Plaintiff's and Kentucky Subclass Members' data.

679. Defendants' representations and omissions include both implicit and explicit representations.

680. Defendants acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Kentucky Plaintiff's and Kentucky Subclass Members' rights, because

Defendants intentionally intercepted, collected, used, and sold Kentucky Plaintiff's and Kentucky Subclass Members' data without obtaining their consent.

681. The fact that Defendants intercepted, collected, used, and sold Kentucky Plaintiff's and Kentucky Subclass Members' data was material to Kentucky Plaintiff and Kentucky Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase, download or use an application.

682. Kentucky Plaintiff and Kentucky Subclass Members were deceived and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the functionality of Defendants' SDK and associated applications, including Routely, the security and privacy of their data to their detriment.

683. In the course of their business, Defendants engaged in activities with a tendency or capacity to deceive. Defendants paid mobile developers millions of dollars to integrate their SDK, which covertly harvested user Data, demonstrating that Defendants knew consumers would not consent to the collection and disclosure of data, thus necessitating Defendants' omissions and misrepresentations regarding their programs.

684. Had Defendants disclosed to Kentucky Plaintiff and Kentucky Subclass Members that they were collecting and disclosing data, they would have been unable to enroll so many individuals in their programs. Instead, in order to drastically increase the numbers of consumers enrolled in its programs and third-party applications, Defendants did not disclose material terms or obtain actual, written consent for them. Instead, Defendants omitted material facts from consumers and misrepresented the actual purpose of its programs. Accordingly, Kentucky Plaintiff and the Kentucky Subclass Members acted reasonably in relying on Defendants' misrepresentations and omissions, the truth of which they could not have discovered.

685. Defendants are engaged in unfair and unconscionable conduct in violation of the Act by engaging in the conduct alleged herein, including by selling and disseminating Kentucky Plaintiff's and Kentucky Subclass Members' data without their consent.

686. The above unfair, deceptive, and unconscionable practices and acts by Defendants a were immoral, unethical, oppressive, and unscrupulous. These acts caused substantial injury to Kentucky Plaintiff and Kentucky Subclass members that they could not reasonably avoid; this substantial injury outweighed any benefits to consumers or to competition.

687. Defendants acted intentionally, knowingly, and maliciously to violate Kentucky's Consumer Protection Act, and recklessly disregarded Kentucky Plaintiff's and Kentucky Subclass Members' rights.

688. Kentucky Plaintiff's and the Kentucky Subclass' data has tangible value. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Kentucky Plaintiff's and Kentucky Subclass Members' data is in the possession of third parties who have used and will use such data for their commercial benefits.

689. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Kentucky Plaintiff and Kentucky Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

690. Kentucky Plaintiff and Kentucky Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages, injunctive relief, and reasonable attorneys' fees and costs. Defendants' violations present a continuing risk to Kentucky Plaintiff

and Kentucky Subclass Members as well as to the general public if injunctive relief does not prevent them from continuing their deceptive acts and practices in the future.

**<u>COUNT NINETEEN</u>**
**Violation of the Mississippi Consumer Protection Act,**
**Miss. Code. §§ 75-24-1, *et seq.***
**(On Behalf of the Mississippi Plaintiffs and the Mississippi Subclass Against All Defendants)**

691. Plaintiffs Appleton and Hill (for the purposes of this count, the "Mississippi Plaintiffs"), individually and on behalf of the Mississippi Subclass, repeat and reallege all preceding paragraphs, as if fully alleged herein.

692. Mississippi Plaintiffs bring this claim on their own behalf and on behalf of each member of the Mississippi Subclass described above.

693. Mississippi Plaintiffs and Defendants are each "persons" as defined by Miss. Code. § 75-24-1(a).

694. Defendants engaged in "trade" and "commerce" as defined by Miss. Code. § 75-24-1(b).

695. Defendants engaged in trade and commerce in Mississippi and/or directly or indirectly affecting the people of Mississippi.

696. Defendants engaged in unfair or deceptive trade practices in or affecting commerce, in violation of Miss. Code. § 75-24-5, including by:

a. Intercepting, collecting, using, and selling Mississippi Plaintiffs' and Mississippi Subclass Members' data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Mississippi Plaintiffs' and Mississippi Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that third parties collected, manipulated, used, and sold Mississippi Plaintiffs' and Mississippi Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and associated applications, including Routely, with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of Defendants' SDK and associated applications, including Routely, and that it would protect the privacy of Mississippi Plaintiffs' and the Mississippi Subclass Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Mississippi Plaintiffs' and Mississippi Subclass Members' data.

697. Defendants intended to mislead Mississippi Plaintiffs and induce Mississippi Subclass Members to rely on their misrepresentations and omissions.

698. Defendants acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Mississippi Plaintiffs' and Mississippi Subclass Members' rights, because Defendants intentionally intercepted, collected, used, and sold Mississippi Plaintiffs' and Mississippi Subclass Members' data without obtaining their consent.

699. The fact that Defendants intercepted, collected, used, and sold Mississippi Plaintiffs' and Mississippi Subclass Members' data was material to Mississippi Plaintiffs and Mississippi Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase, download or use an application.

700. Mississippi Plaintiffs and Mississippi Subclass Members were deceived, and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the functionality of the SDK, the security and privacy of their data, and their privacy in their own vehicles and while going about their day, to their detriment.

701. Defendants engaged in unfair and deceptive trade practices in or affecting commerce, in violation of Miss. Code. § 75-24-5, by engaging in the conduct alleged herein, including by using, selling and disseminating Mississippi Plaintiffs' and Mississippi Subclass Members' data without their consent.

702. Defendants acted intentionally, knowingly, and maliciously to violate Mississippi's Consumer Protection Act, and recklessly disregarded Mississippi Plaintiffs' and the Mississippi Subclass' rights.

703. Mississippi Plaintiffs' and the Mississippi Subclass' data, including driving data, has tangible value. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, Mississippi Plaintiffs' and Mississippi Subclass Members' data is in the possession of third parties who have used and will use such data for their commercial benefit.

704. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, Mississippi Plaintiffs and Mississippi Subclass Members have suffered and will continue to suffer injury ascertainable losses of money or property, and monetary and nonmonetary damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

705. Mississippi Plaintiffs' and the Mississippi Subclass' data was exploited without informed consent. Accordingly, Mississippi Plaintiffs and the Mississippi Subclass are entitled to part of Defendants' profits that were generated by their data without informed consent.

706. Mississippi Plaintiffs and the Mississippi Subclass seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, injunctive relief, attorneys' fees and costs, and any other relief that is just and proper. Miss. Code. § 75-24-15.

**COUNT TWENTY**
**Violation of the Michigan Consumer Protection Act,**
**Mich. Comp. Laws Ann. §§ 445.901, *et seq.***
**(On Behalf of the Michigan Plaintiff and the Michigan Subclass Against All Defendants)**

707. Plaintiff Anderson (for the purposes of this count, the "Michigan Plaintiff"), individually and on behalf of the Michigan Subclass, repeats and realleges all preceding paragraphs, as if fully alleged herein.

708. Defendants and Michigan Subclass members are "persons" as defined by Mich. Comp. Laws Ann. § 445.903(d).

709. Defendants advertised, offered, or sold goods or services in Michigan and engaged in trade or commerce directly or indirectly affecting the people of Michigan, as defined by Mich. Comp. Laws Ann. § 445.903(g).

710. Defendants engaged in unfair, unconscionable, and deceptive practices in the conduct of trade and commerce, in violation of Mich. Comp. Laws Ann. § 445.903(1), including:

a. Representing that their goods and services have characteristics, uses, and benefits that they do not have, in violation of Mich. Comp. Laws Ann. § 445.903(1)(c);

b. Representing that its goods and services are of a particular standard or quality if they are of another in violation of Mich. Comp. Laws Ann. § 445.903(1)(e);

c. Making a representation or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is, in violation of Mich. Comp. Laws Ann. § 445.903(1)(bb); and

d. Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive matter, in violation of Mich. Comp. Laws Ann. § 445.903(1)(cc).

711. Defendants' unfair, unconscionable, and deceptive practices included the following conduct:

a. Intercepting, collecting, using, and selling Michigan Plaintiff's and Michigan Subclass Members' data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Michigan Plaintiff's and Michigan Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that third parties collected, manipulated, used, and sold Michigan Plaintiff's and Michigan Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and associated applications, including Routely, with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of Defendants' SDK and associated applications, including Routely, and that it would protect the privacy of Michigan Plaintiff's and the Michigan Subclass Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Michigan Plaintiff's and Michigan Subclass Members' data.

712. Defendants' representations and omissions were material because they were likely to deceive reasonable consumers.

713. Defendants intended to mislead Michigan Plaintiff and Michigan Subclass members and induce them to rely on its misrepresentations and omissions.

714. The fact that Defendants intercepted, collected, used, and sold Michigan Plaintiffs' and Michigan Subclass Members' Driving Data was material to Michigan Plaintiff and Michigan Subclass Members. This is a fact that reasonable consumers would consider important when choosing to use applications associated with Defendants' SDK.

715. Defendants acted intentionally, knowingly, and maliciously to violate Michigan's Consumer Protection Act, and recklessly disregarded Michigan Plaintiff and Michigan Subclass members' rights because Defendants intentionally intercepted, collected, used, and sold Michigan Plaintiff's and Michigan Subclass Members' data without obtaining their consent.

716. Defendants' unfair, unconscionable, and deceptive practices in the conduct of trade and commerce included entering into a consumer transaction in which the consumer waives or purports to waive a right, benefit, or immunity provided by law, where the waiver was not clearly stated and the consumer did not specifically consent to it. Mich. Comp. Laws Ann. § 445.903(1)(t).

717. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive practices, Michigan Plaintiff and Michigan Subclass members have suffered and will continue to suffer injury, ascertainable losses of money or property, and monetary and non-monetary damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the

likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

718. Michigan Plaintiff's and the Michigan Subclass' data was exploited without informed consent. Accordingly, Michigan Plaintiff and the Michigan Subclass are entitled to part of Defendants' profits that were generated by their data without informed consent.

719. Michigan Plaintiff and Michigan Subclass members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or $250, disgorgement, injunctive relief, attorneys' fees and costs, and any other relief that is just and proper.

**COUNT TWENTY-ONE**
**Violation of the New Jersey Consumer Fraud Act,**
**N.J. Stat. Ann. §§ 56:8-1, *et seq.***
**(On Behalf of the New Jersey Plaintiff and the New Jersey Subclass Against All Defendants)**

720. Plaintiff Sanginito (for the purposes of this count, the "New Jersey Plaintiff"), individually and on behalf of the New Jersey Subclass, repeats and realleges all preceding paragraphs, as if fully alleged herein.

721. New Jersey Plaintiff brings this claim on his own behalf and on behalf of each member of the New Jersey Subclass described above.

722. Defendants are "person(s)" as defined by N.J. Stat. Ann. § 56:8-1(d).

723. Defendants sell "merchandise," as defined by N.J. Stat. Ann. § 56:8-1(c) and (e).

724. The New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.*, prohibits unconscionable commercial practices, deception, fraud, false pretense, false promise, misrepresentation, as well as the knowing concealment, suppression, or omission of any material fact with the intent that others rely on the concealment, omission, or fact, in connection with the sale or advertisement of any merchandise.

725. Defendants' unconscionable and deceptive practices include:

a. Intercepting, collecting, using, and selling New Jersey Plaintiff's and New Jersey Subclass Members' data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling New Jersey Plaintiff's and New Jersey Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that third parties collected, manipulated, used, and sold New Jersey Plaintiff's and New Jersey Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and associated applications, including Routely, with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of Defendants' SDK and associated applications, including Routely, and that it would protect the privacy of New Jersey Plaintiff's and the New Jersey Subclass Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of New Jersey Plaintiff's and New Jersey Subclass Members' data.

726. Defendants intended to mislead New Jersey Plaintiff and New Jersey Subclass members and induce reliance on their misrepresentations and omissions.

727. Defendants acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded New Jersey Plaintiff's and New Jersey Subclass Members' rights, because Defendants intentionally intercepted, collected, used, and sold New Jersey Plaintiff's and New Jersey Subclass Members' data without obtaining their consent.

728. The fact that Defendants intercepted, collected, used, and sold New Jersey Plaintiff's and New Jersey Subclass Members' data was material to New Jersey Plaintiff and New Jersey Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase, download or use an application.

729. New Jersey Plaintiff and New Jersey Subclass Members were deceived and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the functionality of Defendants' SDK and associated applications, including Routely, the security and privacy of their data, and their privacy to their detriment.

730. New Jersey Plaintiff's and the New Jersey Subclass' data has tangible value. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, New Jersey Plaintiff's and New Jersey Subclass Members' data is in the possession of third parties who have used and will use such data for their commercial benefit.

731. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, New Jersey Plaintiff and New Jersey Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

732. New Jersey Plaintiff and New Jersey Subclass Members have suffered injuries in fact and ascertainable losses of money or property as a result of Defendants' deceptive acts and practices. New Jersey Plaintiff's data has tangible economic value, which was wrongfully appropriated by Defendants for financial gain.

733. New Jersey Plaintiff and New Jersey Subclass members seek all monetary and non-monetary relief allowed by law, including injunctive relief, restitution, treble damages under N.J. Stat. Ann. § 56:8-19, attorneys' fees, filing fees, and costs.

**<u>COUNT TWENTY-TWO</u>**
**Violation of the New York General Business Law,**
**N.Y. Gen. Bus. Law § 349**
**(On Behalf of the New York Plaintiff and the New York Subclass Against All Defendants)**

734. Plaintiff Tupper (for the purposes of this count, the "New York Plaintiff"), individually and on behalf of the New York Subclass, repeats and realleges all preceding paragraphs, as if fully alleged herein.

735. New York Plaintiff brings this claim on her own behalf and on behalf of each member of the New York Subclass described above.

736. Defendants engaged in deceptive acts or practices in the conduct of their business, trade, and commerce, in violation of N.Y. Gen. Bus. Law § 349. Defendants engaged in deceptive acts and practices by:

a. Intercepting, collecting, using, and selling New York Plaintiff's and New York Subclass Members' data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling New York Plaintiff's and New York Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that third parties collected, manipulated, used, and sold New York Plaintiff's and New York Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and associated applications, including Routely, with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of Defendants' SDK and associated applications, including Routely, and that it would protect the privacy of New York Plaintiff's and the New York Subclass Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of New York Plaintiff's and New York Subclass Members' data.

737. Defendants' omissions and misrepresentations were material because they were likely to deceive reasonable consumers into believing that their data would not be sold or used for financial gain without their knowledge or consent.

738. Defendants acted intentionally, knowingly, and maliciously to violate N.Y. Gen. Bus. Law § 349, or acted with reckless disregard for the rights of New York Plaintiff and New York Subclass Members.

739. As a direct and proximate result of Defendants' deceptive and unlawful acts and practices, New York Plaintiff and New York Subclass Members have suffered and will continue to suffer injury, but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

740. New York Plaintiff and New York Subclass Members have suffered injuries in fact and ascertainable losses of money or property as a result of Defendants' deceptive acts and

practices. New York Plaintiff's and New York Subclass Members' data has tangible economic value, which was wrongfully appropriated by Defendants for financial gain.

741. The public interest and consumers at large were harmed by Defendants' deceptive and unlawful acts, which affected thousands of New York residents.

742. New York Plaintiff and New York Subclass Members seek all monetary and non-monetary relief available under N.Y. Gen. Bus. Law § 349, including actual damages or statutory damages of $50 (whichever is greater), treble damages, injunctive relief, attorneys' fees, and costs.

## <u>COUNT TWENTY-THREE</u>
## Violation of the New York General Business Law, N.Y. Gen. Bus. Law § 350
## (On Behalf of the New York Plaintiff and the New York Subclass Against All Defendants)

743. Plaintiff Tupper (for the purposes of this count, the "New York Plaintiff"), individually and on behalf of the New York Subclass, repeats and realleges all preceding paragraphs, as if fully alleged herein.

744. New York Plaintiff brings this claim on her own behalf and on behalf of each member of the New York Subclass described above.

745. Defendants engaged in advertising, including labeling, of goods and services that was misleading in a material respect in violation of New York General Business Law § 350-a(1).

746. Defendants' advertising was misleading in a material respect because it falsely implied that their goods and services included privacy protections for consumers' data and failed to disclose material facts regarding the collection and sale of such data. Specifically, Defendants failed to disclose that it was surreptitiously collecting New York Plaintiff's and New York Subclass Members' data and subsequently selling that data to third parties for profit.

747. The omission of these material facts rendered Defendants' representations misleading in light of the advertised nature of their goods and services. New York Plaintiff and

New York Subclass Members reasonably believed, based on Defendants' advertising, that their data would not be collected or sold without their knowledge and consent.

748. Defendants knowingly and intentionally engaged in false advertising with the intent to induce New York Plaintiff and New York Subclass Members to use their goods and services, and the goods and services of applications using Defendants' SDK, relying on the misleading representations and omissions regarding privacy protections for data.

749. As a direct and proximate result of Defendants' false advertising, New York Plaintiff and New York Subclass Members were injured in that they purchased or downloaded goods and services under false pretenses and suffered a loss of privacy and control over their data, which has tangible value. New York Plaintiff and New York Subclass Members would not have purchased or downloaded Defendants' goods and services, or the goods and services of mobile applications utilizing Defendants' SDK, or would have paid less for them, had the true facts been disclosed.

750. New York Plaintiff seeks all monetary and non-monetary relief allowed by law, including actual damages or statutory damages of five hundred dollars per violation, whichever is greater, treble damages for willful or knowing violations, injunctive relief, reasonable attorneys' fees, costs, pre-judgment interest, and any other relief the Court deems just and proper.

**<u>COUNT TWENTY-FOUR</u>**
**Violation of the North Carolina Unfair and Deceptive Trade Practices Act,**
**N.C. Gen. Stat. §§ 75-1.1, *et seq.***
**(On Behalf of the North Carolina Plaintiff and the North Carolina Subclass Against All Defendants)**

751. Plaintiff Singh (for the purposes of this count, the "North Carolina Plaintiff"), individually and on behalf of the North Carolina Subclass, repeats and realleges all preceding paragraphs, as if fully alleged herein.

752. North Carolina Plaintiff brings this claim on her own behalf and on behalf of each member of the North Carolina Subclass described above.

753. Defendants and North Carolina Plaintiff are "persons" as defined by N.C. Gen. Stat. § 75-1.1(d).

754. Defendants advertised, offered, or sold goods and services in North Carolina and engaged in trade or commerce directly or indirectly affecting the people of North Carolina, as defined by N.C. Gen. Stat. § 75-1.1(b).

755. Defendants engaged in unfair, unconscionable, and deceptive practices in violation of N.C. Gen. Stat. § 75-1.1(a). These practices include:

a. Intercepting, collecting, using, and selling North Carolina Plaintiff's and North Carolina Subclass Members' data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling North Carolina Plaintiff's and North Carolina Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that third parties collected, manipulated, used, and sold North Carolina Plaintiff's and North Carolina Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and associated applications, including Routely, with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of Defendants' SDK and associated applications, including Routely, and that it would protect the privacy of North Carolina Plaintiff's and the North

Carolina Subclass Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of North Carolina Plaintiff's and North Carolina Subclass Members' data.

756. Defendants acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded North Carolina Plaintiff's and North Carolina Subclass Members' rights, because Defendants intentionally intercepted, collected, used, and sold North Carolina Plaintiff's and North Carolina Subclass Members' data, including driving data, without obtaining their consent. Defendants intended to mislead North Carolina Plaintiff and North Carolina Subclass members and induce them to rely on the omissions to their detriment.

757. The fact that Defendants intercepted, collected, used, and sold North Carolina Plaintiff's and North Carolina Subclass Members' data was material to North Carolina Plaintiff and North Carolina Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase, use or download an application.

758. North Carolina Plaintiff and North Carolina Subclass Members were deceived and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the functionality of Defendants' SDK and associated applications, including Routely, the security and privacy of their data, and their privacy to their detriment.

759. North Carolina Plaintiff's and the North Carolina Subclass' data has tangible value. As a direct and proximate result of Defendants' unfair and deceptive acts and practices, North Carolina Plaintiff's and North Carolina Subclass Members' data is in the possession of third parties who have used and will use such data for their commercial benefit.

760. As a direct and proximate result of Defendants' unfair, unconscionable, and deceptive acts and practices, North Carolina Plaintiff and North Carolina Subclass Members have suffered and will continue to suffer injury, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable Data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

761. North Carolina Plaintiff and the North Carolina Subclass seek all monetary and non- monetary relief allowed by law, including actual damages or statutory damages of $500 per violation, whichever is greater, treble damages pursuant to N.C. Gen. Stat. § 75-16, injunctive relief, attorneys' fees under N.C. Gen. Stat. § 75-16.1, pre-judgment interest, costs, and any other relief the Court deems just and proper.

**COUNT TWENTY-FIVE**
**Violation of the Ohio Consumer Sales Practices Act,**
**Ohio Rev. Code §§ 1345.01, *et seq.***
**(On Behalf of the Ohio Plaintiff and the Ohio Subclass Against All Defendants)**

762. Plaintiff Robert Smith (for the purposes of this count, the "Ohio Plaintiff"), individually and on behalf of the Ohio Subclass, repeats and realleges all preceding paragraphs, as if fully alleged herein.

763. Ohio Plaintiff brings this claim on his own behalf and on behalf of each member of the Ohio Subclass described above.

764. Ohio Plaintiff and Ohio Subclass Members are "persons" as defined by Ohio Rev. Code § 1345.01(B).

765. Defendants are a "supplier" engaged in "consumer transactions," as defined by Ohio Rev. Code §§ 1345.01(A) and (C), by offering goods and services to consumers in Ohio.

766. Defendants engaged in unfair and deceptive acts and practices in connection with consumer transactions, in violation of Ohio Rev. Code §§ 1345.02 and 1345.03.

767. Defendants violated Ohio Rev. Code § 1345.02(B)(1) by representing that its goods and services had characteristics, uses, and benefits that they did not have, including misleading Ohio Plaintiff and Ohio Subclass Members into believing their data would remain private and secure, while surreptitiously collecting and selling such data to third parties.

768. Defendants further violated Ohio Rev. Code § 1345.02(B)(2) by representing that its goods and services were of a particular standard or quality when they were not, misleading Ohio Plaintiff and Ohio Subclass Members into believing that their data, including driving data, would not be misused for Defendants' profit.

769. Defendants engaged in unconscionable acts in connection with consumer transactions, in violation of Ohio Rev. Code § 1345.03, by surreptitiously collecting and monetizing Ohio Plaintiff's and Ohio Subclass Members' data without their knowledge or consent and by exploiting the inability of consumers to reasonably protect their interests in the face of Defendants' concealed practices.

770. Defendants failed to disclose material facts about its data collection and monetization practices, despite a duty to do so, and concealed its sale of data to third parties, in violation of Ohio Rev. Code §§ 1345.02 and 1345.03.

771. Defendants acted knowingly, intentionally, and maliciously to violate the Ohio Consumer Sales Practices Act by surreptitiously monetizing Ohio Plaintiff's and Ohio Subclass Members' data without consent and in reckless disregard of Ohio Plaintiff's and Ohio Subclass Members' rights.

Case 1:25-cv-04309-CTJB Document 1 Filed 11/05/26 196 Page 199 of 263 PageID:

772. As a direct and proximate result of Defendants' unfair, deceptive, and unconscionable acts and practices, Ohio Plaintiff and Ohio Subclass Members have suffered ascertainable losses of money or property, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

773. Ohio Plaintiff and Ohio Subclass Members seek all monetary and non-monetary relief allowed by law, including the greater of actual damages or statutory damages, treble damages, injunctive relief, attorneys' fees and costs, and any other relief the Court deems just and proper.

**COUNT TWENTY-SIX**
**Violation of the Oregon Unlawful Trade Practices Act,**
**ORS §§ 646.605, *et seq.***
**(On Behalf of the Oregon Plaintiff and the Oregon Subclass Against All Defendants)**

774. Plaintiff Hartline (for the purposes of this count, the "Oregon Plaintiff"), individually and on behalf of the Oregon Subclass, repeats and realleges all preceding paragraphs, as if fully alleged herein.

775. Oregon Plaintiff brings this claim on her own behalf and on behalf of each member of the Oregon Subclass described above.

776. Defendants are "person(s)" within the meaning of ORS § 646.605(4).

777. Defendants have sold "goods or services" within the meaning of the Act, which mean "those that are or may be obtained primarily for personal, family or household purposes[.]" ORS § 646.605(6)(a).

778. Defendants violated the Unlawful Trade Practices Act ("UTPA") by representing that its goods and services had characteristics, uses, and benefits that they did not have, including

misleading Oregon Plaintiff and Oregon Subclass Members into believing their data would remain private and secure, while surreptitiously collecting and selling such data to third parties.

779. Defendants' conduct violated ORS § 646.607(1) by employing unconscionable tactics in connection with its sale by surreptitiously monetizing Oregon Plaintiff's and Oregon Subclass Members' data without consent and in reckless disregard of Oregon Plaintiff's and Oregon Subclass Members' rights.

780. Defendant's conduct also violated ORS § 646.608(1)(e) by representing at the time of sale that goods or services have characteristics, uses, benefits, or qualities that Defendant now claims they do not have.

781. Defendant's conduct also violated ORS § 646.608(1)(g) by representing at the time of sale that goods or services were of a particular standard or quality that Defendant now claims they are not.

782. Defendant's conduct also violated ORS § 646.608(1)(i) by advertising goods or services with the intent not to provide them as advertised.

783. Defendant's conduct also violated ORS § 646.608(1)(u) by, *inter alia*, by surreptitiously monetizing Oregon Plaintiff's and Oregon Subclass Members' data without consent and in reckless disregard of Oregon Plaintiff's and Oregon Subclass Members' rights, including but not limited to the rights provided by the Oregon Consumer Privacy Act, § ORS 646A.570, *et seq*.

784. Defendant's conduct also violated ORS § 646.607(2) by failing to deliver Oregon Plaintiff's and Class Members' goods or services as promised.

785. A violative representation "may be made by any assertion by words or conduct, including, but not limited to, a failure to disclose a fact." ORS § 646.608(2). Defendants engaged in unlawful trade practices by:

a. Intercepting, collecting, using, and selling Oregon Plaintiff's and Oregon Subclass Members' data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Oregon Plaintiff's and Oregon Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that third parties collected, manipulated, used, and sold Oregon Plaintiff's and Oregon Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and associated applications, including Routely, with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of Defendants' SDK and associated applications, including Routely, and that it would protect the privacy of Oregon Plaintiff's and the Oregon Subclass Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Oregon Plaintiff's and Oregon Subclass Members' data.

786. These misrepresentations and omissions concern the characteristics, uses, benefits, qualities and standards of Defendants' goods and services, in violation of ORS § 646.605(1)(e) and (1)(g).

787. By misrepresenting and omitting crucial information regarding the functionality of the apps with respect to the privacy of drivers in their own vehicles, Defendants advertised its goods and services with intent not to provide them as advertised, in violation of ORS § 646.605(1)(i).

788. Defendants' conduct caused substantial injury to Oregon Plaintiff and Class Members, is not outweighed by any countervailing benefits to consumers or competitors, and was not reasonably avoidable by consumers.

789. Defendant's conduct is unfair because these acts and practices are immoral, unethical, oppressive, and/or unscrupulous.

790. Had Oregon Plaintiff and Class Members known about Defendants unlawful trade practices, they would not have purchased the goods or services or would have paid much less for them.

791. As a direct and proximate result of Defendants' unlawful practices, Oregon Plaintiff and Oregon Subclass Members have suffered and will continue to suffer injury, losses, and damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

792. In violating Oregon Plaintiff's and Oregon Subclass Members' rights under the UPTA as described herein, Defendants acted intentionally, knowingly, and/or with reckless disregard of the rights of Oregon Plaintiff and Oregon Subclass Members.

793. Oregon Plaintiff, individually and on behalf of the Class, seeks all remedies available under the UTPA, including equitable relief, actual damages and statutory damages, including under ORS § 646.638(1).

794. Oregon Plaintiff, individually and on behalf of the Class, also seeks reasonable attorneys' fees and costs under ORS § 646.638(3).

**<u>COUNT TWENTY-SEVEN</u>**
**Pennsylvania Unlawful Use of Computer**
**(On Behalf of the Pennsylvania Plaintiffs and the Pennsylvania Subclass Against All Defendants)**

795. Plaintiffs DeValkeneer, Eppley, Rochester, and Winkelvoss (for the purposes of this count, the "Pennsylvania Plaintiffs"), individually and on behalf of the Pennsylvania Subclass, repeat and reallege all preceding paragraphs, as if fully alleged herein.

796. Pennsylvania Plaintiffs bring this claim on their own behalf and on behalf of each member of the Pennsylvania Subclass described above.

797. Pennsylvania criminal code prohibits parties to "intentionally and without authorization accesses or exceeds authorization to access, alters, interferes with the operation of, damages or destroys any computer, computer system, computer network, computer software, computer program, computer database, World Wide Web site or telecommunication device or any part thereof," and to "intentionally or knowingly and without authorization gives or publishes a password, identifying code, personal identification number or other confidential information about a computer, computer system, computer network, computer database, World Wide Web site or telecommunication device." 73 Pa. Stat. § 7611(a).

798. Pennsylvania Plaintiffs' and Pennsylvania Subclass Members' smartphones constitute "computers" within the scope of Pennsylvania law.

799. Defendants knowingly accessed Pennsylvania Plaintiffs' and Pennsylvania Subclass Members' smartphones without their permission by including within the SDK (that Defendants provide to developers) software that intercepts and transmits data, communications,

Case 1:25-cv-00407 Document 1-2 Filed 11/05/26 Page 204 of 263 PageID: 3365

and personal and confidential information concerning Pennsylvania Plaintiffs and Pennsylvania Subclass Members.

800. Defendants used data, communications, and personal information that it intercepted and took from Pennsylvania Plaintiffs' and Pennsylvania Subclass Members' smart phones to wrongfully and unjustly enrich itself at the expense of Pennsylvania Plaintiffs and Subclass Members.

801. Defendants knowingly and without Pennsylvania Plaintiffs' and Subclass Members' permission accessed or caused to be their smartphones by installing without Pennsylvania Plaintiffs' and Subclass Members' informed consent software that intercepts and/or takes data, communications, and personal information concerning Pennsylvania Plaintiffs and Subclass Members.

802. Pennsylvania Plaintiffs and Pennsylvania Subclass Members are residents of Pennsylvania, and used their smartphones in Pennsylvania. Defendants accessed or caused to be accessed Pennsylvania Plaintiffs' and Pennsylvania Class Members' data, communications, and personal information from Pennsylvania.

803. As a direct and proximate result of Defendants' violations of the Pennsylvania unlawful computer use statute, Pennsylvania Plaintiffs and Pennsylvania Subclass Members suffered damages.

804. Pennsylvania Plaintiffs and Subclass Members seek compensatory, injunctive and equitable relief in an amount to be determined at trial, including an award of reasonable attorneys' fees and costs and punitive or exemplary damages for Defendants' willful violations.

**<u>COUNT TWENTY-EIGHT</u>**

**Violation of the Pennsylvania Unfair Trade Practices and Consumer Protection Law (“UTP”), 73 Pa. Stat. §§ 201, *et seq.***

**(On Behalf of the Pennsylvania Plaintiffs and the Pennsylvania Subclass Against All Defendants)**

805. Plaintiffs DeValkeneer, Eppley, Rochester, and Winkelvoss (for the purposes of this count, the “Pennsylvania Plaintiffs”), individually and on behalf of the Pennsylvania Subclass, repeat and reallege all preceding paragraphs, as if fully alleged herein.

806. Pennsylvania Plaintiffs bring this claim on their own behalf and on behalf of each member of the Pennsylvania Subclass described above.

807. Pennsylvania’s Unfair Trade Practices and Consumer Protection Law (“UTP”) defines “unfair or deceptive acts or practices” to include any “fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.” 73 Pa. Stat. § 201, et seq.

808. Pennsylvania courts have invariably interpreted the UTP using the kind of liberal construction afforded to state consumer protection statutes intended to prevent fraud.

809. Pennsylvania Plaintiffs and the Pennsylvania Subclass Members, as “person[s],” are consumers within the protection of the UTP. See 73 Penn. Stat. § 201-2(2).

810. Defendants engaged in unfair, unconscionable, and unlawful trade acts or practices in the conduct of trade or commerce, in violation of 73 Penn. Stat. § 201-2(4), including but not limited to the following: (a) knowingly and improperly storing, possessing, using, and/or procuring the interception of, Pennsylvania Plaintiffs’ and Pennsylvania Subclass Members’ Personal; (b) using that PII and other personal data to impose increased insurance rates; and (c) selling and/or transmitting Pennsylvania Plaintiffs’ and Pennsylvania Subclass Members’ data to third parties without their consent.

811. The unfair, unconscionable, and unlawful acts and practices of Defendants alleged herein, emanated and arose within the Commonwealth of Pennsylvania, within the scope of the UTP.

812. Pennsylvania Plaintiffs and Pennsylvania Subclass Members are entitled to injunctive relief to protect them from the substantial and imminent risk of future loss of Private Information, including, but not limited to: (a) ordering that Defendants immediately purge, delete, and destroy PII and other personal data not necessary for its provisions of services; and (b) remove tracking technology that causes the disclosure of PII and other personal data without consent.

813. Pennsylvania Plaintiffs bring this action on behalf of themselves and Pennsylvania Subclass Members for the relief requested above and for the public benefit in order to promote the public interests in the provision of truthful, fair information to allow consumers to make informed decisions with their PII and other personal data and to protect Pennsylvania Plaintiffs, Pennsylvania Subclass Members, and the public from Defendants' unconscionable, and unlawful practices. Defendants' wrongful conduct as alleged in this Class Action Complaint has had widespread impact on the public at large.

814. Defendants' actions and inactions in engaging in the unfair, unconscionable, and unlawful practices described herein were negligent, knowing and willful, and/or wanton and reckless.

815. Pennsylvania Plaintiffs and Pennsylvania Subclass Members seek relief under the UTP, 73 P.S. §§ 201-1, *et seq.*, including, but not limited to, a declaratory judgment that Defendants' actions and/or practices violate the UTP; and injunctive relief enjoining Defendants, their employees, parents, subsidiaries, affiliates, executives, and agents from continuing to violate the UTP as described above.

816. Pennsylvania Plaintiffs and Pennsylvania Subclass Members therefore seek restitution, an injunction, and all other appropriate relief in equity, including reasonable attorneys' fees and costs of suit.

**COUNT TWENTY-NINE**
**Violation of the Pennsylvania Wiretapping and Electronic Surveillance Act ("WECMA"), 18 Pa. Stat. §§ 5703, *et seq.***
**(On Behalf of the Pennsylvania Plaintiffs and the Pennsylvania Subclass Against All Defendants)**

817. Plaintiffs DeValkeneer, Eppley, Rochester, and Winkelvoss (for the purposes of this count, the "Pennsylvania Plaintiffs"), individually and on behalf of the Pennsylvania Subclass, repeat and reallege all preceding paragraphs, as if fully alleged herein.

818. Pennsylvania Plaintiffs bring this claim on their own behalf and on behalf of each member of the Pennsylvania Subclass described above.

819. To establish liability under the Pennsylvania Wiretapping and Electronic Surveillance Control Act ("WECMA"), Pennsylvania Plaintiffs need only to establish that Defendant "procure[d] any other person to intercept [electronic] communication." 18 Pa. C.S. § 5725.

820. At all relevant times, there was in full force and effect WECMA, which prohibits parties that

> (1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication;
>
> (2) intentionally discloses or endeavors to disclose to any other person the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication; or
>
> (3) intentionally uses or endeavors to use the contents of any wire, electronic or oral communication, or evidence derived therefrom, knowing or having reason to know, that the information was obtained through the interception of a wire, electronic or oral communication.

18 Pa. Stat. § 5703.

821. Pennsylvania Plaintiffs' and Subclass Members' specific user input events and choices on their mobile devices that are tracked by Defendants' SDK constitute communications within the scope of Pennsylvania's prohibition upon Wiretapping.

822. Pennsylvania Plaintiffs and Subclass Members are residents of Pennsylvania, and used their smartphones within Pennsylvania. As such, Defendants intercept, collected, read or attempt to read, and/or used or attempted to use Pennsylvania Plaintiffs' and Subclass Members' data, communications, and personal information in Pennsylvania.

823. Defendants intercept Pennsylvania Plaintiffs' and Subclass Members' communications and data while they are in transit to and from Plaintiff's and Subclass Members' smartphones and the apps, app developers, and cellphone towers; Defendants transmit a copy of Pennsylvania Plaintiffs' and Subclass Members' communications to itself and/or third parties. Defendants use the contents of the communications to sell to third parties and in other methods for their own pecuniary gain.

824. Neither Defendants nor any other person informed Pennsylvania Plaintiffs and Subclass Members that Defendants were intercepting and transmitting Pennsylvania Plaintiffs' private communications and data.

825. Pennsylvania Plaintiffs and Subclass Members did not know Defendants were intercepting and recording their communications and data, as such they could not and did not consent for their communications and data to be intercepted by Defendants and thereafter transmitted to others.

826. Defendants' SDK constitutes a machine, instrument, contrivance or other manner to track and intercept Pennsylvania Plaintiffs' and Subclass Members' communications while they are using their smartphones.

827. Defendants use and attempt to use or communicate the meaning of Pennsylvania Plaintiffs' and Subclass Members' communications and data by ascertaining their personal information, including their geolocation and places that they have visited and other PII and personal data, in order to sell Pennsylvania Plaintiffs' and Subclass Members' personal information to third parties and to use for Defendants' own gain.

828. At all relevant times to this complaint, Defendants intercepted and recorded components of Plaintiff's and the putative Subclass members' private phone communications and transmissions when Plaintiff and other Subclass Members accessed Defendants' software via their cellular mobile access devices within the State of Pennsylvania.

829. At all relevant times to this complaint, Pennsylvania Plaintiffs and the other Subclass Members did not know Defendants were engaging in such interception and recording and therefore could not provide consent to have any part of their PII and other personal data and communications intercepted and recorded by Defendants and thereafter transmitted to others.

830. Defendants never advised Pennsylvania Plaintiffs or the other Subclass Members that any part of their PII and other personal data and communications would be intercepted, recorded and transmitted to third parties.

831. Defendants' use of MAIDs, IDFAs, IDFVs and its SDK are both a "machine, instrument, contrivance, or . . . other manner" used to engage in the prohibited conduct at issue here.

832. At all relevant times, by using Defendants' MAID software and SDK as well as tracking Pennsylvania Plaintiffs' and Subclass Members' geolocation, Defendants intentionally tapped, electrically or otherwise, the lines of internet communication between Pennsylvania

Plaintiffs and Subclass Members on the one hand, and the specific sites, apps, and locations Pennsylvania Plaintiffs and Subclass Members visited on the other.

833. At all relevant times, by using Defendants' geolocation tracking software technology, Defendants willfully and without the consent of all parties to the communication, or in any unauthorized manner, read or attempted to read or learn the contents or meaning of electronic communications of Pennsylvania Plaintiffs and putative Subclass Members, while the electronic communications were in transit or passing over any wire, line or cable or were being sent from or received at any place within Pennsylvania.

834. Pennsylvania Plaintiffs and Subclass Members did not consent to any of Defendants' actions in implementing these wiretaps within its geolocation tracking software. Nor have Pennsylvania Plaintiffs or Subclass Members consented to Defendants' intentional access, interception, reading, learning, recording, and collection of Pennsylvania Plaintiffs and Subclass Members' electronic communications.

835. Pennsylvania Plaintiffs' and the Subclass Members devices of which Defendants accessed through its unauthorized actions included their computers, smart phones, and tablets and/or other electronic computing devices.

836. Defendants violated WECMA by knowingly accessing and without permission accessing Pennsylvania Plaintiffs' and Subclass Members' devices in order to obtain their personal information, including their communications and device and location data, and in order for Defendants to share that data with third parties, in violation of Pennsylvania Plaintiffs' and Subclass Members' reasonable expectations of privacy in their devices and data.

837. Defendants violated WECMA by knowingly and without permission intercepting, wiretapping, accessing, taking and using Pennsylvania Plaintiffs' and the Subclass Members' personally identifiable information and personal communications with others.

838. As a direct and proximate result of Defendants' violation of WECMA, Pennsylvania Plaintiffs and Subclass Members were injured and suffered damages, a loss of privacy, and loss of the value of their personal information in an amount to be determined at trial.

839. Defendants were unjustly enriched by its violation of WECMA.

840. Pursuant to 18 Pa. Stat. § 5703, Pennsylvania Plaintiffs and Subclass Members have been injured by Defendants' violation, and seek damages for the greater of $5,000 or three times the amount of actual damages, and injunctive relief.

## COUNT THIRTY
**Violation of the South Carolina Unfair Trade Practices Act ("South Carolina UTPA"), S.C. Code §§ 39-5-10, *et seq.***
**(On Behalf of the South Carolina Plaintiffs and the South Carolina Subclass Against All Defendants)**

841. Plaintiffs Baumgartner and Seay (for the purposes of this count, the "South Carolina Plaintiffs"), individually and on behalf of the South Carolina Subclass, repeat and reallege all preceding paragraphs, as if fully alleged herein.

842. South Carolina Plaintiffs bring this claim on their own behalf and on behalf of each member of the South Carolina Subclass described above.

843. The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") makes unlawful unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce. S.C. Code § 39-5-10(a).

844. Defendants are each a "person" as defined by S.C. Code § 39-5-10(a), which includes corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity.

845. Defendants are each engaged in "trade" or "commerce" as defined by S.C. Code § 39-5-10(b), which includes the advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity or thing of value wherever situate, and shall include any trade or commerce directly or indirectly affecting the people of South Carolina.

846. The South Carolina UTPA is guided by the interpretations given by the Federal Trade Commission and the Federal Courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. § 45(a)(1)).

847. Pursuant to 15 U.S.C. 45(n), an act or practice is "unfair" if it "causes or is likely to cause substantial injury to consumers which is not reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition." 15 U.S.C. § 45(n).

848. By surreptitiously collecting South Carolina Plaintiffs' and South Carolina Subclass Members' data, including driving data, and exploiting that data for their own commercial gain, Defendants have engaged in unfair practices.

849. South Carolina Plaintiffs and South Carolina Subclass Members could not have reasonably avoided Defendants' practices as described herein because Defendants concealed their practices.

850. South Carolina Plaintiffs and South Carolina Subclass Members have derived no benefit from Defendants' surreptitious collection and exploitation of their private information, and there are no countervailing benefits to consumers or to competition in engaging in the unauthorized tracking and sale of consumer data.

851. South Carolina Plaintiffs and South Carolina Subclass Members have been substantially injured by the practices described herein because their rights to privacy have been violated, and because they have experienced economic loss.

852. As a direct and proximate result of Defendants' unfair practices, South Carolina Plaintiffs and South Carolina Subclass Members have suffered and will continue to suffer injury, losses, and damages, including, but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

853. In violating South Carolina Plaintiffs' and South Carolina Subclass Members' rights under the South Carolina UTPA as described herein, Defendants acted intentionally, knowingly, and/or with reckless disregard of the rights of South Carolina Plaintiffs and South Carolina Subclass Members.

854. South Carolina Plaintiffs and South Carolina Subclass Members seek all monetary and nonmonetary relief allowed by law, including equitable relief, actual damages, treble damages, punitive damages, and reasonable attorneys' fees and costs.

**COUNT THIRTY-ONE**
**Violation of the Texas Deceptive Trade Practices-Consumer Protection Act ("Texas TPCPA"), Tex. Bus. & Com. Code §§ 17.41, *et seq.***
**(On Behalf of the Texas Plaintiff and the Texas Subclass Against All Defendants)**

855. Plaintiff Summersill (for the purposes of this count, the "Texas Plaintiff"), individually and on behalf of the Texas Subclass, repeats and realleges all preceding paragraphs, as if fully alleged herein.

856. Texas Plaintiff brings this claim on her own behalf and on behalf of each member of the Texas Subclass described above.

857. The Texas Trade Practices-Consumer Protection Act ("Texas TPCPA") "shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty and to provide efficient and economical procedures to secure such protection." Tex. Bus. & Com. Code § 17.44(a).

858. Defendants are each a "person" as defined by Tex. Bus. & Com. Code § 17.45(3), which includes partnership, corporation, association, or other group, however organized.

859. Defendants engage in "trade" or "commerce" as defined by Tex. Bus. & Com. Code § 17.45(6), which includes advertising, offering for sale, sale or distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value wherever situate, and includes any trade or commerce directly or indirectly affecting the people of Texas.

860. Defendants engaged in unfair and deceptive trade practices by representing to Texas Plaintiff and Texas Subclass Members, as well as third party applications, that their data would be kept secure and that data would not be shared, when in fact Defendants regularly collected detailed consumer data.

861. Defendants further engaged in deceptive and unfair trade practices by failing to disclose to and concealing from Texas Plaintiff and Texas Subclass Members that their detailed data was being collected and sold to third parties, who then used the data to make products and profit.

862. These deceptive statements, misrepresentations, and omissions, and concealments constitute violations of Tex. Bus. & Com. Code § 17.46(b).

863. Defendants violated Tex. Bus. & Com. Code § 17.46(b)(5), (9), and (20) and (24) by:

a. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Texas Plaintiff's and Texas Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

b. Omitting, suppressing, and concealing the material fact that third parties collected, manipulated, used, and sold Texas Plaintiff's and Texas Subclass Members' data for their own financial and commercial benefit;

c. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and associated applications, including Routely, with respect to the privacy of consumers in their own vehicles; and

d. Misrepresenting the purpose of Defendants' SDK and associated applications, including Routely, and that it would protect the privacy of Texas Plaintiff's and the Texas Subclass Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent.

864. Texas Plaintiff and Texas Subclass Members were deceived and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the functionality of Defendants' SDK and associated applications, including Routely, the security and privacy of their data, including driving data, and their privacy in their own vehicles to their detriment.

865. Further, Defendants violated Tex. Bus. & Com. Code § 17.46(b)(2) and (3) by causing likelihood of confusion or misunderstanding as to the source, sponsorship, approval, certification, affiliation, connection, or association with Texas Plaintiff's and Texas Subclass

Members' data, namely that the collection and sale of such data was not authorized or consented-to by them, and therefore unlawfully obtained.

866. In engaging in the above-described practices, Defendants acted intentionally and with flagrant disregard of prudent and fair business practices to the extent that Defendant should be treated as having acted intentionally. Tex. Bus. & Com. Code § 17.45(13).

867. Texas Plaintiff and Texas Subclass Members have been substantially injured by the practices described herein because their rights to privacy have been violated, and because substantial numbers of them have experienced economic loss.

868. As a direct and proximate result of Defendants' deceptive practices, Texas Plaintiff and Texas Subclass Members have suffered and will continue to suffer injury, losses, and damages, including but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

869. Texas Plaintiff and Texas Subclass Members seek all monetary and non-monetary relief allowed by law, including equitable relief, actual damages, punitive damages, and reasonable attorneys' fees and costs.

**COUNT THIRTY-TWO**
**Violation of the Utah Truth in Advertising Act,**
**Utah Code Ann. §§ 13.11a-1, *et seq.***
**(On Behalf of the Utah Plaintiff and the Utah Subclass Against All Defendants)**

870. Plaintiff Arellano (for the purposes of this count, the "Utah Plaintiff"), individually and on behalf of the Utah Subclass, repeats and realleges all preceding paragraphs, as if fully alleged herein.

871. Utah Plaintiff brings this claim on her own behalf and on behalf of each member of the Utah Subclass described above.

Case 1:25-cv-14399-GCD Document #: 112 Filed: 10/28/25 Page 217 of 263 PageID #:3378

872. The Utah Truth in Advertising Act prohibits "deceptive, misleading, and false advertising practices and forms in Utah." Utah Code Ann. § 13.11a-1.

873. Defendants are each a "person" as defined by Utah Code Ann. § 13.11a-2(7).

874. Defendants engaged in the complained-of conduct in connection with "sales transaction[s]," as defined by Utah Code Ann. § 13.11a-2(15).

875. Defendants engaged in deceptive acts or practices, misrepresentations, and the concealment, suppression, and omission of material facts with respect to the sale and advertisement of the goods and services purchased by Utah Plaintiff and the Utah Subclass Members in violation of Utah Code Ann. § 13.11a-2(e), (g), and (i), including by:

a. Intercepting, collecting, using, and selling Utah Plaintiff's and Utah Subclass Members' data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Utah Plaintiff's and Utah Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that third parties collected, manipulated, used, and sold Utah Plaintiffs' and Utah Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and associated applications, including Routely, with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of Defendants' SDK and associated applications, including Routely, and that it would protect the privacy of Utah Plaintiff's and the Utah Subclass

Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Utah Plaintiff's and Utah Subclass Members' data.

876. Defendants acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Utah Plaintiff's and Utah Subclass Members' rights, because Defendants intentionally intercepted, collected, used, and sold Utah Plaintiff's and Utah Subclass Members' data, including driving data, without obtaining their consent.

877. The fact that Defendants intercepted, collected, used, and sold Utah Plaintiff's and Utah Subclass Members' data was material to Utah Plaintiff and Utah Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase, use or download an application.

878. Utah Plaintiff and Utah Subclass Members were deceived and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the functionality of Defendants' SDK and associated applications, including Routely, the security and privacy of their data, and their privacy to their detriment.

879. Defendants intended to mislead Utah Plaintiff and Utah Subclass Members and induce them to rely on their misrepresentations and omissions.

880. Defendants benefited from misleading Utah Plaintiff and Utah Subclass Members as it obtained a profit from the collection of data, including driving data.

881. The foregoing unlawful and deceptive acts and practices were immoral, unethical, oppressive, and unscrupulous.

882. Defendants' deceptive acts directly and proximately caused Utah Plaintiff and Utah Subclass Members to suffer damages including, but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

883. Utah Plaintiff and Utah Subclass Members seek all monetary and non-monetary relief allowed by law, including actual damages sustained or $2,000, whichever is greater, restitution, injunctive relief, and attorneys' fees and costs.

**<u>COUNT THIRTY-THREE</u>**
**Violation of the Washington Consumer Protection Act ("Washington CPA"), Wash. Rev. Code §§ 19.86.010, *et seq.***
**(On Behalf of the Washington Plaintiff and the Washington Subclass Against All Defendants)**

884. Plaintiff Raftis (for the purposes of this count, the "Washington Plaintiff"), individually and on behalf of the Washington Subclass, repeats and realleges all preceding paragraphs, as if fully alleged herein.

885. Washington Plaintiff brings this claim on her own behalf and on behalf of each member of the Washington Subclass described above.

886. The Washington Consumer Protection Act ("Washington CPA") declares that unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are unlawful. Wash. Rev. Code § 19.86.020.

887. Defendants are each a "person" as defined by Wash. Rev. Code § 19.86.010(1), which includes corporations, trusts, unincorporated associations and partnerships.

888. Defendants engage in "trade" or "commerce" as defined by Wash. Rev. Code § 19.86.010(2), which includes the sale of assets or services, and any commerce directly or indirectly affecting the people of the state of Washington. Defendants have engaged in unfair practices by:

a. Intercepting, collecting, using, and selling Washington Plaintiff's and Washington Subclass Members' data without obtaining their consent;

b. Omitting, suppressing, and concealing the material fact that Defendants were intercepting, collecting, using, and selling Washington Plaintiff's and Washington Subclass Members' data to third parties for Defendants' own financial and commercial benefit;

c. Omitting, suppressing, and concealing the material fact that third parties collected, manipulated, used, and sold Washington Plaintiff's and Washington Subclass Members' data for their own financial and commercial benefit;

d. Omitting, suppressing, and concealing material facts regarding the functionality of Defendants' SDK and associated applications, including Routely, with respect to the privacy of consumers in their own vehicles;

e. Misrepresenting the purpose of Defendants' SDK and associated applications, including Routely, and that it would protect the privacy of Washington Plaintiff's and the Washington Subclass Members' data, including that it would not intercept, collect, use, or sell such data without consumers' express consent; and

f. Failing to comply with common law and/or statutory duties pertaining to the privacy of Washington Plaintiff's and Washington Subclass Members' data.

889. Defendants acted intentionally, knowingly, and maliciously to violate the Act, and recklessly disregarded Washington Plaintiff's and Washington Subclass Members' rights, because Defendants intentionally intercepted, collected, used, and sold Washington Plaintiff's and Washington Subclass Members' data, including driving data, without obtaining their consent.

890. The fact that Defendants intercepted, collected, used, and sold Washington Plaintiff's and Washington Subclass Members' data was material to Plaintiff and Washington

Subclass Members. This is a fact that reasonable consumers would consider important when choosing to purchase, use or download an application.

891. Washington Plaintiff and Washington Subclass Members were deceived and/or could reasonably be expected to be deceived by Defendants' material misrepresentations and omissions regarding the functionality of Defendants' SDK and associated applications, including Routely, the security and privacy of their data, and their privacy to their detriment.

892. Washington Plaintiff and Washington Subclass Members could not have reasonably avoided Defendants' practices as described herein because Defendants concealed their practices.

893. Washington Plaintiff and Washington Subclass Members have derived no benefit from Defendants' surreptitious collection and exploitation of their private information, and there are no countervailing benefits to them or to competition in engaging in the unauthorized tracking and sale of consumer data.

894. Washington Plaintiff and Washington Subclass Members have been substantially injured by the practices described herein because their rights to privacy have been violated, and because substantial numbers of them have experienced economic loss. As such, Defendants' deceptive and unfair acts and practices affect the public interest as they have had the capacity to injure and have injured other persons.

895. As a direct and proximate result of Defendants' unfair practices, Washington Plaintiff and Washington Subclass Members have suffered and will continue to suffer injury, losses, and damages, including but not limited to: loss of privacy; unauthorized dissemination of their valuable data; damage to and diminution of the value of their personal information; the

likelihood of future misuse of their data; and economic harm stemming from the exploitation of their data.

## VIII. REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against Defendants as follows:

a. For an Order certifying the Class as defined herein, and appointing Plaintiffs as class representatives;

b. For permanent injunctive relief to prohibit Defendants from continuing to engage in the unlawful acts, omissions, and practices described herein;

c. For equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendants' wrongful conduct;

d. For an award of actual damages and compensatory damages, in an amount to be determined;

e. For an award of pre-judgment and post-judgment interest as allowed by law;

f. For an award of costs of suit and attorneys' fees, as allowable by law; and

g. Such other and further relief as this court may deem just and proper.

## IX. JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Case 1:25-cv-04009-C Document 112 Filed 11/05/26 Page 223 of 263 PageID: 3384

Dated: October 28, 2026

Respectfully submitted,

*/s/ Gary M. Klinger*
Gary M. Klinger
*gklinger@milberg.com*
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel.: (866) 252-0878

*/s/ John A. Yanchunis*
John A. Yanchunis
*jyanchunis@forthepeople.com*
**MORGAN & MORGAN COMPLEX LITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel.: (813) 223-5505

*Interim Co-Lead Counsel*

# EXHIBIT 2

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Northern District of Illinois

In re: Allstate & Arity Consumer Privacy Litigation
*Plaintiff*
v.

*Defendant*

Civil Action No. 25-cv-00407

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To: Citizens United Reciprocal Exchange (CURE)
c/o Christopher Lowe, 214 Carnegie Center, Suite 101, Princeton, NJ 08540

*(Name of person to whom this subpoena is directed)*

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: See Attachment A

| Place: | Date and Time: |
|---|---|
| Clarkson S. Fisher Federal Building and U.S. Courthouse<br>402 East State Street, Trenton, NJ 08608 | 09/23/2026 5:00 pm |

❒ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|
| | |

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date: 09/09/2026

*CLERK OF COURT*

OR

/s/ Daniel O. Herrera

*Signature of Clerk or Deputy Clerk* *Attorney's signature*

The name, address, e-mail address, and telephone number of the attorney representing *(name of party)* Plaintiffs , who issues or requests this subpoena, are:

Daniel O. Herrera, Cafferty Clobes Meriwether & Sprengel, LLP, 135 S. LaSalle Street, #3210, Chicago, IL 60603
312-782-4880 dherrera@caffertyclobes.com

**Notice to the person who issues or requests this subpoena**

If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

Civil Action No. 25-cv-00407

**PROOF OF SERVICE**

***(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)***

I received this subpoena for *(name of individual and title, if any)* ______________________
on *(date)* ____________ .

❒ I served the subpoena by delivering a copy to the named person as follows: ____________
______________________________________________
______________________________ on *(date)* ____________ ; or

❒ I returned the subpoena unexecuted because: ______________________
______________________________________________ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ ____________ .

My fees are $ ____________ for travel and $ ____________ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: ____________

______________________________
*Server's signature*

______________________________
*Printed name and title*

______________________________
*Server's address*

Additional information regarding attempted service, etc.:

# Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** ***For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
**(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
**(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
**(i)** is a party or a party's officer; or
**(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** ***For Other Discovery.*** A subpoena may command:
**(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
**(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** ***Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** ***Command to Produce Materials or Permit Inspection.***
**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
**(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** ***Quashing or Modifying a Subpoena.***
**(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
**(i)** fails to allow a reasonable time to comply;
**(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
**(iv)** subjects a person to undue burden.
**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
**(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** ***Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** ***Claiming Privilege or Protection.***
**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
**(i)** expressly make the claim; and
**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

## ATTACHMENT A

Pursuant to FED. R.CIV. P. 45, You are commanded to produce Documents in Your possession, custody, or control that are responsive to each of the Requests described below ("Document Requests").

## DEFINITIONS

1. "You," and "Your" mean Citizens United Reciprocal Exchange (CURE) and its predecessors and successors in interest; its present and former officers, directors, and Employees; its parents, subsidiaries, divisions, entities, and affiliated companies, including, but not limited to, Citizens United Reciprocal Exchange (CURE); and its attorneys, representatives, agents and all other persons, associations, or entities acting or authorized to act on their behalf, including third party entities.

2. "Action" means the case captioned *In re Allstate and Arity Consumer Privacy Litigation,* No. 1:25-cv-00407 pending in the United States District Court for the Eastern Division of the Northern District of Illinois.

3. "Arity SDK" refers to the software development kit ("SDK") developed by Defendants to be embedded into mobile applications, and designed or intended to, *inter alia*, intercept users' location or behavioral data, Driving Data, Driving Scores and/or personally identifying information.

4. "Class Members" means the individuals identified within the definition of the proposed Class set forth in the Complaint.

5. "Complaint" refers to Consolidated Class Action Complaint filed in this Action on May 27, 2025.

6. "Consumer" refers to Person(s) who during the Relevant Time Period (defined infra) downloaded, accessed, or otherwise used Your Apps.

7. "Communications" means and includes any contact between two or more persons, including but not limited to written contact by letter, memorandum, telegram, email, facsimile or telex, text messages, other digital means of transmitting data or information, or oral contact in face-to-face meetings, telephone conversations or otherwise.

8. "Defendants" or "Defendant" means the defendant entities named in the Complaint—The Allstate Corporation, Allstate Insurance Company, Allstate Vehicle and Property Insurance Company, Arity LLC, Arity 875 LLC, and Arity Services LLC—individually or collectively.

9. "Document" shall have the broadest definition possible under Fed. R. Civ. P. 34, and shall include the original or true and correct copy of any information recorded in any manner or medium, including ESI. Specifically, and without limitation, the terms shall include any kind of written or graphic matter, however provided or reproduced, of any kind or description, whether sent or received or neither, including but not limited to papers, books, book entries, correspondence, telegrams, cables, telex messages, memorandum, notes, data, bank statements, log files, notations, work papers, inter-office communications, transcripts, minutes, reports and recordings of telephone or other conversations, or of interviews, or of conferences, or of committee meetings, or of other meetings, affidavits, statements, summaries, opinions, reports, studies, analyses, formulae, plans, specifications, evaluations, contracts, licenses, agreements, offers, ledgers, journals, books of records of account, summaries of accounts, bills, service invoices, receipts, balance sheets, income statements, questionnaires, answers to questionnaires, text and any other responsive data provided by an individual in an online form, user account records,

statistical records, desk calendars, appointment books, diaries, lists, tabulations, charts, graphs, maps, surveys, sound recordings, computer tapes, magnetic tapes, computer printouts, data processing input and output, e-mails, SMS text messages, MMS text messages, any other type of text messages, instant messages, microfilms, electronic communications, word processing documents, spreadsheets, databases, calendars, telephone logs, contact manager information, Internet usage files, network access information, databases, networks, computer systems including legacy systems (hardware and software), servers, archives, backup or disaster recovery systems, tapes, discs, drives, cartridges and other storage media, laptops, personal computers, internet data, personal digital assistants, handheld wireless devices, mobile telephones, paging devices, and audio systems (including voicemail) and all other records kept by electronic, photographic, or mechanical means, Electronically Stored Information (as defined below), and things similar to any of the foregoing, however, denominated, whether currently inexistence or already destroyed.

10. “Driving Data” means all telematics data collected, obtained, recorded, analyzed, transmitted, or shared from Plaintiffs’ phones through Apps into which the Arity SDK was integrated, including geolocation, route history, driving schedule, fuel or charging levels, phone usage, hard braking events, hard acceleration events, tailgating, time spent idle, speeds over 80 miles per hour, vehicle speed, average speed, late night driving, driver attention, and more.

11. “Driving Scores” means customer-specific scores or statistics based on risk or other factors applied to Driving Data.

12. “Electronic Media” means any digital, magnetic, optical, or other storage media device used to record ESI including, without limitation, computer memory, hard disks, floppy disks, flash memory devices, CDs, DVDs, Blu-ray disks, cloud storage (e.g., Dropbox, OneDrive, SharePoint), tablet computers (e.g., iPad, Kindle, Nook, Samsung Galaxy tablet), cellular or smart

phones (e.g., BlackBerry, iPhone, Google Pixel, Samsung Galaxy), personal digital assistants, magnetic tapes of all types, or any other means for digital storage, and/or transmittal.

13. "Employee" means any current or former officer, director, or other person who is or was employed by You.

14. "ESI" or "Electronically Stored Information" means information that is stored in Electronic Media, regardless of the media or whether it is in the original format in which it was created, and that is retrievable in perceivable form and includes, without limitation, metadata, system data, and fragmented data.

15. "Identify" or "Identifying" with respect to Persons, means to give, to the extent known, the Person's full name, present or last known address, telephone numbers, email addresses, and when referring to a natural person, their present or last known place of employment.

16. "Includes" or "Including" means "including, but not limited to" and "including, without limitation."

17. "Marketing Materials" mean any print advertisement, including labels and packaging, radio advertisement, television advertisement, Internet advertisement, banner advertisement, billboard, website page, social media posting, letter, postcard, brochure, pamphlet, packaging, offer, placard, in-store display, spokesperson or other attempt, effort, or process used to promote Your products and/or services.

18. "Meeting" means the contemporaneous presence, whether in person or through any means of communication, of any natural persons, whether or not such presence was by chance or prearranged, and whether or not the meeting was formal or informal, or occurred in connection with some other activity.

19. "Person" includes without limitation any natural person, firm, association, organization, partnership, business, trust, corporation, or public entity. Any reference to a Person that is a business entity and is not otherwise defined Includes that Person's predecessors, if any (Including any pre-existing Person that at any time became part of that entity after merger or acquisition), successors, parents, divisions, subsidiaries, affiliates, franchisors and franchisees, and any other Person acting for or on behalf of them.

20. "Plaintiff" or "Plaintiffs" refers to the plaintiffs identified in the Complaint.

## RULES OF CONSTRUCTION

1. The terms "all," "any," and "each" shall each be construed as encompassing any and all.

2. "Referring," "in relation to" or "relating to" means all Documents which comprise, explicitly, or implicitly refer to, were reviewed in conjunction with, or were created, generated, or maintained as a result of the subject matter of the request, including, without limitation, all Documents which reflect, record, memorialize, embody, discuss, evaluate, consider, review, or report on the subject matter of the request.

3. The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

4. The use of the singular form of any word includes the plural and vice versa.

5. The use of any tense of any verb shall also include within its meaning all other tenses of that verb.

6. A term or word defined herein is meant to include both the lower-case and uppercase reference to such term or word.

**INSTRUCTIONS**

1. Documents and information provided in response to the Requests shall be provided in accordance with the Stipulated Protective Order, [ECF No. 89], attached hereto as **Exhibit A**,

2. Restate each Request in full immediately above Your response.

3. If You cannot fully answer a Request, provide as full an answer as possible. State the reason for the inability to answer fully, and give any information, knowledge, or belief which You have regarding the unanswered portion, including the name(s) and address(es) of person(s) or organization(s) having further information and their contact information.

4. If You interpose any objection to any Request, fully state the grounds for the objection and the legal authority upon which You would rely in response to a Motion to Compel.

5. If You object to any Request, You must still provide all Documents or information covered by the Request that is not subject to the objection.

6. If You claim there is any ambiguity in a particular Request or in a Definition or Instruction applicable thereto, You shall not use such claim as a basis for refusing to respond, but You shall set forth as part of the response the language You deem ambiguous and the interpretation You chose or used in responding to the Request.

7. Where You object that a Request is overly broad, burdensome, or oppressive, as to that Request:

   a. Provide all information that is available without unreasonable burden;

   b. Describe with particularity the efforts made to secure the information, the provision of which You claim is unreasonably burdensome, and the burden that would be imposed by the production of such information; and

   c. State all facts or other evidence demonstrating the nature of the burden.

8. For information withheld on a claim of privilege or immunity, specify the following:

a. A general description of the nature and subject matter of the information;

b. The basis for Your claim of privilege or immunity;

c. The identity of the person(s) holding the privilege or immunity; and

d. The job title of every person named in subsection (c) above.

9. If Your objection is based upon the work-product doctrine, set forth the following information:

a. Whether the requested information or document(s) exists and the general nature of such items (e.g., recording, video, etc.);

b. The identity of the individual(s) in possession of the requested information or document(s); and

c. The date the requested information or items were created and the date same was obtained by You.

10. Pursuant to Federal Rule of Civil Procedure 26(e), each Request shall be deemed to be continuing in nature so that if You subsequently discover or obtain possession, custody, or control of any Document or information previously requested or required to be produced, You shall promptly make such Document or information available to Plaintiffs.

11. Plaintiffs reserve the right to propound additional Requests.

**RELEVANT TIME PERIOD AND SCOPE**

The Relevant Time Period for these requests is October 1, 2016 to the present date. If a Document prepared before or after this period is necessary for a correct or complete understanding of any Document covered by a request, You must preserve the earlier or subsequent Document as

well. If any Document is undated and the date of its preparation cannot be determined, the Document shall be preserved if otherwise responsive to the preservation request.

**DOCUMENTS REQUESTS**

1. A copy of each agreement between You and any Defendant relating to the provision, use, lease, licensing of, or access to Driving Data or Driving Scores sourced from any Defendant.

2. Communications between You and any Defendant relating to the provision, use, lease, licensing of, or access to Driving Data or Driving Scores sourced from any Defendant.

3. Documents sufficient to show any amounts You paid any Defendant for or relating to the provision, use, lease, licensing of, or access to Driving Data or Driving Scores sourced from any Defendant.

4. Internal Communications relating to the provision, use, lease, licensing of, or access to Driving Data or Driving Scores sourced from any Defendant.

5. Documents sufficient to show how You used Driving Data or Driving Scores.

6. Marketing Materials received from any Defendant relating to the provision, use, lease, licensing of, or access to Driving Data sourced from any Defendant.

7. Documents relating to any of the Plaintiffs, including but not limited to:

   a. All applications for insurance or requested insurance quotes made by or on behalf of one or more Plaintiffs (including Identifying the specific vehicle(s) Plaintiff(s) sought to insure);

   b. The results of those applications/requests (including any insurance quotes provided to any Plaintiff);

   c. Inquiries to any Defendant for Driving Data or Driving Scores relating to one or more Plaintiffs;

d. Records of Plaintiffs consenting to the use of Driving Data or Driving Scores in the insurance underwriting process, including in relation to providing insurance quotes and setting insurance rates;

e. Driving Data or Driving Scores relating to one or more Plaintiffs received from any Defendant;

f. Documents or Communications relating to the use of Driving Data or Driving Scores in relation to assessing applications for insurance, calculating insurance quotes and/or setting insurance rates in relation to one or more Plaintiffs;

g. Communications with Plaintiffs; and

h. Communications with Defendants regarding one or more Plaintiffs.

8. Documents sufficient to Identify all Class Members for whom You obtained from any Defendant Driving Data or Driving Scores as well as the type of Driving Data or Driving Scores You obtained from any Defendant.

9. Documents relating to how You use and/or used in the insurance underwriting process Driving Data sourced from any Defendant, including in relation to: (a) providing insurance quotes to Class Members; (b) deciding whether to insure Class Members; and (c) setting rates for Class Members You insured, initially and at each renewal.

10. Records of information disclosures or other notices provided to Class Members regarding the potential use in the insurance underwriting process of Driving Data sourced from Defendants, including in relation to: (a) providing insurance quotes to Class Members; (b) deciding whether to insure Class Members; and (c) setting rates for Class Members You insured, initially and at each renewal.

11. Documents relating to Class Members' consent to the provision and/or use of Driving Data or Driving Scores sourced from Defendants in the insurance underwriting process, including in relation to: (a) providing insurance quotes to Class Members; (b) deciding whether to insure Class Members; and (c) setting rates for Class Members You insured, initially and at each renewal, including records of any such consents being sought from Class Members, given by Class Members or withheld by Class Members.

12. Complaints received from any Person(s) relating to the use of Driving Data or Driving Scores in the insurance underwriting process.

13. Documents filed with state departments of insurance and/or any regulatory bodies relating to Your use of Driving Data or Driving Scores sourced from any Defendant in the insurance underwriting process, including in relation to (a) providing insurance quotes; (b) deciding whether to insure individuals; and (c) setting insurance rates and Related Communications.

14. Documents (including any testimony) relating to any government entity or law enforcement investigation of the collection, storage, transmission, use or sale of Driving Data or Driving Scores sourced from any Defendant.

15. Documents relating to any decision by You and/or Defendants to stop providing and/or using Driving Data or Driving Scores sourced from any Defendant.

# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **IN RE: ALLSTATE & ARITY CONSUMER PRIVACY LITIGATION** | Master Docket No. 1:25-cv-00407<br>Hon. Jeremy C. Daniel<br>Hon. Daniel P. McLaughlin |

**AGREED CONFIDENTIALITY ORDER**

The parties to this Agreed Confidentiality Order have agreed to the terms of this Order; accordingly, it is ORDERED:

1. **Scope.** All materials produced or adduced in the course of discovery, including initial disclosures, responses to discovery requests, deposition testimony and exhibits, and information derived directly therefrom (hereinafter collectively, "documents"), shall be subject to this Order concerning Confidential Information and Highly Confidential – Attorneys' Eyes Only Information as defined below. This Order is subject to the Local Rules of this District and the Federal Rules of Civil Procedure on matters of procedure and calculation of time periods.

2. **Confidential Information and Highly Confidential AEO Information.**

(a) As used in this Order, "**Confidential Information**" means information designated as "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" by the producing party that falls within one or more of the following categories: (i) information prohibited from disclosure by statute; (ii) research, technical, commercial, or sensitive business or financial information that the party has a good faith belief is confidential; (iii) medical information

concerning any individual; (iv) personal identity information (including but not limited to payment card numbers, financial account numbers, Social Security numbers, addresses, phone numbers, e-mail addresses, driver's license numbers or other state identification numbers, employer identification numbers, tax identification numbers, passport numbers, mobile advertising identifiers, device identifiers, user IDs, account identifiers, or foreign government equivalents of any such numbers or identifiers); (v) income tax returns (including attached schedules and forms), W-2 forms, and 1099 forms; or (vi) personnel or employment records of a person who is not a party to the case. Information or documents that are available to the public may not be designated as Confidential Information.

(b) As used in this Order, **"Highly Confidential – Attorneys' Eyes Only Information" or "AEO Information"** means Confidential Information that the producing party reasonably and in good faith believes contains highly sensitive, nonpublic information for which disclosure to a party, party employee, putative class member, or other unauthorized person would create a substantial risk of serious competitive, privacy, security, or other harm that could not be avoided by a less restrictive designation. Examples of material that may qualify for AEO treatment include: (i) proprietary source code, object code, SDK code, APIs, technical documentation, build files, configuration files, and developer documentation; (ii) proprietary algorithms, model logic, model weights, feature sets, scoring, pricing, underwriting, claims, fraud, or risk models, and nonpublic validation or performance analyses; (iii) telematics data schemas, data dictionaries, raw or trip-level geolocation, trip, accelerometer, gyroscope, magnetometer, phone-usage, or sensor data; (iv) mobile advertising identifiers, device identifiers, user IDs, account identifiers, and other persistent identifiers, particularly when produced in bulk or linked to trip-level or location data; and (v) nonpublic security architecture, access-control information, vulnerability information,

penetration-test results, incident-response procedures, authentication or authorization designs, encryption or key-management details, network diagrams, and other information that could reasonably be used to compromise systems, data, or privacy.

The parties shall narrowly construe the categories of information that may be designated as AEO Information and shall use the AEO designation only for material that satisfies the standard set forth in this paragraph. The fact that information falls within one of the examples listed above does not, by itself, justify AEO treatment absent a good-faith determination that disclosure under the less restrictive Confidential Information designation would create a substantial risk of serious competitive, privacy, security, or other harm.

(c) As used in this Order, "**Designated Material**" refers to Confidential Information and AEO Information.

3. **Designation.**

(a) A party may designate a document as Confidential Information or AEO Information for protection under this Order by placing or affixing the words "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY," as appropriate, on the document and on all copies in a manner that will not interfere with the legibility of the document. As used in this Order, "copies" includes electronic images, duplicates, extracts, summaries, descriptions, or data exports that contain or reveal Designated Material. The applicable marking shall be applied prior to or at the time the documents are produced or disclosed.

(i) For digital files being produced, the producing party may mark each viewable page or image with the appropriate designation and mark the medium, container, load file, metadata field, and/or

communication in which the digital files were contained. If original documents, source code, databases, or other materials are produced for inspection, such materials shall be presumed "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" during the inspection unless the producing party identifies them as AEO Information before or during the inspection, and shall be re-designated as appropriate during the copying or production process.

(ii) Where electronic files and documents are produced in native electronic format, such electronic files and documents shall be designated for protection under this Order by appending to the file names or designator information indicating whether the file contains "CONFIDENTIAL" or "AEO" material, by using a confidentiality metadata field, by identifying the designation in a production cover letter, or by any other reasonable method for so designating Designated Material produced in electronic format.

(b) **Third Parties.** Third parties producing documents in the course of this action may also designate documents as Confidential Information or AEO Information subject to the same protections, obligations, and constraints as the parties to the action. A copy of this Protective Order shall be served along with any subpoena or document request served on third parties in connection with this action. All documents produced by any subpoenaed third parties shall be treated as Confidential for a period of fourteen (14) business days from the date of their receipt, and during that period any party or the third party may designate such documents as Confidential Information or AEO Information pursuant to the terms of this Protective Order.

(c) Applying the marking “CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER” or “HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY” to a document does not mean that the document has any status or protection by statute or otherwise except to the extent and for the purposes of this Order. Any copies that are made of any documents marked with either designation shall also be so marked, except that indices, electronic databases, or lists of documents that do not contain substantial portions or images of the text of marked documents and do not otherwise disclose the substance of the Designated Material are not required to be marked.

(d) The designation of a document as Confidential Information or AEO Information is a certification by an attorney or a party appearing *pro se* that the document contains Designated Material as defined in this Order.[1]

4. **Depositions.**

(a) Unless all parties agree on the record at the time the deposition testimony is taken, all deposition testimony taken in this case shall be treated as Confidential Information, but not AEO Information, until the expiration of the following period: No later than the twenty-first day after the final transcript is delivered to any party or the witness. Within this time period, a party may serve a Notice of Designation to all parties of record as to specific portions of the testimony that are designated Confidential Information or AEO Information, and thereafter only those portions identified in the Notice of Designation shall be protected by the terms of this Order.

[1] An attorney who reviews the documents and designates them as CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER or HIGHLY CONFIDENTIAL – ATTORNEYS’ EYES ONLY must be admitted to the Bar of at least one state but need not be admitted to practice in the Northern District of Illinois unless the lawyer is appearing generally in the case on behalf of a party. By designating documents as Confidential Information or AEO Information pursuant to this Order, counsel submits to the jurisdiction and sanctions of this Court on the subject matter of the designation.

If testimony concerning AEO Information is elicited or expected to be elicited, counsel may request that persons not authorized to receive AEO Information under this Order leave the deposition room or remote deposition session for that portion of the testimony. The failure to serve a timely Notice of Designation shall waive any designation of testimony taken in that deposition as Confidential Information or AEO Information, unless otherwise ordered by the Court, but shall not otherwise waive any designations as to documents including Designated Material used or discussed in the course of that testimony.

(b) Any Designated Material that is used in the taking of a deposition shall remain subject to the provisions of this Order, along with the transcript pages of the deposition testimony dealing with such Designated Material designated in accordance with this paragraph, and such use shall not in any way affect the Designated Material's designation. In such cases the court reporter shall be informed of this Order and shall be required to operate in a manner consistent with this Order.

(c) In the event the deposition is videotaped, the original and all copies of the videotape shall be marked by the video technician to indicate that the contents of the videotape are subject to this Protective Order, substantially along the lines of "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," as appropriate. The use of a document as an exhibit at a deposition shall not in any way affect its designation as Confidential Information or AEO Information.

(d) Any challenges to a confidentiality or AEO designation shall be resolved in accordance with Section 9, below.

5. **Protection of Designated Material.**

(a) **General Protections.** Designated Material shall not be used or disclosed by the parties, counsel for the parties, or any other persons identified in this Section for any purpose whatsoever other than in this litigation, including any appeal thereof. Confidential Information may be disclosed only to the named plaintiff(s) and not to any other member of the putative class unless and until a class including the putative member has been certified. AEO Information shall not be disclosed to any party, party employee, named plaintiff, putative class member, or in-house counsel except as expressly provided in subparagraph 5(c), by written consent of the producing party, or by order of the Court.

(b) **Disclosure of Confidential Information.** The parties and counsel for the parties shall not disclose or permit the disclosure of any Confidential Information to any third person or entity except as set forth in subparagraphs (i)–(xi). Subject to these requirements, the following categories of persons may be allowed to review Confidential Information:

(i) **Counsel.** Counsel for the parties and employees of counsel who have responsibility for the action;

(ii) **Parties.** Individual parties and employees of a party but only to the extent counsel determines in good faith that the employee's assistance is reasonably necessary to the conduct of the litigation in which the information is disclosed;

(iii) **The Court and its personnel**;

(iv) **Court Reporters and Recorders.** Court reporters and recorders engaged for depositions;

(v) **Contractors.** Those persons specifically engaged for the limited purpose of making copies of documents or organizing or processing documents, including outside vendors hired to process electronically stored documents;

(vi) **Consultants and Experts.** Consultants, investigators, or experts employed by the parties or counsel for the parties to assist in the preparation and trial of this action but only after such persons have completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound;

(vii) **Witnesses at Depositions.** During their depositions, and in preparation therefor, witnesses in this action to whom disclosure is reasonably necessary. Witnesses shall not retain a copy of documents containing Confidential Information, except witnesses may receive a copy of all exhibits marked at their depositions in connection with review of the transcripts. Pages of transcribed deposition testimony or exhibits to depositions that are designated as Confidential Information pursuant to the process set out in this Order must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Order.

(viii) **Author or recipient.** The author or recipient of the document (not including a person who received the document in the course of litigation);

(ix) **Mock jurors.** Mock jurors who have completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound;

(x) **Mediators.** Any mediator, arbitrator, or other dispute-resolution neutral who is assigned to hear this matter, and his or her staff, but only after such persons have completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound; and

(xi) **Others by Consent.** Other persons only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(c) **Disclosure of AEO Information.** Unless otherwise agreed in writing by the producing party or ordered by the Court, AEO Information may be disclosed only to:

(i) **Outside Counsel.** Outside counsel of record in this action and employees of such outside counsel who have responsibility for this action;

(ii) T**he Court and its personnel**;

(iii) **Court Reporters and Recorders.** Court reporters, videographers, and recorders engaged for depositions or hearings;

(iv) **Contractors.** Those persons specifically engaged by outside counsel for the limited purpose of copying, imaging, hosting, organizing, processing, reviewing, or producing documents or electronically stored information in this action;

(v) **Consultants and Experts.** Consultants, investigators, or experts retained by outside counsel to assist in the preparation or trial of this action, but only after such persons have completed Attachment A and only if they are not current officers, directors, employees, consultants, or agents of any party or of any direct competitor of the producing party and will not use the AEO Information for any business, competitive, product-development, underwriting, pricing, claims, fraud, risk-modeling, security, or other purpose outside this litigation;

(vi) **Author or recipient.** The author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information;

(vii) **Mediators.** Any mediator, arbitrator, or other dispute-resolution neutral who is assigned to hear this matter, and his or her staff, but only after such persons have completed the certification contained in Attachment A, Acknowledgment of Understanding and Agreement to Be Bound;

(viii) **Named Plaintiffs.** The Named Plaintiff(s) but only to the extent (i) the material designated “HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY” expressly names or references that Plaintiff or that Plaintiff’s information or data, and (ii) the Plaintiff views only his or her information or data, and not information or data concerning any other individual. To the extent material

designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" does not expressly name or reference the Named Plaintiff, then the designated material may be discussed with the Named Plaintiff but not shown to the Named Plaintiff;

(ix) **Others by Consent.** Any other person only by written consent of the producing party or upon order of the Court and on such conditions as may be agreed or ordered.

(x) In addition, a party may disclose arguments and materials derived (but not directly quoted or excerpted) from Designated Material designated as "HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY" to mock jurors who have agreed to be bound by the provisions of the Confidentiality Order by signing a copy of Attachment A.

(d) **Additional Safeguards for AEO Technical and Data Materials.** A receiving party shall store AEO Information using reasonable administrative, technical, and physical safeguards, including access limited to persons authorized under this Order, encryption of electronic data in transit and at rest where reasonably available, and multifactor authentication for litigation-review platforms where reasonably available. AEO Information shall not be stored on personal devices or consumer file-sharing services except as reasonably necessary for this litigation and subject to safeguards at least as protective as those used for the receiving party's own confidential information.

(e) **Restrictions on the Use of Artificial Intelligence.** The parties agree that a receiving party may use artificial intelligence software and services (together, an "AI Model") to

aid in the processing, review, and analysis of Designated Material in this litigation, provided however that any such AI Model must protect the confidentiality of the information as required by this Confidentiality Order. The parties expressly agree that no receiving party will submit any Designated Material received pursuant to this Confidentiality Order to an AI Model that is open or available to the public, including ChatGPT and similar tools. The parties further expressly agree that no receiving party will submit any Designated Material received pursuant to this Confidentiality Order to any proprietary or closed AI Model unless it first ensures that the AI tool will not retain, learn from, be trained on, or otherwise incorporate the Designated Material for any purpose other than the prosecution or defense of this litigation. The parties further agree that a receiving party may not co-mingle any Designated Material with materials from any other litigation or matter. Before a receiving party submits Designated Material received pursuant to this Confidentiality Order to an AI Model in compliance with this paragraph, the receiving party shall make certain that such Designated Material will not be accessible to unauthorized persons and that the material can be deleted from the AI Model in accordance with paragraph 14(b) of this Confidentiality Order. For the avoidance of doubt, these restrictions apply to the categories of persons set forth in Sections 5(b) and 5(c).

(f) **Source Code.** Source code, executable code, model artifacts, and data schemas designated as AEO Information shall be inspected, produced, or hosted in a reasonably secure manner agreed by the parties or ordered by the Court.

(g) **Control of Documents.** Counsel for the parties shall make reasonable efforts to prevent unauthorized or inadvertent disclosure of Designated Material. Counsel shall maintain the originals of the forms signed by persons acknowledging their obligations under this Order for a period of three years after the termination of the case.

(h) **Inadvertent Disclosure Not Authorized by Order.** In the event of a disclosure of any Designated Material to any person not authorized to receive it under this Order, the party responsible for having made such disclosure, and each party with knowledge thereof, shall immediately notify counsel for the party or non-party whose Designated Material has been disclosed and provide to such counsel all known relevant information concerning the nature and circumstances of the disclosure. The party responsible for the inadvertent disclosure shall also promptly take all reasonable measures to retrieve the improperly disclosed Designated Material and to ensure that no further or greater unauthorized disclosure and/or use thereof is made. Any inadvertent or unauthorized disclosure shall not, by itself, waive any confidentiality or AEO designation.

6. **Inadvertent Failure to Designate.** An inadvertent failure to designate a document as Confidential Information or AEO Information does not, standing alone, waive the right to so designate the document; provided, however, that a failure to serve a timely Notice of Designation of deposition testimony as required by this Order, even if inadvertent, waives any protection for deposition testimony. If a party designates a document as Confidential Information or AEO Information after it was initially produced, the receiving party, on notification of the designation, must make a reasonable effort to assure that the document is treated in accordance with the provisions of this Order. No party shall be found to have violated this Order for failing to maintain the confidentiality of material during a time when that material has not been designated as Designated Material, even where the failure to so designate was inadvertent and where the material is subsequently designated as Designated Material.

7. **Filing of Designated Material.** This Order does not, by itself, authorize the filing of any document under seal. Any party wishing to file a document designated as Confidential

Information or AEO Information in connection with a motion, brief, or other submission to the Court must comply with L.R. 26.2.

8. **No Greater Protection of Specific Documents.** Except on privilege grounds not addressed by this Order, no party may withhold information from discovery on the ground that it requires protection greater than that afforded by this Order unless the party moves for an order providing such special protection.

9. **Challenges by a Party to Designation as Confidential Information or AEO Information.** The designation of any material or document as Confidential Information or AEO Information is subject to challenge by any party. The following procedure shall apply to any such challenge.

(a) **Meet and Confer.** A party challenging the designation of Confidential Information or AEO Information must do so in good faith and must begin the process by conferring directly with counsel for the designating party. In conferring, the challenging party must identify the challenged material, explain the basis for its belief that the designation was not proper, and give the designating party an opportunity to review the designated material, reconsider the designation, and, if no change in designation is offered, explain the basis for the designation. The designating party must respond to the challenge within five (5) business days.

(b) **Judicial Intervention.** If the parties cannot resolve a challenge without court intervention, the challenging party shall seek relief from the Court in accordance with Local Rule 37.2, Local Rule 5.3, Judge Daniel's case procedures, and any other applicable order or referral in this action within

Case 1:25-cv-04399-OTW Document #: 2 Filed: 06/16/25 Page 253 of 263 PageID: 2957

21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier. Any such request for relief must include or be accompanied by a certification or declaration, as required by the applicable rules or procedures, that the movant has complied with the meet and confer requirements of this procedure. Failure by the challenging party to seek such relief within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality challenge for each challenged designation. The burden of persuasion in any such challenge proceeding shall be on the designating party. Until the Court rules on the challenge, all parties shall continue to treat the materials as Confidential Information or AEO Information, as designated, under the terms of this Order.

10. **Action by the Court.** Applications to the Court for an order relating to materials or documents designated Confidential Information or AEO Information shall be made in accordance with the applicable Local Rules, Judge Daniel's case procedures, and any other applicable order or referral in this action. Nothing in this Order or any action or agreement of a party under this Order limits the Court's power to make orders concerning the disclosure of documents produced in discovery or at trial.

11. **Use of Designated Material at Trial.** Nothing in this Order shall be construed to affect the use of any document, material, or information at any trial or hearing. A party that intends to present or that anticipates that another party may present Designated Material at a hearing or trial shall bring that issue to the Court's and the parties' attention by motion or in a pretrial

memorandum without disclosing the Designated Material. The Court may thereafter make such orders as are necessary to govern the use of such documents or information at trial.

12. **Designated Material Subpoenaed or Ordered Produced in Other Litigation.**

(a) If a receiving party is served with a subpoena or an order issued in other litigation that would compel disclosure of any material or document designated in this action as Confidential Information or AEO Information, the receiving party must so notify the designating party, in writing, immediately and in no event more than three (3) court days after receiving the subpoena or order. Such notification must include a copy of the subpoena or court order.

(b) The receiving party also must immediately inform in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is the subject of this Order. In addition, the receiving party must deliver a copy of this Order promptly to the party in the other action that caused the subpoena to issue.

(c) The purpose of imposing these duties is to alert the interested persons to the existence of this Order and to afford the designating party in this case an opportunity to try to protect its Designated Material in the court from which the subpoena or order issued. The designating party shall bear the burden and the expense of seeking protection in that court of its Designated Material, and nothing in these provisions should be construed as authorizing or encouraging a receiving party in this action to disobey a lawful directive from another court. The obligations set forth in this paragraph remain in effect while the party has in its possession, custody, or control Designated Material produced or designated by the other party to this case.

13. **Challenges by Members of the Public to Sealing Orders.** A party or interested member of the public has a right to challenge the sealing of particular documents that have been

filed under seal, and the party asserting confidentiality will have the burden of demonstrating the propriety of filing under seal.

14. **Obligations on Conclusion of Litigation.**

(a) **Order Continues in Force.** Unless otherwise agreed or ordered, this Order shall remain in force after dismissal or entry of final judgment not subject to further appeal.

(b) **Obligations at Conclusion of Litigation.** Within sixty-three (63) days after dismissal or entry of final judgment not subject to further appeal, all Designated Material and documents marked "CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER" or "HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY" under this Order, including copies as defined in ¶ 3(a), shall be returned to the producing party unless: (1) the document has been offered into evidence or filed without restriction as to disclosure; (2) the parties agree to destruction to the extent practicable in lieu of return; or (3) as to documents bearing the notations, summations, or other mental impressions of the receiving party, that party elects to destroy the documents and certifies to the producing party that it has done so. The receiving party also shall destroy documents containing Designated Material and certify the fact of destruction, but shall not be required to locate, isolate, and return e-mails (including attachments to e-mails) that may include Designated Material, or Designated Material contained in deposition transcripts or drafts or final expert reports.

(c) **Retention of Work Product and One Set of Filed Documents.** Notwithstanding the above requirements to return or destroy documents, counsel may retain (1) attorney work product, including an index that refers or relates to Designated Material so long as that work product does not duplicate verbatim substantial portions of Designated Material, and (2) one complete set of all documents filed with the Court including those filed under seal. Any

retained Designated Material shall continue to be protected under this Order. An attorney may use his or her work product in subsequent litigation, provided that its use does not disclose or use Designated Material.

(d) **Deletion of Documents filed under Seal from Electronic Case Filing (ECF) System.** Filings under seal shall be deleted from the ECF system only upon order of the Court.

15. **Order Subject to Modification.** This Order shall be subject to modification by the Court on its own initiative or on motion of a party or any other person with standing concerning the subject matter.

16. **No Prior Judicial Determination.** This Order is entered based on the representations and agreements of the parties and for the purpose of facilitating discovery. Nothing herein shall be construed or presented as a judicial determination that any document or material designated as Confidential Information or AEO Information by counsel or the parties is entitled to protection under Rule 26(c) of the Federal Rules of Civil Procedure or otherwise until such time as the Court may rule on a specific document or issue.

17. **No Privilege Waiver.** Nothing herein shall be deemed to waive any applicable privilege or work product protection, or to affect the ability of a party to seek relief for an inadvertent disclosure of material protected by an applicable privilege or work product protection.

18. **Persons Bound.** This Order shall take effect when entered and shall be binding upon all counsel of record and their law firms, the parties, and persons made subject to this Order by its terms.

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

Dated: August 5, 2026

Respectfully submitted,

/s/ Robert A. Clifford
Robert A. Clifford
*rac@cliffordlaw.com*
**CLIFFORD LAW OFFICES, P.C.**
120 North LaSalle Street, 36th Floor
Chicago, Illinois 60602
Tel.: (312) 899-9090

*Liaison Counsel*

/s/ Gary M. Klinger
Gary M. Klinger
*gklinger@milberg.com*
**MILBERG, PLLC**
227 W. Monroe Street, Suite 2100
Chicago, Illinois 60606
Tel.: (866) 252-0878

/s/ John A. Yanchunis
John A. Yanchunis
*jyanchunis@forthepeople.com*
**MORGAN & MORGAN COMPLEXLITIGATION GROUP**
201 N. Franklin Street, 7th Floor
Tampa, Florida 33602
Tel.: (813) 223-5505

*Interim Co-Lead Counsel*

/s/ Tina Wolfson
Tina Wolfson
*twolfson@ahdootwolfson.com*
**AHDOOT & WOLFSON PC**
2600 W. Olive Avenue, Suite 500
Burbank, California 91505
Tel.: (310) 474-9111

/s/ Lesley E. Weaver
Lesley E. Weaver (SBN 191305)
*lweaver@bfalaw.com*
**STRANCH, JENNINGS & GARVEY, PLLC**
1111 Broadway, Suite 300
Oakland, California 946107
Tel.: (341) 217-0550

/s/ Sabita J. Soneji
Sabita J. Soneji
*ssoneji@tzlegal.com*
**TYCKO & ZAVAREEI LLP**
1970 Broadway, Suite 1070
Oakland, California 94612
Tel.: (510) 254-6808

/s/ Daniel O. Herrera
Daniel O. Herrera
*dherrera@caffertyclobes.com*
**CAFFERTY CLOBES MERIWETHER & SPRENGEL LLP**
135 S. LaSalle, Suite 3210
Chicago, Illinois 60603
Tel.: (312) 782-4880

/s/ Julian C. Diamond
Julian C. Diamond
*jdiamond@bursor.com*

/s/ Rebecca Solomon
Rebecca Solomon

**BURSOR &FISHER PA**
1330 Avenue of the Americas, 32nd Floor
New York, New York 10019
Tel.: (646) 837-7150

*rsolomon@tousley.com*
**TOUSLEY BRAIN STEPHENS PLLC**
1200 5th Avenue, Suite 1700
Seattle, Washington 98101
Tel.: (206) 667-0249

*/s/ Thomas E. Loeser*
Thomas E. Loeser
*tloeser@cpmlegal.com*
**COTCHETT,PITRE &MCCARTHY LLP**
1809 7th Avenue, Suite 1610
Seattle, Washington 98101
Tel.: (206) 970-8181

*/s/ Adam E. Polk*
Adam E. Polk
*apolk@girardsharp.com*
**GIRARD SHARP LLP**
601 California Street, Suite 1400
San Francisco, CA 94108
Tel.: (415) 981-4800

*/s/ Adele Daniel*
Adele Daniel
*adaniel@kellerrohrback.com*
**KELLER ROHRBACK L.L.P.**
1201 Third Avenue, Suite 3400
Seattle, Washington 98101
Tel.: (206) 623-1900

*/s/ Jeff Ostrow*
Jeff Ostrow
*ostrow@kolawyers.com*
**KOPELOWITZ OSTROW P.A.**
One West Las Olas Boulevard, Suite 500
Fort Lauderdale, Florida 33301
Tel: (954) 332-4200

*/s/ Charles E. Schaffer*
Charles E. Schaffer
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Tel: (215) 592-1500
*cschaffer@lfsblaw.com*

*Plaintiffs' Executive Committee*

*/s/ David A. Gordon*
David A. Gordon
Lawrence P. Fogel
Liamarie M. Quinde
**SIDLEY AUSTIN LLP**
One South Dearborn
Chicago, IL 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
dgordon@sidley.com

Ian M. Ross
**SIDLEY AUSTIN LLP**
830 Brickell Plaza

Miami, FL 33131
Telephone: (305) 391-5100
Facsimile: (305) 391-5101

*Counsel for Defendants*

**FOR GOOD CAUSE SHOWN, IT IS SO ORDERED.**

DATED: 8/5/2026

Hon. Jeremy C. Daniel
United States District Judge

**ATTACHMENT A**

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| **IN RE: ALLSTATE & ARITY CONSUMER PRIVACY LITIGATION** | Master Docket No. 1:25-cv-00407<br><br>Hon. Jeremy C. Daniel<br><br>Hon. Daniel P. McLaughlin |

**ACKNOWLEDGMENT**
**AND**
**AGREEMENT TO BE BOUND**

The undersigned hereby acknowledges that he/she has read the Confidentiality Order dated in the above-captioned action and attached hereto, understands the terms thereof, and agrees to be bound by its terms. The undersigned submits to the jurisdiction of the United States District Court for the Northern District of Illinois in matters relating to the Confidentiality Order and understands that the terms of the Confidentiality Order obligate him/her to use materials designated as Confidential Information in accordance with the Order solely for the purposes of the above-captioned action, and not to disclose any such Confidential Information to any other person, firm, or concern.

The undersigned acknowledges that violation of the Confidentiality Order may result in penalties for contempt of court.

Name: ______________________________

Job Title: ______________________________

Employer: ______________________________

Business Address: ______________________________

______________________________

______________________________

Date: ______________________ Signature: ______________________________

# EXHIBIT 3

459468

Law Firm Ref#: ALLSTATE & ARITY CONSUMER PRIVACY

**UNITED STATES DISTRICT COURT**
**for the**
**Northern District of Illinois**

**In re: Allstate & Arity Consumer Privacy Litigation,**

Case No.: 25-cv-00407

**AFFIDAVIT OF SPECIAL PROCESS SERVER**

Plaintiff(s)
vs.

Defendant(s)

I, Sharon McCabe Villa, being first duly sworn on oath, deposes and states the following:

I am over the age of 18 and not a party of this action. I am an agent of It's Your Serve, Inc, Illinois Department of Financial and Professional Regulation number 117.000885. I attempted service of the within **Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action; Agreed Confidentiality Order to Citizens United Reciprocal Exchange (CURE) c/o Christopher Lowe, located at 214 Carnegie Center, Suite 101, Princeton, NJ 08540** resulting in the following:

☐ **PERSONAL SERVICE:** By leaving a copy of the process with Citizens United Reciprocal Exchange (CURE) c/o Christopher Lowe personally on
the ____ day of ______________, 20____ at ________M.

☒ **AUTHORIZED SERVICE:** By leaving a copy of the process with:
Name: Natalie Vasquez, Title: Authorized Agent, an individual of the company willing and able to accept on behalf of the entity/respondent/witness on
the 18 day of Sept., 2026 at 2:59P.M.

☐ **SUBSTITUTE SERVICE:** By leaving a copy of the process at the above address which is Citizens United Reciprocal Exchange (CURE) c/o Christopher Lowe's usual place of abode with:
Name: ______________, Relationship: ______________, a person of his/her family, or other person residing there, over the age of 13 years who was informed of the contents of the listed documents on
the ____ day of ______________, 20____ at ________M.
After substitute service, I mailed a copy of the listed documents via regular mail to the subject on
the ____ day of ______________, 20____.

A description of person with whom the documents were left is as follows:

**Sex:** F **Race:** Hispanic **Age:** 30
**Height:** 5'4" **Weight:** 150 **Hair:** Brown
**Noticeable features/Notes:** ______________

The undersigned verifies that the statements set forth in this Affidavit of Service are true and correct.

Signed and sworn before me on this 22 day of Sept., 2026

[signature]
Notary Public

ALEXANDRA N TRUJILLO
My Commission Expires 06-08-2028
NOTARY PUBLIC
Comm. # 50210822
STATE OF NEW JERSEY

[signature]
(Server Signature)

Sharon McCabe Villa
(Print Name)

9/22/26
(Date)

SAAFF/459468